UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| IN RE QUIDELORTHO CORPORATION SECURITIES LITIGATION | No. 1:24-cv-02804-JAV <br><br> **<u>ORAL ARGUMENT REQUESTED</u>** |

## <u>MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'</u> <u>MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT</u>

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
Telephone: 212.351.4000
Facsimile: 212.351.4035

*Attorneys for Defendants*

**TABLE OF CONTENTS**

**Page(s)**

PRELIMINARY STATEMENT --------------------------------------------------------------------------------- 1

FACTUAL BACKGROUND ----------------------------------------------------------------------------------- 3

    I.     Quidel Supports the Global Response to the COVID-19 Pandemic ------------------------- 3

    II.    Quidel Combines With Ortho to Create a Leading International Diagnostics Company -- 4

    III.   Quidel Launches Savanna RVP4 in Europe ------------------------------------------------- 4

    IV.   QuidelOrtho Refines Its Financial and Operational Forecasts Over Time --------------- 5

        A.   Quidel Warns of Declining COVID-19 Revenue and Announces RVP4 FDA
Submissions -------------------------------------------------------------------------------------------------- 5

        B.   QuidelOrtho Projects 2023 COVID-19 Revenue of \$150-\$200 Million and Revises the
U.S. Launch Timeline for Savanna ----------------------------------------------------------------------- 6

        C.   QuidelOrtho Increases Its 2023 COVID-19 Revenue Projection to \$300-\$500 Million 7

        D.   QuidelOrtho Decreases Its COVID-19 Revenue Projection to \$300-\$400 Million ------ 7

        E.   QuidelOrtho Announces 2023 Results and Revises 2024 COVID-19 Guidance and
Announces 510(k) Clearance for Savanna ----------------------------------------------------------- 8

    V.    QuidelOrtho Withdraws Its 510(k) Application for the Savanna RVP4 Assay -------------- 8

    VI.   Procedural History ----------------------------------------------------------------------------- 9

LEGAL STANDARD ----------------------------------------------------------------------------------------- 9

ARGUMENT --------------------------------------------------------------------------------------------------- 10

    I.     Plaintiff Fails to Adequately Plead an Actionable Misstatement or Omission. ------------ 10

        A.   Most of the Challenged Statements Are Protected Forward-Looking Statements ----- 10

          *i. The Safe Harbor Protects Forward-Looking Statements About Future Plans,
Financial Projections, and Assumptions Underlying Projections* -------------------------- 11

          *ii. Defendants Identified the Forward-Looking Statements and Provided Meaningful
Cautionary Language* -------------------------------------------------------------------------------- 13

          *iii. Plaintiff Fails to Plead That Any Speaker Actually Knew Any Forward-Looking
Statement Was False* -------------------------------------------------------------------------------- 15

        B.   Many of the Challenged Statements Also Are Inactionable Puffery -------------------- 15

        C.   The Challenged Statements Were Not False When Made ------------------------------- 17

    II.    Plaintiff Fails to Plead Adequately That Defendants Acted With Scienter---------------- 24

        A.   Plaintiff Fails to Plead Facts Evidencing Conscious or Severely Reckless Behavior by
Any Individual Defendant ---------------------------------------------------------------------------- 24

          *i. Plaintiff's Former Employee Allegations Do Not Establish Scienter* ------------------- 25

**TABLE OF CONTENTS**

**(continued)**

**Page(s)**

*ii. Plaintiff Pleads No Particularized Facts Supporting Any Inference of Scienter as to Any Individual Defendant* ------------------------------------------------------------------- 29

*iii. Plaintiff's "Core Operations" Allegations Do Not Support Scienter* ------------------ 31

*iv. The Departures of Messrs. Bryant, Bujarski, and Iskra Do Not Support Scienter* ---- 32

*v. The Most Plausible Inference Is That Defendants Acted in Good Faith* ---------------- 33

III.    Plaintiff Fails to Plead Scheme Liability -------------------------------------------------- 34

IV.    Plaintiff's Section 20(a) Claims Must Be Dismissed ------------------------------------- 35

CONCLUSION ----------------------------------------------------------------------------------------- 35

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*In re Aceto Corp. Sec. Litig.*,
2019 WL 3606745 (E.D.N.Y. Aug. 6, 2019) ..................................................................19

*In re Adient plc Sec. Litig.*,
2020 WL 1644018 (S.D.N.Y. Apr. 2, 2020) ..................................................................30

*In re Aegean Marine Petro. Network, Inc. Sec. Litig.*,
529 F. Supp. 3d 111 (S.D.N.Y. 2021)...........................................................................31

*In re Aratana Therapeutics Inc. Sec. Litig.*,
315 F. Supp. 3d 737 (S.D.N.Y. 2018)..................................................................... 13, 16

*Arkansas Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*,
28 F.4th 343 (2d Cir. 2022)..........................................................................................25

*In re AstraZeneca plc Sec. Litig.*,
2022 WL 4133258 (S.D.N.Y. Sept. 12, 2022) ..............................................................35

*Bajjuri v. Raytheon Techs. Corp.*,
641 F. Supp. 3d 735 (D. Ariz. 2022) ............................................................................33

*In re Barrick Gold Corp. Sec. Litig.*,
341 F. Supp. 3d 358 (S.D.N.Y. 2018)................................................................ 10, 29, 30

*Born v. Quad/Graphics, Inc.*,
521 F. Supp. 3d 469 (S.D.N.Y. 2021)..................................................................... 17, 21

*Chapman v. Mueller Water Prods. Inc.*,
466 F. Supp. 3d 382 (S.D.N.Y. 2020).........................................................................26

*In re Chembio Diagnostics, Inc. Sec. Litig.*,
616 F. Supp. 3d 192 (E.D.N.Y. 2022) .........................................................................29

*City of N. Miami Beach Police Officers' and Firefighters' Ret. Plan v. Nat'l Gen.
Holdings Corp.*,
2021 WL 212337 (S.D.N.Y. Jan. 21, 2021)..................................................................32

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
752 F.3d 173 (2d Cir. 2014)...........................................................................................3

*In re Doral Fin. Corp. Sec. Litig.*,
563 F. Supp. 2d 461 (S.D.N.Y. 2008)..........................................................................27

*In re DraftKings Inc. Sec. Litig.*,
650 F. Supp. 3d 120 (S.D.N.Y. 2023)..........................................................................25

*In re Dynagas LNG Partners LP Sec. Litig.*,
504 F. Supp. 3d 289 (S.D.N.Y. 2020)..........................................................................14

# TABLE OF AUTHORITIES

## (continued)

**Page(s)**

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009) ................................................................... 24, 30

*Eden Alpha CI LLP v. Polished.com Inc.*,
  -- F. Supp. 3d --, 2025 WL 296998 (E.D.N.Y. Jan. 24, 2025) ...................................... 26, 28

*In re Express Scripts Holding Co. Sec. Litig.*,
  2017 WL 3278930 (S.D.N.Y Aug. 1, 2017) ............................................................ 31

*Francisco v. Abengoa, S.A.*,
  559 F. Supp. 3d 286 (S.D.N.Y. 2021) .................................................................. 32

*Gillis v. QRX Pharma Ltd.*,
  197 F. Supp. 3d 557 (S.D.N.Y. 2016) ................................................................. 16, 32

*Gray v. Wesco Aircraft Holdings, Inc.*,
  454 F. Supp. 3d 366 (S.D.N.Y. 2020) ................................................................. 12, 15

*Gregory v. ProNAi Therapeutics Inc.*,
  297 F. Supp. 3d 372 (S.D.N.Y. 2018) .................................................................. 26

*Hawes v. Argo Blockchain plc*,
  2024 WL 4451967 (S.D.N.Y. Oct. 9, 2024) ............................................................ 16

*Inter-Local Pension Fund GCC/IBT v. Gen. Elec. Co.*,
  445 F. App'x 368 (2d Cir. 2011) ...................................................................... 30

*Jackson v. Abernathy*,
  960 F.3d 94 (2d Cir. 2020) ........................................................................... 24

*Kalnit v. Eichler*,
  264 F.3d 131 (2d Cir. 2001) ......................................................................... 25, 34

*In re Lehman Bros. Sec. & ERISA Litig.*,
  2013 WL 3989066 (S.D.N.Y. July 31, 2013) ........................................................... 26

*Lentell v. Merrill Lynch & Co., Inc.*,
  396 F.3d 161 (2d Cir. 2005) .......................................................................... 35

*Leonard F. v. Israel Discount Bank of N.Y.*,
  199 F.3d 99 (2d Cir. 1999) ............................................................................ 3

*Long Miao v. Fanhua, Inc.*,
  442 F. Supp. 3d 774 (S.D.N.Y. 2020) .................................................................. 25

*In re Lottery.com, Inc. Sec. Litig.*,
  715 F. Supp. 3d 506 (S.D.N.Y. 2024) .................................................................. 15

*In re Lululemon Sec. Litig.*,
  14 F. Supp. 3d 553 (S.D.N.Y. 2014) ................................................................. 22, 23

**TABLE OF AUTHORITIES**

**(continued)**

**Page(s)**

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
    601 U.S. 257 (2024) ...................................................................................................18

*Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*,
    277 F. Supp. 3d 500 (S.D.N.Y. 2017)........................................................................35

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000).............................................................................. 19, 22

*Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*,
    300 F. Supp. 3d 551 (S.D.N.Y. 2018).......................................................................16

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015) ...................................................................................................11

*Pearlstein v. BlackBerry Ltd.*,
    93 F. Supp. 3d 233 (S.D.N.Y. 2025) .........................................................................16

*In re Phillip Morris Int'l Inc. Sec. Litig.*,
    89 F.4th 408 (2d Cir. 2023)..........................................................................................9

*In re Plug Power, Inc. Sec. Litig.*,
    2022 WL 4631892 (S.D.N.Y. Sept. 29, 2022) .........................................................31

*Robeco Cap. Growth Funds SICAV–Robeco Glob. Consumer Trends v. Peloton
Interactive, Inc.*,
    665 F. Supp. 3d 522 (S.D.N.Y. 2023)........................................................................11

*In re Sanofi Sec. Litig.*,
    87 F. Supp. 3d 510 (S.D.N.Y. 2015), *aff'd sub nom. Tongue v. Sanofi*, 816
    F.3d 199 (2d Cir. 2016) ................................................................... 12, 14, 29

*Schaeffer v. Nabriva Therapeutics plc*,
    2020 WL 7701463 (S.D.N.Y. Apr. 28, 2020) ...........................................................12

*SEC v. China Ne. Petroleum Holdings Ltd.*,
    27 F. Supp. 3d 379 (S.D.N.Y. 2014) .........................................................................34

*SEC v. GPL Ventures LLC*,
    2022 WL 158885 (S.D.N.Y. Jan. 18, 2022)..............................................................34

*SEC v. Kelly*,
    817 F. Supp. 2d 340 (S.D.N.Y. 2011)........................................................................35

*SEC v. Lee*,
    720 F. Supp. 2d 305 (S.D.N.Y. 2010)........................................................................34

*Slayton v. American Exp. Co.*,
    604 F.3d 758 (2d Cir. 2010)............................................................................... 13, 15

# TABLE OF AUTHORITIES

## (continued)

**Page(s)**

*In re Smith Barney Transfer Agent Litig.*,
    884 F. Supp. 2d 152 (S.D.N.Y. 2012)................................................................35

*Steamship Trade Ass'n of Balt.-Int'l Longshoreman's Ass'n Pension Fund v. Olo Inc.*,
    704 F. Supp. 3d 429 (S.D.N.Y. 2023).............................................................11

*Sun v. TAL Educ. Grp.*,
    2023 WL 6394413 (S.D.N.Y. Sept. 29, 2023) ................................................26

*In re Synchrony Fin. Sec. Litig.*,
    988 F.3d 157 (2021) ...........................................................................................9

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ....................................................................9, 10, 24, 33

*Villare v. Abiomed, Inc.*,
    2021 WL 4311749 (S.D.N.Y. Sept. 21, 2021) .......................................... 12, 30

*Woolgar v. Kingstone Cos.*,
    477 F. Supp. 3d 193 (S.D.N.Y. 2020)..............................................................32

## Statutes

15 U.S.C. § 78t(a) .......................................................................................................35

15 U.S.C. § 78u-4(b)(1)..............................................................................................10

15 U.S.C. § 78u-4(b)(2)......................................................................................... 10, 24

15 U.S.C. § 78u-5(i)(1) ..................................................................................... 10, 11, 13

15 U.S.C. § 78u-5(c) ..................................................................................................10

Defendants QuidelOrtho Corporation ("QuidelOrtho" or the "Company"), Douglas Bryant, Joesph Busky, Randall Steward, Robert J. Bujarski, Michael Iskra, and Tamara Ranalli (collectively, the "Individual Defendants" and together with QuidelOrtho, "Defendants") move to dismiss with prejudice for failure to state a claim the Amended Class Action Complaint ("Complaint") filed by Lead Plaintiff Central States, Southeast and Southwest Areas Health and Welfare Fund and Teamsters Local 710 Pension Fund (collectively, "Teamsters Fund" or "Plaintiff") pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. § 78u-4 et seq., and Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

During the COVID-19 pandemic, QuidelOrtho and its predecessor, Quidel Corporation, led the way in COVID-19 diagnostic testing. The Company's market-leading position drove substantial revenue and stock price growth, enabling QuidelOrtho to expand its global footprint and invest in new diagnostic platforms, including the Savanna platform. At the same time, QuidelOrtho warned investors that the COVID-19 pandemic was unpredictable and the Company's results would be impacted as the disease transitioned to an endemic state. And QuidelOrtho cautioned investors that its ability to achieve regulatory clearance of new technologies, including Savanna, depended on unpredictable outcomes of complex clinical studies.

Ultimately, some of the events QuidelOrtho warned about came to pass. As the COVID-19 pandemic wound down, the Company announced lower-than-expected COVID-19 revenue guidance for 2024. And after obtaining regulatory clearance for the Savanna device, QuidelOrtho determined to withdraw its FDA submission for the RVP4 test assay, after clinical studies did not generate the desired results.

According to Plaintiff, QuidelOrtho and the Individual Defendants deliberately misled

1

investors about the success and prospects of Savanna RVP4 and the Company's estimated future COVID-19 revenue.  But Plaintiff's nearly 200-page Complaint lacks any well-pleaded facts to support this ambitious theory of fraud and should be dismissed for two reasons.  First, Plaintiff fails to plead specific facts demonstrating that QuidelOrtho or the Individual Defendants lied to investors.  Plaintiff claims that virtually every statement made to the market about Savanna RVP4 and endemic COVID-19 revenue over a two-year period was false or misleading.  Absent from the Complaint, however, are any specific facts contradicting what QuidelOrtho said about RVP4 or the Company's predictions of COVID-19 revenue as the disease transitioned to an endemic state.  Plaintiff's generalized explanations of how the challenged statements were false or misleading and vague references to allegations in other sections of the Complaint do not satisfy the PSLRA's heightened pleading requirements.  Many of the challenged statements also are classic forward-looking statements protected under the PSLRA safe harbor, and others are puffery not actionable under the securities laws.

Second, the Complaint fails to plead facts showing that any Defendant acted with scienter when making any challenged statements.  The vast majority of "former employee" witnesses cited in the Complaint were low-level employees who are not even alleged to have ever interacted with the Individual Defendants, and most of the "facts" they purport to offer are completely untethered in time.  None of these unnamed witnesses offer facts contradicting the challenged statements, let alone facts showing that any Individual Defendant knew or was reckless in not knowing that his or her statements about Savanna RVP4 and endemic COVID-19 revenue were untrue.

At bottom, Plaintiff attacks with 20/20 hindsight QuidelOrtho's expectations for Savanna RVP4 and its estimates of future financial results.  But Plaintiff's allegations do not meet the high standard for pleading that, at the time of the challenged statements, Defendants knew, but failed

to disclose, that RVP4 would fail and the Company's financial projections were unachievable. Indeed, the most compelling inference drawn from Plaintiff's allegations is that Defendants did their best to bring a revolutionary product to market and forecast the Company's future financial performance in what QuidelOrtho transparently told investors was a "very, very challenging" environment.

The Complaint should be dismissed in full.

## FACTUAL BACKGROUND

### I.    Quidel Supports the Global Response to the COVID-19 Pandemic

Quidel Corporation ("Quidel") was a leading manufacturer and marketer of immunoassays and diagnostic solutions.   ¶ 68.[1]   In 2011, Quidel announced plans to develop a molecular diagnostics platform that would perform multiplex real-time polymerase chain reaction tests using the Savanna analyzer device ("Savanna") and test assay cartridges.   ¶ 79.   Quidel intended to develop several assays for Savanna, eventually including Respiratory Viral Panel-4 ("RVP4"), which would detect influenza A and B, COVID-19, and respiratory syncytial virus.   ¶ 80.

Throughout the COVID-19 pandemic, Quidel led the way in diagnostic testing.   ¶ 67.   By March 17, 2020, Quidel had received emergency use authorization ("EUA") for its Lyra SARS-CoV-2 Assay.   *Id.*   Quidel received EUAs for four additional COVID-19 tests by March 2021.   *Id.*

Quidel's leading position in the COVID-19 testing market helped propel its 2020 revenue

---

[1] Citations in the form of "¶ __" are to the Complaint (Dkt. No. 42).  Citations to "Ex. __" refer to the exhibits attached to the Declaration of Colin B. Davis, dated April 4, 2025.  The Court may consider documents incorporated by reference in the Complaint.  *See Leonard F. v. Israel Discount Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) ("In adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken.").  The Court also may consider "public disclosure documents required by law to be, and that have been, filed with the SEC[.]"  *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 179 (2d Cir. 2014).

to $1.661 billion—a 211% increase as compared to 2019—with COVID-19 testing products accounting for 70%. Ex. 1 at 35. This growth, in turn, delivered significant returns to Quidel's stockholders, with Quidel's stock price rising from $77.24 per share on February 28, 2020, Ex. 46, to $283.45 per share on November 6, 2020, ¶ 3. It also enabled Quidel to invest beyond COVID-19, including devoting resources to developing Savanna. *See* ¶¶ 5–6; Ex. 3 at 171–73.

## II. Quidel Combines With Ortho to Create a Leading International Diagnostics Company

In early 2021, Quidel sought combination partners to capitalize on its COVID-19-fueled growth and prepare itself for a sustainable future. ¶ 77; *see also* Ex. 3 at 223, 238–42. Quidel aspired not only to diversify its diagnostics portfolio, but also to "accelerate development of [its] global commercial footprint[.]" Ex. 3 at 238. Ortho Clinical Diagnostics plc ("Ortho"), another leading global provider of in vitro diagnostic solutions, offered this opportunity. ¶¶ 75–76. The combination of Quidel and Ortho, which closed on May 27, 2022, was anticipated to generate revenue synergies "estimated to be about $100 million by 2025," largely derived from the launch of Savanna. ¶¶ 36, 86. QuidelOrtho is now an international leader in diagnostic testing and technology. ¶¶ 67, 78.

## III. Quidel Launches Savanna RVP4 in Europe

Meanwhile, in late 2021 and early 2022, Quidel launched Savanna and the RVP4 assay in Austria, Germany, and Italy after obtaining a Conformité Europëenne Mark—a self-certifying declaration that a product complies with the European Union's requirements for sale. ¶¶ 10, 83. This small-scale launch of approximately 40 instruments was intended to help the Company understand how to improve Savanna and prepare for a larger U.S. launch. *See* ¶ 10; Ex. 2 ("We expect to deploy our first batch of instruments to select international customers and the performance data generated will support our longer-term commercialization efforts ….").

Following this initial rollout, the Company anticipated a full European launch in Q4 2022, and assay menu expansion in 2023. Ex. 15 at 4. In 2023, following improvement in year-over-year sales and positive performance in Europe, the Company shipped an additional 40–50 instruments to customers in France, Spain, Belgium, and Switzerland. Ex. 33 at 4; ¶ 10.

## IV. QuidelOrtho Refines Its Financial and Operational Forecasts Over Time

QuidelOrtho regularly updated the market on its financial results for the completed period and the expected future performance of its businesses. During quarterly earnings calls and in quarterly financial reports, the Company provided information regarding all its business segments. QuidelOrtho and the Individual Defendants emphasized the dynamic and unpredictable nature of the pandemic and the impact of that uncertainty on the Company's businesses. *See, e.g.*, Exs. 12 at 7 ("[I]t's very, very challenging to really identify a low watermark [for COVID-19] …."), 19 at 16 ("It is hard to forecast not only the intensity of the season, but the duration and that's one of the bigger variables, it's just so hard to predict[.]"), 27 at 7–8 ("Going forward, although there may be spikes and no one really knows for sure, we assume COVID-19 transitions to an endemic state[.]").

### A. Quidel Warns of Declining COVID-19 Revenue and Announces RVP4 FDA Submissions

On February 17, 2022—the first day of the putative class period—Quidel discussed its fourth quarter and full year 2021 financial results on an earnings call. Quidel CEO Mr. Bryant warned investors that Quidel was "seeing demand moderate in the professional and retail markets, commensurate with lower COVID-19 positive cases" as COVID-19 shifted to "an endemic phase." Ex. 7 at 3–4. Mr. Bryant also announced that he "expect[ed] 2020 to be a busy year for Savanna as we work toward EUA for RVP[4]," utilizing both "live" and "bank" samples. *Id*. at 4, 17. In the Company's Form 10-K filed later that month, Quidel warned investors that "there is no assurance our efforts to develop new technologies, products or markets will be successful" and

5

that "[r]egulatory review can be a lengthy, expensive, and uncertain process, making the timing and costs of clearances and approvals difficult to predict." Ex. 8 at 23, 33. Quidel further cautioned that the data needed for FDA clearance, including that required for Savanna and RVP4, required "complex" clinical studies that are "not guaranteed to generate data that demonstrate … substantial equivalence of the evaluated product." *Id*. at 33. Quidel made clear that "[f]ailure to obtain FDA clearance or approval would preclude commercialization in the U.S., which could materially and adversely affect our future results of operations." Ex. 28 at 40–41.

Mr. Busky explained during the next earnings call on May 4, 2022, that Quidel was not currently "forecasting at [sic] significant revenue contribution from our COVID-19 products in the back half of the year." Ex. 12 at 3. Mr. Bryant also announced that Quidel was focused "on getting the necessary approvals to launch Savanna in the U.S. later this year," including submitting an EUA for RVP4 the following week and a 510(k) application for RVP4 in July, *id*. at 3.[2] Quidel CFO Mr. Steward also addressed Quidel's increasing inventory of expiring products, which could impact future COVID-19 revenue. *Id*. at 9.

B. QuidelOrtho Projects 2023 COVID-19 Revenue of $150-$200 Million and Revises the U.S. Launch Timeline for Savanna

On QuidelOrtho's August 4, 2022 earnings call, the Company provided another update on its newly combined business as the impact of the pandemic—and the demand for COVID-19 testing products—began to decline. Mr. Busky projected that COVID-19 revenue for 2023 would "be in that $150-$200 million range annual for total revenue." Ex. 15 at 10. Mr. Bryant also announced that QuidelOrtho had "completed the Savanna EUA submission with RVP4 in May" and that it expected to make its 510(k) submission "this year." *Id*. at 4. Mr. Busky updated this

---

[2] To obtain 510(k) clearance, a manufacturer must demonstrate that the proposed device is "substantially equivalent" to another legally marketed device. ¶ 101 n.4; Ex. 3 at 191.

6

projection during the November 2, 2022 earnings call, explaining that "there are signs the expedited regulatory path for FDA [EUA] is changing and we now believe that the surest pathway to full availability of Savanna instrument panels is to include immediately 510(k) clearance and [CLIA] waiver." Ex. 19 at 4. As a result, the Company revised the timeline for its expected U.S. launch of the Savanna platform to 2023. *Id*. Investors understood management lacked clarity "around the timing of Savanna regulatory approval in the U.S." Ex. 23 at 1.

C.  QuidelOrtho Increases Its 2023 COVID-19 Revenue Projection to $300-$500 Million

On February 15, 2023, QuidelOrtho updated investors on its adjusted outlook, noting that "[g]ross profit margin for the quarter was 54.6% in-line with our expectations and down from prior year largely due to the decline in COVID related revenue." Ex. 27 at 7. Mr. Busky also announced revised 2023 COVID-19 revenue guidance of $300 to $500 million, including approximately $100 million in government contracts based on the Company's expectation that 2023 would "return to a more normal respiratory season" and that global supply chain disruptions would "further ease." *Id*. at 9, 12, 14. Mr. Busky reaffirmed this guidance on the next earnings call on May 3, 2023, in part due to QuidelOrtho having "overachieve[d] in Q1." Ex. 30 at 10, 15. He also announced that the Company was "pursuing parallel paths to EUA and [510(k)] clearance" for Savanna and that it was "progressing toward a late Q2 EUA submission with a follow-up [510(k)] shortly thereafter." *Id*. at 5. He affirmed that QuidelOrtho expected to launch Savanna in the U.S. ahead of "the Q4 respiratory season." *Id*. at 13.

D.  QuidelOrtho Decreases Its COVID-19 Revenue Projection to $300-$400 Million

On QuidelOrtho's August 8, 2023 earnings call, Mr. Busky disclosed "[r]espiratory revenue declines driven by a reduction in our retail business as expected following the end of the COVID-19 public health emergency," effective May 11, 2023, which "had a significant dampening effect on molecular COVID test volumes." Ex. 33 at 3. As a result, the Company

revised its full-year COVID-19 revenue guidance down to $300 million to $400 million.  *Id*. at 9.

QuidelOrtho reaffirmed 2023 guidance during the next earnings call on November 1, 2023. Ex. 35 at 10.  Mr. Bryant also disclosed "fairly high inventory levels," which he expected to decrease over the course of the respiratory season.  *Id*. at 12–13.  In the Q3 2023 earnings release filed that same day, QuidelOrtho stated that "[r]espiratory revenue decreased by 21% … primarily due to the anticipated decline in COVID-19 revenue."  Ex. 36 at 1.  Investors viewed QuidelOrtho's endemic COVID-19 forecast for 2023 as "spot on." Ex. 38 at 1.

   E.   QuidelOrtho Announces 2023 Results and Revises 2024 COVID-19 Guidance and
        Announces 510(k) Clearance for Savanna

On the final earnings call of the putative class period, held on February 13, 2024, Mr. Busky reported that "fourth quarter numbers fell short of our expectations as we overestimated the size of the endemic COVID-19 and flu season." Ex. 41 at 3; *see also id.* (noting that flu revenue "was down 29% versus the prior year").  The Company revised its COVID-19 guidance "to the low $200 million[s] for 2024," excluding new government contracts, to "more accurately reflect the current endemic environment." *Id*. at 7.  Mr. Busky also announced that QuidelOrtho had received FDA clearance for Savanna and expected to receive approvals for RVP4 in Q1 2024.  *Id*. at 4, 7.

**V.    QuidelOrtho Withdraws Its 510(k) Application for the Savanna RVP4 Assay**

On April 2, 2024, QuidelOrtho announced it had decided to withdraw its 510(k) application for RVP4 after the Company concluded that its most recent February 2024 dataset would not meet the clinical market's expectations.  ¶ 303; Ex. 44 at 2–3.  QuidelOrtho nonetheless continued to view Savanna as a competitive product and to invest in its next-generation respiratory and other panels.  *See, e.g.*, Ex. 45 at 3 ("[W]e expect to enter clinical trials on our respiratory panel later this year, and … our goal is to be in the market with both the respiratory panel and the [STD] panel in 2025.").

## VI.    Procedural History

On April 12, 2024, Plaintiff Bristol County Retirement System filed a complaint alleging that QuidelOrtho and Messrs. Bryant, Busky, and Steward made misrepresentations regarding sales of the Company's COVID-19 diagnostic tests and the 510(k) submission for its Savanna RVP4 assay.  Dkt. No. 1, ¶¶ 1, 4.  On December 16, 2024, the Court appointed Teamsters Fund as Lead Plaintiff.  Dkt. No. 34.  Teamsters Fund filed a nearly 200-page amended complaint on February 7, 2025, challenging *104* statements between February 17, 2022, and April 1, 2024, in QuidelOrtho's SEC filings and press releases, on earnings calls, and at industry conferences.  Dkt. No. 42.  Plaintiff also added Messrs. Bujarski and Iskra, and Ms. Ranalli as defendants.  ¶¶ 37–42. In the Complaint, Plaintiff challenges statements regarding: (1) the European launch of RVP4; (2) Savanna's readiness for a U.S. launch and FDA approval; (3) the Company's manufacturing capabilities and ability to manufacture the Savanna platform at a scale necessary to achieve its projected synergies; and (4) endemic COVID-19 revenue guidance.

## LEGAL STANDARD

To state a claim under Section 10(b) of the Securities Exchange Act of 1934, and Rule 10b-5, a plaintiff must plead "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *In re Phillip Morris Int'l Inc. Sec. Litig.*, 89 F.4th 408, 417 (2d Cir. 2023) (citation omitted).  Section 10(b) claims must comply with the "heightened pleading requirements imposed by Federal Rule 9(b)," which requires plaintiff to "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 166–67, 173 (2021) (citations omitted).  Additionally, plaintiffs must meet the

9

"[e]xacting pleading requirements" of the PSLRA, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007), which require plaintiffs to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed," 15 U.S.C. § 78u-4(b)(1); *see also Tellabs*, 551 U.S. at 321. Plaintiffs also must plead "with particularity facts giving rise to a strong inference that the defendant acted with" scienter. 15 U.S.C. § 78u-4(b)(2)(A).

**ARGUMENT**

Throughout the putative class period, QuidelOrtho received new information, updated its projections related to Savanna RVP4 and COVID-19 revenue accordingly, and promptly relayed those updates to investors through SEC filings, earnings calls, press releases, and investor presentations. Plaintiff claims that certain statements in those documents were materially false or misleading, and they allege—without particularized factual support—that the Individual Defendants made these statements knowing they would mislead investors. As explained below, Plaintiff's allegations fail to state claims under Section 10(b) or 20(a).

**I.    Plaintiff Fails to Adequately Plead an Actionable Misstatement or Omission.**

A.    Most of the Challenged Statements Are Protected Forward-Looking Statements

The PSLRA provides a safe harbor for forward-looking statements. 15 U.S.C. § 78u-5(c). A "forward-looking statement" is one that contains "a projection of revenues, income…, [or] earnings," "a statement of the plans and objectives of management for future operations," or "a statement of future economic performance." 15 U.S.C. § 78u-5(i)(1). Under the safe harbor, forward-looking statements are protected from liability if they are "identified and accompanied by meaningful cautionary language," or if "the plaintiff fails to prove that the forward-looking statement was made with actual knowledge that it was false or misleading." *In re Barrick Gold*

10

*Corp. Sec. Litig.*, 341 F. Supp. 3d 358, 375 (S.D.N.Y. 2018).

The challenged forward-looking statements satisfy both prongs. *See Robeco Cap. Growth Funds SICAV–Robeco Glob. Consumer Trends v. Peloton Interactive, Inc.*, 665 F. Supp. 3d 522, 538 (S.D.N.Y. 2023) ("Because the safe harbor is written in the disjunctive, a forward-looking statement is protected under the safe harbor if [either] of the [] prongs applies.").

### i. The Safe Harbor Protects Forward-Looking Statements About Future Plans, Financial Projections, and Assumptions Underlying Projections

Statements about QuidelOrtho's projections, the future performance of its business, and assumptions underlying those statements are forward-looking.[3]  15 U.S.C. § 78u-5(i)(1).

Plaintiff challenges dozens of statements "containing a projection of revenues" or about "future economic performance."[4]  15 U.S.C. § 78u-5(i)(1)(A), (C).  For example, Plaintiff challenges statements forecasting "[$]100 million in [] revenue synergies by 2025," ¶ 339(a), and projecting "between $200 million and $400 million" of COVID-19 testing revenue, ¶ 344(b). These financial estimates "are pure forward-looking projections … that plainly fall within the safe harbor." *Steamship Trade Ass'n of Balt.-Int'l Longshoreman's Ass'n Pension Fund v. Olo Inc.*, 704 F. Supp. 3d 429, 441 (S.D.N.Y. 2023).  Statements reaffirming these revenue projections, "which merely endorse or state the speaker's belief in a certain future outlook [also] satisfy the

---

[3] Many of these forward-looking statements and others are inactionable for the additional reason that they are opinion statements. *See, e.g.*, ¶¶ 321(a); 327(g), (m); *see also* ¶¶ 321(c), (e), (g), (m), (o), (p); 327(a), (c), (h), (i), (r), (u)–(w); 337(d); 339(d), (i), (o), (p), (u), (w), (y), (aa); 344(i), (j), (l)–(n), (p)–(r), (v).  "[A] sincere statement of pure opinion is not an 'untrue statement of material fact'" giving rise to liability under the securities laws, even if "an investor can ultimately prove the belief wrong." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186 (2015).  Plaintiff does not even attempt to plead facts showing that Defendants did not honestly hold those beliefs or "identify particular (and material) facts going to the basis for the issuer's opinion[s] … whose omission makes the opinion statement[s] at issue misleading to a reasonable person reading the statement fairly and in context." *Id.* at 194.

[4] *See, e.g.*, ¶¶ 321(a), (j), (m), (n), (p), (s); 327(f), (h), (m), (s), (v); 339(a)–(c), (e)–(h) (j), (k), (n), (s), (z), (aa); 344(b), (e)–(j), (l), (n), (p)–(r), (u), (v).

PSLRA forward-looking requirement."[5]  *Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 387 (S.D.N.Y. 2020).

The Company's statements projecting regulatory approval for RVP4 and its subsequent U.S. commercial launch also are forward-looking.  For example, Plaintiff challenges statements that "[w]e're still expecting RVP[4] for EUA in April [2023] and the 510(k) will be just shortly after that," ¶ 327(g), "[w]e do expect to get regulatory clearance in the US on the Savanna product and start placing those boxes as we move into the fourth quarter of [2023]," ¶ 327(m), "[t]he status of the submission of the [RVP4] 510(k) is on track," 327(r), and "we're very much on track for the launch," ¶ 327(g).[6]  These "statements about FDA approval are classically forward-looking—they address what defendants expected to occur in the future." *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 535 (S.D.N.Y. 2015), *aff'd sub nom. Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016); *Schaeffer v. Nabriva Therapeutics plc*, 2020 WL 7701463, at *10 (S.D.N.Y. Apr. 28, 2020) ("[S]tatements that Defendants expected [its drug] to win FDA approval and intended to launch [the drug] shortly after approval are both forward-looking.").  And statements that "a company was presently on track with its projected goals" are "forward looking under the PSLRA." *Villare v. Abiomed, Inc.*, 2021 WL 4311749, at *17 (S.D.N.Y. Sept. 21, 2021).

Plaintiff also challenges statements about QuidelOrtho's anticipated manufacturing capabilities and timing for development of additional Savanna test panels, like "we expect to begin clinical trials for RVP11 [and other panels]," ¶ 337(b), "[w]e continue to expect Savanna instrument placements of approximately 1,000 in 2024," ¶ 327(s), and "our Savanna cartridge automated manufacturing line is expected to begin its ramp-up and outfit to over 1 million

---

[5] *See also* ¶¶ 327(f), (h), (m), (v); 339(g), (j), (z), (aa); 344(f), (l), (m), (r), (u), (v).

[6] *See also* ¶¶ 321(f), (g); 327(a), (b), (e), (f), (h)–(j), (l), (m), (o), (q)–(s), (v), (w); 339(i), (r), (v), (bb).

cartridges per month," ¶ 339(e).[7]  These and similar statements about the Company's product development plans as well as statements "underlying or relating to" statements of future economic performance qualify as forward-looking statements under the safe harbor.  *See* 15 U.S.C. § 78u-5(i)(1)(C), (D); *see also In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 758 (S.D.N.Y. 2018) (statements that company would have "sufficient supply" to meet its commercial forecast and that it expected "to commence commercialization of [a] product" by a certain date were forward-looking).

### ii.  Defendants Identified the Forward-Looking Statements and Provided Meaningful Cautionary Language

Each of the challenged forward-looking statements were "identified [as forward-looking] and accompanied by meaningful cautionary language."[8]  *Slayton v. American Exp. Co.*, 604 F.3d 758, 766 (2d Cir. 2010).  At the outset of earnings calls and investor presentations, QuidelOrtho explained that remarks about the Company's future expectations, plans, and prospects would include forward-looking statements within the meaning of the PSLRA.  In addition, the "facts and circumstances of the language used" identified the statements as forward-looking because, on their face and in context, the statements "project[ed] results in the future."  *Slayton*, 604 F.3d at 769. Nothing more was required to identify the challenged statements as forward-looking.  *Id*.

Meaningful cautionary language also accompanied each forward-looking statement. During earnings calls and at investor conferences, the Company warned investors that its forward-looking statements were subject to the risk factors identified in the Company's SEC filings.  Those SEC filings, in turn, outlined substantive, detailed warnings about risks to QuidelOrtho's future

---

[7] *See also* ¶¶ 327(g); 337(a), (c)–(e); 339(b), (i), (l), (o), (p), (x)–(z).

[8] *See, e.g.*, Exs. 6 at 2; 7 at 1–2; 12 at 1–2; 14 at 2; 15 at 1; 19 at 1; 21 at 3; 25 at 2; 27 at 2; 30 at 2; 33 at 1–2.

financial performance and business, including risks directly related to the challenged forward-looking statements regarding RVP4, COVID-19, and the Company's revenue projections. *See In re Dynagas LNG Partners LP Sec. Litig.*, 504 F. Supp. 3d 289, 319 (S.D.N.Y. 2020) ("Courts in this Circuit routinely find that references to SEC filings that expound more fully on the risks suffice to adequately convey the risks.").

For example, QuidelOrtho provided meaningful cautionary language regarding the estimated regulatory clearance for RVP4 and other assays, as well as underlying assumptions about development and manufacturability. QuidelOrtho warned that "there is no assurance … our efforts to develop new technologies, products or markets will be successful or such technologies, products or markets will be commercially viable[,]" Ex. 28 at 30, and that "[r]egulatory review can be a lengthy, expensive, and uncertain process, making the timing and costs of clearances and approvals difficult to predict," *id*. at 40. The Company also cautioned that "[t]he FDA has been requiring more rigorous demonstration of product performance as part of the 510(k) process," *id*. at 16, and that the data needed for FDA clearance required QuidelOrtho to conduct "complex" clinical studies that are "not guaranteed to generate data that demonstrate … substantial equivalence of the evaluated product," Exs. 8 at 33, 28 at 40. And the Company made clear that "[f]ailure to obtain FDA clearance or approval would preclude commercialization in the U.S., which could materially and adversely affect our future results of operations." Exs. 28 at 40–41, 8 at 33. These warnings conveyed substantive information about specific, relevant risks—including "that a regulatory authority such as the FDA could deny or delay approval of" RVP4—and therefore easily qualify as "meaningful" for purposes of the PSLRA's safe harbor. *Sanofi*, 87 F. Supp. 3d at 536.

The Company also provided meaningful cautionary language about its projected COVID-19-related revenue and underlying assumptions. For example, QuidelOrtho warned that

14

its financial results depended on "uncertain and difficult to predict" factors such as "infection rates and severity," and that it had "experienced significant volatility in demand for [its] COVID-19 products," including periods of "dramatic decreases in demand." Ex. 28 at 56–57. QuidelOrtho also specifically warned that demand for its COVID-19 products would fluctuate depending on "the prevalence of the SARS-CoV-2 virus and its variants, the supply of COVID-19 tests generally, the purchasing activity of government entities, and the dissemination and effectiveness of vaccinations." *Id.* at 23. These warnings "addressed the very risks that Plaintiffs allege [the company] failed to disclose." *In re Lottery.com, Inc. Sec. Litig.*, 715 F. Supp. 3d 506, 539 (S.D.N.Y. 2024).

### iii. Plaintiff Fails to Plead That Any Speaker Actually Knew Any Forward-Looking Statement Was False

The challenged forward-looking statements also are protected from liability under the second prong of the safe harbor. As described in Section I.C., *infra*, Plaintiff fails to plead that any Defendant actually knew that any forward-looking statement was false when made. *See Slayton*, 604 F.3d at 773 (noting that "the scienter requirement for forward-looking statements is stricter than for statements of current fact" and requires "proof of knowing falsity"). Therefore, even if Defendants' forward-looking statements were not identified and accompanied by meaningful cautionary language (they were), the statements still are protected under the actual knowledge prong of the safe harbor. *Gray*, 454 F. Supp. 3d at 395.

### B. Many of the Challenged Statements Also Are Inactionable Puffery

Plaintiff also challenges dozens of statements that are inactionable statements of corporate optimism. For example, Plaintiff challenges statements about the launch of Savanna RVP4 in Europe, including "[we] have received very positive customer feedback to date," ¶ 321(b), and "we've been pretty pleased with what we've done in Europe with the Savanna launch early on,"

15

¶ 321(g).[9] These "vague[] and enthusiastic[]" statements are "too general to cause a reasonable investor to rely upon them." *Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 551, 569-70 (S.D.N.Y. 2018); *Pearlstein v. BlackBerry Ltd.*, 93 F. Supp. 3d 233, 240–41 (S.D.N.Y. 2025) (statements that "the launch of BlackBerry … marked the beginning of the organization's transition to becoming a leading mobile computing organization" and "customers love the device" were not false or misleading "[e]ven though … BlackBerry 10 devices were not selling well" because that fact did not "contradict generally optimistic sentiments").

Plaintiff also challenges statements that "[o]ur key near-term opportunity is the anticipated U.S. launch of our revolutionary Savanna multiplex molecular platform," ¶ 327(a), and "[w]e're still expecting RVP for EUA in April and the 510(k) will be just shortly after that," ¶ 327(g).[10] No reasonable investor could have interpreted these statements "as a guarantee" that the FDA would clear RVP4 and that QuidelOrtho would launch RVP4 in the United States. *Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 596 (S.D.N.Y. 2016). Indeed, "the use of phrases like 'we expect' or 'we believe'" suggest the opposite because "'such language, at a minimum, signals to prospective investors that the predictions … may not come to fruition.'" *Hawes v. Argo Blockchain plc*, 2024 WL 4451967, at *3 (S.D.N.Y. Oct. 9, 2024). These statements are "too general to cause a reasonable investor to rely upon them," and therefore they "are not actionable." *Aratana Therapeutics*, 315 F. Supp. 3d at 757; *id.* at 757–58 (statements that company was "on track to have [] products reach the market in 2016" and that placed a "positive spin development in the FDA approval process" were puffery).

---

[9] *See also* ¶¶ 321(c)–(f), (h)–(k), (m), (o)–(s); 344(c), (j), (k), (o)–(q), (s); 350; 351.

[10] *See also* ¶¶ 327(b), (c), (g), (i), (j), (l), (n), (o), (q), (r), (t)–(v); 337(b), (d), (e); 339(d), (g), (h), (m), (p), (u), (v), (aa).

16

C.  The Challenged Statements Were Not False When Made

The Complaint also should be dismissed for failure to plead falsity.  The nearly 200-page Complaint impermissibly "plac[es] the burden on the Court to sort out the alleged misrepresentations and then match them with the corresponding adverse facts"—a pleading tactic that "is insufficiently particular under the PSLRA." *Born v. Quad/Graphics, Inc.*, 521 F. Supp. 3d 469, 478–79 (S.D.N.Y. 2021).  Even if the Court could meaningfully line up the challenged statements to the corresponding allegedly adverse facts, the Complaint still fails to state a plausible securities fraud claim because Plaintiff fails to plead particularized facts demonstrating that any of the 104 challenged statements were untrue or misleading when made.[11]

**(i)  European Launch of Savanna RVP4.**  Plaintiff fails to plead that statements concerning the European launch of Savanna RVP4 were false or misleading.[12]  For example, Plaintiff challenges statements that the Company was "receiving some really nice feedback," ¶ 321(d), and that Savanna "continued to perform well in the EU," ¶ 321(q).  Plaintiff alleges these statements were contradicted by "the number of defective and invalid RVP4 tests, defective Savanna instruments and related string of escalating customer complaints."  ¶ 322.  But Plaintiff does not allege that QuidelOrtho did not receive positive feedback or that demand was nonexistent for the Savanna instrument and RVP4 assay in Europe.  Nor does the alleged number of "defective and invalid" tests, "defective" instruments, or "customer complaints" contradict statements regarding the performance of and demand for Savanna in Europe.  ¶ 322.  Indeed, the Company disclosed that it had encountered "error codes on instruments" and "challenges in cartridge

---

[11] Defendants cannot possibly address individually every one of the 104 challenged statements in Plaintiff's nearly 200-page Complaint.  Defendants have organized the challenged statements below (and in the attached Appendix A) by topic, with an explanation of why exemplar statements in each category are unsupported by particularized factual allegations demonstrating falsity.

[12] *See, e.g.*, ¶¶ 321(a)–(s).

17

manufacturing." Ex. 38 at 2.

**(ii)  Savanna RVP4 Readiness for U.S. Launch and FDA Approval.**[13]  Plaintiff also fails to plead that statements concerning RVP4's readiness for U.S. launch and FDA approval were false or misleading.[14]

*First*, Plaintiff fails to plead specific facts contradicting the challenged statements.  For example, Plaintiff challenges statements that QuidelOrtho "continue[d] to focus on overcoming manufacturing and supply chain challenges as we ramp up production of both instruments and cartridges" and had "completed development activities for all Savanna panels planned for launch in 2023."  ¶ 327(d).[15]  Plaintiff contends these statements were false or misleading because they failed to disclose that the RVP4 assays the Company manufactured allegedly generated an unacceptable number of invalid test results or suffered from other issues that would prevent FDA approval.  ¶¶ 328–29.  That a percentage of RVP4 tests allegedly generated invalid results at an unspecified point in time, however, does not contradict statements in November 2022 that QuidelOrtho was focused on overcoming manufacturing and supply chain challenges and had completed development activities for the Savanna panels planned for launch in 2023.[16]

Plaintiff also challenges statements that "[w]e are advancing both with FDA review of our RVP4 panel and others in the queue" and "a successful Savanna commercial launch is on [the U.S.

---

[13] Plaintiff challenges statements made during the November 30, 2023 Evercore ISI HealthCONx Conference, but these statements do not appear in that transcript.  *Compare* ¶¶ 327(p), 344(r), *with* Ex. 37.  These statements should be dismissed on this basis alone.

[14] *See, e.g.*, ¶¶ 327(a)–(w).

[15] *See also* ¶¶ 327(g)–(i), (l), (n), (o), (s), (u), (w).

[16] Rule 10b-5 "does not proscribe pure omissions," only omissions of "material facts necessary to make the 'statements made … not misleading.'"  *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 263 (2024).  As explained *supra*, *none* of the challenged statements included affirmative representations rendered false or misleading by the failure to disclose the allegedly omitted information.

18

sales team's] menu." ¶ 327(r).[17] Plaintiff alleges these statements were false or misleading for the additional reason that RVP4 never could meet the FDA's 95% sensitivity threshold. ¶¶ 328–34. But the documents cited in the Complaint make clear that the Company "d[id]n't know exactly what all the requirements for [FDA] clearance … [may be] at the end of the day" and that it expected to "get into interactive discussions with the [FDA] reviewer" to resolve any issues. Ex. 15 at 13. In fact, the Company disclosed in September 2023 that the FDA had sent a "series of questions to talk about what's in the package of the data [for the Savanna and RVP4 510(k) submissions]." Ex. 34 at 9; *see also* Ex. 35 at 14 (noting analyst question about Savanna "feedback so far at the FDA and sure they've had questions around the submission").

Plaintiff's challenge a March 2023 statement that "we should be able to generate $30 million to $40 million in Savanna revenue, which obviously includes what we're doing in Europe now too," ¶ 327(h),[18] as false or misleading because QuidelOrtho "later disclosed" that it "generated only $2.56 million from RVP4 sales in Europe in 2023," ¶ 333. This is a classic attempt impermissibly to plead fraud by hindsight. *See In re Aceto Corp. Sec. Litig.*, 2019 WL 3606745, at *4 (E.D.N.Y. Aug. 6, 2019) (dismissing statements because the "amended complaint assumes that because a problem was disclosed in November, defendants must have known of the problem in August, making the representation false"); *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) ("[A]llegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice ….").

*Second*, several of the challenged statements also are not false or misleading when read in context. For example, Plaintiff challenges a June 2023 statement that "we do expect to get

---

[17] *See also* ¶¶ 327(a)–(c), (e)–(j), (l), (m), (p)–(r), (t).

[18] *See also* ¶¶ 327(f), (m), (v).

regulatory clearance in the US on the Savanna product and start placing those boxes as we move into the fourth quarter of this year." ¶ 327(m).[19]  As Plaintiff concedes, the Savanna *instrument* received 510(k) clearance in December 2023.  ¶ 101.  Plaintiff's challenge to the statement that "Savanna meets the criteria that the FDA are looking for" similarly fails.  ¶ 327(k).[20]  This statement referred to the FDA's continued acceptance of "new EUAs if certain criteria are met," not the requirements for 510(k) clearance.  Ex. 30 at 16.

**(iii)  Development and Timing of Additional Savanna Panels Beyond RVP4.**  Plaintiff's challenge to statements regarding the development and timing of additional testing panels for Savanna also fails.[21]  For example, Plaintiff contends an August 2023 statement that Savanna's "initial menu includes our RVP4 respiratory viral panel and HSV/ VZV lesion panel *to be followed* throughout 2024 by RVP11 and HSV/VZV syphilis panel, a panel for sexually transmitted infections … plus two gastrointestinal panels … [and] a vaginitis panel," ¶ 337(e) (emphasis added),[22] was false or misleading because those additional panels "were not in development for Savanna's 'initial menu,'" ¶ 338.  Plaintiff relies on former employee ("FE") allegations that similar disclosures in an undated "Welcome to Savanna®" promotional brochure for Savanna sales in Europe were misleading because "there was no evidence *at the time* that Savanna RVP11 was

---

[19] *See also* ¶¶ 327(a) ("Our key near-term opportunity is the anticipated U.S. launch of our revolutionary Savanna multiplex molecular platform."), 327(b) ("I'd also like to address progress we've made with our revolutionary Savanna platform and what lies in store for us as we prepare for its U.S. launch later this year."), 327(s) ("We continue to expect Savanna instrument placements of approximately 1,000 in 2024[.]").

[20] This statement should be dismissed for the additional reason that Plaintiff incorrectly attributes it to Mr. Bryant.

[21] *See, e.g.*, ¶¶ 337(a)–(e).

[22] This statement should also be dismissed because Plaintiff incorrectly identifies the statement as having been made during the Q3 2023 earnings call.  *See* Ex. 33 at 4.  For similar reasons, the statement challenged in paragraph 339(n) should be dismissed.  *See* App'x A at 23 n.6.

going to launch in the near future" and "the other tests listed as 'in development' were 'a pipe dream.'"  ¶ 169 (emphasis added); *see also* ¶¶ 168, 338.  But Plaintiff fails to allege any specific facts regarding when these "promotional materials"—for a different market—were produced, what supposed "evidence" FE-4 was referring to, or what qualifications FE-4, a marketing employee, had to assess that "evidence."  *See Born*, 521 F. Supp. 3d at 479 ("generalized" explanations of how challenged statements are allegedly false not enough to plead falsity).  Plaintiff also misreads this statement, which made clear that RVP11 and other panels were not part of the "initial menu" but instead would *follow* the initial menu.  ¶ 337(e).  Indeed, investors understood that the U.S. launch of Savanna included only RVP4 and HSV/VZV.  Ex. 22 at 2.

**(iv)  Ability to Manufacture Savanna at Scale Necessary to Achieve $75 Million in Revenue Synergies and $300 Million in Revenue.**  Plaintiff also fails to plead specific facts demonstrating that statements regarding QuidelOrtho's ability to manufacture Savanna at scale were false or misleading.[23]  For example, Plaintiff challenges a statement that the Company had "begun ramping our instrument manufacturing capacity." ¶ 339(i).[24]  At most, Plaintiff points to isolated FE allegations about manufacturing and production yields at unspecified times.  For example, FE-6 allegedly recalled that production yields for Savanna "were 30 to 40%," ¶ 340, but Plaintiff does not allege when these "30 to 40%" yields allegedly were observed, nor does it plead any facts demonstrating that a "30 to 40%" production yield contradicted statements about ramping up capacity or building inventory.  In fact, a low production yield is consistent with the disclosure

---

[23] *See, e.g.*, ¶¶ 339(a)–(bb).

[24] Plaintiff also alleges that the statement that "the only constraint with the launch, honestly, being our ability to get enough instruments into the market as quickly as possible as well as our ability to manufacture cartridges at very, very high volumes," ¶ 339(d), was false because "at no point during the Class Period was the Company able to 'manufacture cartridges at very, very high volumes.'" ¶ 340. This argument is nonsensical. The statement makes clear that QuidelOrtho's ability to manufacture cartridges could be a potential "constraint" on Savanna's launch.

on QuidelOrtho's Q1 2022 earnings call that the Company was "not in a position where we're building a ton of inventory, but at the same time, we're making progress." Ex. 12 at 13–14. And QuidelOrtho repeatedly disclosed that it faced constraints on its manufacturing capabilities. *See, e.g.*, Ex. 5 at 4 ("I think the biggest challenge right now [to Savanna] … will be how quickly can we ramp manufacture[.]").

Plaintiff also challenges a statement estimating "cross-selling revenue synergies of over $100 million by the end of year 3," ¶ 339(g),[25] as misleading because QuidelOrtho's alleged "manufacturing shortcomings would prevent Savanna from contributing any revenue to the Company in the near term," ¶ 343. But during its Q2 2022 earnings call, for example, QuidelOrtho expressly conditioned these cost synergies on the Company's ability to "manufacture the instruments that we have in the forecast." Ex. 15 at 10; *see also* Ex. 29 at 7 ("I think we have the ability to have an effective global launch of Savanna, assuming we can get the cartridge manufacturing to where we want."). That QuidelOrtho did not ultimately achieve its synergy projections does not mean they were false at the time they were made. *See In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014); *Novak*, 216 F.3d at 309 (2d Cir. 2000) (fraud by hindsight is not actionable).

(v)    **Endemic COVID-19 Revenue.**    Plaintiff's challenge to statements regarding QuidelOrtho's anticipated endemic COVID-19 revenue also fails.[26]

*First*, Plaintiff fails to plead specific facts contradicting the challenged statements. For example, Plaintiff alleges that the February 2023 statement that "there's really no change there with that endemic level of annual revenue being it's $200 million to $400 million," ¶ 344(f), was

---

[25] *See also* ¶¶ 339(a)–(c), (f).

[26] *See, e.g.*, ¶¶ 344(a)–(v), 350, 351.

false because it was "directly contradicted by actual COVID sales figures, inventory levels," and unspecified "trends," ¶ 346. But Plaintiff does not explain how current sales figures or high inventory levels, which QuidelOrtho disclosed (*see supra* Factual Background at § IV), could render misleading an accurate projection of future revenue or what "trends" contradicted this statement.[27] Nor can it. Plaintiff acknowledges that QuidelOrtho's 2023 COVID-19 revenue was within the projected guidance range. On March 4, 2024, UBS released a report finding "QuidelOrtho's total COVID-related revenue for fiscal year 2023 w[as] $407 million," and excluding government contracts, "QuidelOrtho made $260 million in COVID-related revenue for fiscal year 2023." Compl. 103 n.13. This is squarely within QuidelOrtho's projections of $200 to $400 million of COVID-19 revenue for 2023, or $300 to $500 million including government contracts. *See, e.g.*, Ex. 27 at 12.

Plaintiff's challenge to statements that QuidelOrtho would "continue to capture and grow our share of the respiratory markets," ¶ 344(e), and that it experienced "significant share gains from competitors for us specifically," ¶ 344(o), also fails. Plaintiff alleges these statements were false because QuidelOrtho was losing COVID-19 test market share to competitors, ¶ 347, but this misses the mark because the statements referred to growth in the Company's share of the *respiratory market as a whole*, not COVID-19 specifically.

*Second*, statements about endemic COVID-19 revenue were not false or misleading "in the context of the surrounding statements in the corresponding documents." *Lululemon*, 14 F. Supp. 3d at 578. Throughout the relevant period, Defendants repeatedly warned investors of the

---

[27] Plaintiff's allegation that two statements made in SEC filings misleadingly omitted the fact that known risks negatively impacting COVID-19 sales and revenues had already transpired similarly fails. ¶¶ 350–53. Plaintiff ignores the fact that Defendants disclosed this very information, including decreases in demand for COVID-19 products. *See supra* Factual Background at § IV.

challenges and difficulty in estimating COVID-19-related trends.  *See supra* Factual Background at § IV.  No reasonable investor would have been misled by projections of QuidelOrtho's endemic COVID-19 revenue given this context.

## II.      Plaintiff Fails to Plead Adequately That Defendants Acted With Scienter

The Complaint should be dismissed for the independent reason that Plaintiff fails to plead "with particularity facts giving rise to a strong inference" that each Defendant acted with an intent "to deceive, manipulate, or defraud."  *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) (emphasis omitted); 15 U.S.C. § 78u–4(b)(2). Plaintiff's allegations must yield an inference of scienter that is "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference."  *Tellabs I* at 314.  In this Circuit, a plaintiff can plead scienter by pleading "facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness."  *ECA*, 553 F.3d at 198.

To establish the scienter of a corporation, a plaintiff must specifically allege "a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter."  *Jackson v. Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020).  "[M]ost courts look to the discrete roles played by the corporate actors who are connected to the alleged misrepresentation to determine which (if any) fall within the locus of a company's scienter."  *Id*.  Plaintiff thus cannot establish a Section 10(b) claim against QuidelOrtho unless it pleads scienter as to one or more Individual Defendants.  None of Plaintiff's allegations comes close to establishing a strong inference of scienter as to any Individual Defendant.

### A.   Plaintiff Fails to Plead Facts Evidencing Conscious or Severely Reckless Behavior by Any Individual Defendant

Plaintiff fails to allege facts showing conscious or severely reckless behavior by any

Individual Defendant.  To plead fraudulent intent, Plaintiff must allege "highly unreasonable" conduct that "represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001).  Where, as here, a plaintiff cannot show a motive or opportunity to defraud, the "circumstantial evidence of conscious misbehavior 'must be correspondingly greater' and show 'highly unreasonably' behavior." *Arkansas Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 355 (2d Cir. 2022) (citation omitted); *see infra* n.33.

### i.  *Plaintiff's Former Employee Allegations Do Not Establish Scienter*

Plaintiff attempts to establish scienter through allegations purportedly drawn from FEs, but these vague, largely undated, and conclusory allegations fail to support the inference Plaintiff seeks to draw.  In evaluating allegations from anonymous sources, courts assess whether (1) "the source is described with specificity so as to make clear that he or she was in a position to know the facts attributed to them"; (2) the source was "situate[d] in time relevant occurrences," such that the source can establish that "the [issuer's] challenged statements were knowingly false when made"; (3) the source's "factual allegations are pled with sufficient particularity"; and (4) "the facts attributed to the confidential source are corroborated, as otherwise, such statements are apt to be disregarded." *In re DraftKings Inc. Sec. Litig.*, 650 F. Supp. 3d 120, 154 (S.D.N.Y. 2023); *see also Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 800 (S.D.N.Y. 2020) (confidential witness ("CW") allegations lacking specificity "are apt to be discounted or disregarded").  Plaintiff fails to allege specific facts that courts in this Circuit require to credit anonymous witness allegations.

*First*, the descriptions of the FEs "do not suggest that they had been in a position to know the facts attributed to them." *Miao*, 442 F. Supp. 3d at 799.  For example, Plaintiff relies on allegations from FE-15 and FE-16 to demonstrate Defendants allegedly were aware of declining

sales of COVID-19 products.  But Plaintiff gives these low-level sources too much credit.  FE-15, a purported Territory Manager, relies on hearsay anecdotes from "customers" in California and Nevada.  ¶¶ 60, 240–42.  Similarly, FE-16, an Account Manager, worked at the Company for less than a year, and only in the northeastern U.S.  ¶ 61.  These low-level employees who allegedly served discrete geographies cannot speak to QuidelOrtho's overall COVID-19 sales figures—let alone its business prospects.  *See In re Lehman Bros. Sec. & ERISA Litig.*, 2013 WL 3989066, at *4 (S.D.N.Y. July 31, 2013) (disregarding allegations from CWs who were not senior employees "who could have spoken to the company's practices broadly").  Nor do allegations of "declining sales" contradict revenue projections the Company ultimately achieved.  Compl. at 103 n.13.

More importantly, seventeen of the twenty-one FEs are not alleged to have had direct contact with any Individual Defendant—let alone personal knowledge of any Individual Defendant's state of mind at the time of any challenged statement.  *Sun v. TAL Educ. Grp.*, 2023 WL 6394413, at *31 (S.D.N.Y. Sept. 29, 2023) (disregarding CW allegations and noting "the complaint must still 'describe the nature of the CW's contact with the individual defendants that would be probative of defendants' mental state'").  In fact, *not one* FE reported directly to *any* Individual Defendant.  *See* ¶¶ 46–66; *Chapman v. Mueller Water Prods. Inc.*, 466 F. Supp. 3d 382, 400 (S.D.N.Y. 2020) (rejecting CW allegations where witnesses did not report to any defendant).

*Second*, the majority of the FE accounts are "unmoored in time."  *Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 408–09 (S.D.N.Y. 2018).  "This omission renders the task of matching [FE] allegations to contrary public statements all but impossible, since allegations about an unspecified time period cannot supply specific contradictory facts available to Defendants *at the time* of an alleged misstatement."  *Eden Alpha CI LLP v. Polished.com Inc.*, -- F. Supp. 3d --, 2025 WL 296998, at *13 (E.D.N.Y. Jan. 24, 2025) (citation omitted).  For example, none of the

26

allegations from the four FEs that are alleged to have had contact with an Individual Defendant "show that [the] individual defendants actually possessed the knowledge highlighting the falsity of public statements." *Id*. at *12 (citation omitted). FE-6 purportedly raised "red flags" about rising costs "multiple times" and told Mr. Busky "each month … that the Company would charge costs to R&D because Savanna still needed adjustments and research to address its failures." ¶ 229. But FE-6 provides no particularized allegations demonstrating that any of this general information allegedly discussed at "monthly close meetings" on unspecified dates rendered any challenged statement false or misleading when made. Similarly, FE-10 purportedly recalled Mr. Busky "ask[ing] for solutions to inventory problems the Company was facing," ¶ 277, and that Mr. Busky "would discuss the analysis and data" regarding expiring products "directly with FE-10," ¶ 278. But Plaintiff does not allege any facts regarding when these discussions supposedly occurred, let alone facts demonstrating that unspecified "inventory problems" were not already disclosed or that they rendered any of Mr. Busky's statements false or misleading when made. Plaintiff also asserts that FE-4 and FE-7 attended "calls at least monthly" with Ms. Ranalli, during which attendees "disclosed to Ranalli that the Savanna RVP4 tests were failing in Europe and provided her with … negative customer feedback." ¶¶ 185–87. Here too, Plaintiff does not allege the time frame during which these calls purportedly occurred, which calls Ms. Ranalli attended, and whether and what "problems with Savanna" were discussed during the calls she did attend. Nor does Plaintiff explain how the information allegedly discussed on these calls rendered any of Ms. Ranalli's statements false or misleading when made.[28]

---

[28] Plaintiff's allegation that Mr. Bryant "held weekly update calls about the Company's 'state of affairs,'" ¶ 369, similarly fails. *In re Doral Fin. Corp. Sec. Litig.*, 563 F. Supp. 2d 461, 466 (S.D.N.Y. 2008) (finding former employee statement that he attended meetings during which reports were circulated and questions raised "so vague as to be meaningless," because it lacked "information regarding how extensively or in what manner the reports were discussed").

*Third*, many of the FE allegations are insufficiently particular. For example, Plaintiff challenges Ms. Ranalli's statement that QuidelOrtho had received "great feedback from our initial customers." ¶ 321(h). But Plaintiff does not explain how FE allegations regarding an investigation into "serious and significant" European customer complaints contradict this challenged statement (or any of the 103 others). ¶ 368. Plaintiff also challenges QuidelOrtho's projection that COVID-19 revenue would "be in that [$]200 to [$]400 million range" for 2023. ¶ 344(l). But FE allegations regarding the purported "fact" that some "salespeople were [far] from hitting their 2023 annual *respiratory* sales quotas" do not contradict a statement pertaining only to COVID-19 revenue, not revenue from overall respiratory sales. ¶ 378 (emphasis added).

*Finally*, Plaintiff cannot rely on FE allegations that are "sourced secondhand from individuals 'with whom Plaintiff's counsel have not themselves interacted.'" *Eden Alpha*, 2025 WL 296998, at *13 (citation omitted). For example, according to FE-2, Werner Kroll "reported directly to the Board" and "knew everything" about Savanna "instrument and cartridge issues." ¶ 363. Plaintiff not only fails to allege what *specific* information Mr. Kroll knew and when, but Plaintiff fails to connect its claims about Mr. Kroll to what the *Individual Defendants* knew, when they knew it, and how that information contradicted any of their challenged statements. Similarly, FE-14 alleges that after Mr. Kroll was informed about RVP4 manufacturability concerns, "[Mr.] Kroll and Defendants Steward and Bujarski held a meeting in 2020 where they 'dismantled' the large team working on Savanna …." ¶ 370. Here again, Plaintiff does not allege what "manufacturability concerns" Mr. Kroll was informed of or when he was informed of them, let alone what (or even whether) he told Messrs. Steward or Bujarski about the purported concerns, when they were told, and how those concerns should have alerted them that any of their challenged statements were false or misleading. These allegations are "'particularly uninformative' because

they suggest that the FEs obtained their information 'through intermediaries, thus undermining the likelihood that they have personal knowledge of their allegations.'"  *Eden Alpha*, 2025 WL 296998, at *13 (cleaned up).

> ii.  *Plaintiff Pleads No Particularized Facts Supporting Any Inference of Scienter as to Any Individual Defendant*

Plaintiff's additional scienter allegations fail to identify *any* facts demonstrating that the Individual Defendants knew or were highly reckless in not knowing that QuidelOrtho would not achieve its expectations for RVP4 approval or COVID-19 endemic guidance, or that their statements regarding Savanna's European launch or QuidelOrtho's ability to manufacture Savanna instruments or RVP4 cartridges at scale were false or misleading.  Instead, Plaintiff relies on allegations utterly devoid of factual support.

In cases involving regulatory approval of a new product, courts in this Circuit have held that an inference of scienter arises where "management knows that certain facts will necessarily prevent the regulatory approval … and conceals these facts from the investing public."  *Sanofi*, 87 F. Supp. 3d at 529.  The threshold for scienter is "near certainty" that a product will not be approved.  *In re Chembio Diagnostics, Inc. Sec. Litig.*, 616 F. Supp. 3d 192, 198 (E.D.N.Y. 2022).  There is no scienter, however, if "management of the company releases positive reports about the [product] to the public along the way which the management honestly believes to be true, and where there is no reckless disregard for truth."  *Sanofi*, 87 F. Supp. 3d at 534 (citation omitted).

Here, Plaintiff has not alleged particularized facts supporting an inference that Defendants knew *for certain* that their expectations regarding FDA clearance of RVP4 were inaccurate.  Despite relying on FE allegations about internal data purportedly showing that RVP4 could not "consistently" detect infection with the 95% sensitivity the FDA allegedly required, *see* ¶¶ 200, 203–04, 330–31, Plaintiff nowhere "specifically identif[ies] the reports or statements containing

29

this information," *Barrick Gold*, 341 F. Supp. 3d at 373.  Nor does Plaintiff explain how Defendants' alleged awareness of RVP4's sensitivity at unspecified times shows they knew RVP4 could never satisfy the FDA's requirement of "consistent" 95% sensitivity.

Plaintiff's other allegations fail to provide "strong circumstantial evidence" of recklessness—let alone the "near certainty" required for the regulatory approval statements.  *See ECA*, 553 F.3d at 198.  Plaintiff contends that the Individual Defendants' alleged receipt of or access to unspecified information supposedly contradicting their challenged statements supports an inference of scienter.  *See, e.g.*, ¶¶ 360, 362–72, 377–78.  But courts in this Circuit routinely dismiss similar claims as too vague.  *See Inter-Local Pension Fund GCC/IBT v. Gen. Elec. Co.*, 445 F. App'x 368, 370 (2d Cir. 2011) ("vague and general averments" that defendants "had access to internal corporate documents and data" insufficient to demonstrate scienter); *Barrick Gold*, 341 F. Supp. 3d at 373 ("broad allegations" that defendants had access to "expense and capital cost data" insufficient to support scienter).  For example, Plaintiff alleges "the Company had a formal complaint system for registering customer issues in the EU and that complaints logged in that system were sent to Defendant Ranalli."  ¶ 369.  But Plaintiff fails to specify exactly what information was contained in the complaints, whether Ms. Ranalli ever reviewed the complaints, or how any information contained in the complaints "contradicted Defendants' public statements."[29]  *In re Adient plc Sec. Litig.*, 2020 WL 1644018, at *28 (S.D.N.Y. Apr. 2, 2020); *Villare*, 2021 WL 4311749, at *23 (allegation that defendants were "hands-on and had access to

---

[29] For the same reasons, Plaintiff's conclusory assertion that RVP4's purported failure to meet the 95% sensitivity threshold "was discussed internally, reported to Defendants, and discussed at Board meetings," ¶ 371, and that information regarding "Savanna's yield problems and cost accounting issues" were "sent to management" and "presented in month-end financial close meetings to upper management," ¶ 372, fail.  Nowhere does Plaintiff specifically allege which, if any, Individual Defendants were informed of this information, when they were informed, or how this information contradicted any challenged statement.

extensive raw data" insufficient to show that defendants had access to contrary information).

Plaintiff also contends that because the "final [RVP4] dataset, submitted in February 2024, did not meet … expectations," Defendants must have known "in February that [QuidelOrtho] would need to withdraw its 510(k) submission."  ¶ 373.  But Plaintiff does not explain how knowledge of a single dataset falling below expectations equates to knowledge that the entire 510(k) submission would need to be withdrawn.

### iii.    Plaintiff's "Core Operations" Allegations Do Not Support Scienter

Given the lack of specific factual allegations establishing that any Individual Defendant acted with fraudulent intent, Plaintiff attempts to invoke the "core operations" doctrine, asking the Court to infer that the Individual Defendants must have known their statements regarding Savanna were false because it "was one of the longest and largest investments in the Company's history." ¶ 357.  The core operations theory allows a court to "infer that a company and its senior executives have knowledge of information concerning the core operations of a business, such as events affecting a significant source of revenue." *In re Aegean Marine Petro. Network, Inc. Sec. Litig.*, 529 F. Supp. 3d 111, 174 (S.D.N.Y. 2021) (citation omitted).  That inference, however, cannot stand alone to plead a cogent theory of scienter.  *See In re Plug Power, Inc. Sec. Litig.*, 2022 WL 4631892, at *18 (S.D.N.Y. Sept. 29, 2022) ("While courts within this Circuit have debated the viability of the [core operations] doctrine, the majority approach treats it as additional evidence of scienter but not independently sufficient to show scienter.").

Even if the doctrine were viable in this Court—and it is not—Plaintiff fails to plead scienter under the core operations theory.  As an initial matter, Plaintiff fails to plausibly allege that Savanna is a core operation.  Core operations include matters "affecting a 'significant source of income.'" *In re Express Scripts Holding Co. Sec. Litig.*, 2017 WL 3278930, at *18 (S.D.N.Y Aug. 1, 2017) (citation omitted).  Here, Plaintiff acknowledges that the Company projected, at

best, $30–$50 million in Savanna revenue by the end of 2024, compared to total revenue of nearly $3 billion for 2023. Plaintiff's assertion that Savanna's significance supports an inference of scienter makes no sense.

Scienter also may not be inferred from the allegation that the Individual Defendants were "responsible for QuidelOrtho's efforts to develop and promote Savanna," ¶ 361, "spoke about Savanna on every conference call," ¶ 357, or "focused on the rising costs of Savanna production," ¶ 372. "[S]imply alleging that executive defendants are closely involved in running their business is not enough to show that they had access to contrary information." *City of N. Miami Beach Police Officers' and Firefighters' Ret. Plan v. Nat'l Gen. Holdings Corp.*, 2021 WL 212337, at *10 (S.D.N.Y. Jan. 21, 2021) (citation omitted).[30]

### iv. The Departures of Messrs. Bryant, Bujarski, and Iskra Do Not Support Scienter

Plaintiff contends that the departures of Messrs. Bryant, Bujarski, and Iskra support an inference of scienter. ¶¶ 379–80. But courts consistently have held that "[t]erminations or resignations of corporate executives are insufficient alone to establish an inference of scienter." *Woolgar v. Kingstone Cos.*, 477 F. Supp. 3d 193, 240 (S.D.N.Y. 2020); *Gillis*, 197 F. Supp. 3d at 605. Rather, executive departures can "establish scienter only if the plaintiff alleges independent evidence corroborating" that the employees "held a culpable state of mind." *Francisco v. Abengoa, S.A.*, 559 F. Supp. 3d 286, 321 (S.D.N.Y. 2021). Without "a factual basis to conclude" that their departures were "tied to participation in or knowledge of the fraud," Plaintiff's allegations regarding certain Individual Defendants' departures do not support an inference of scienter. *Id.*

---

[30] For the same reason, Plaintiff's allegation that Messrs. Bryant and Busky "were responsible for QuidelOrtho's COVID endemic revenue guidance" fails to plead scienter. ¶ 376.

          *v.  The Most Plausible Inference Is That Defendants Acted in Good Faith*

A complaint satisfies the scienter pleading requirement only if the specific factual allegations give rise to an inference of scienter that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs I* at 314. The Court therefore must weigh the "inference urged by the plaintiff" against the "competing inferences rationally drawn from the facts alleged." *Id*.

Here, by far the most compelling inference reasonably drawn from the allegations is that Defendants acted in good faith. As to Savanna, Plaintiff's primary theory is that Defendants intentionally concealed problems with the Savanna instrument and RVP4 assay from investors to force the advancement of products they knew would fail from the beginning. That theory is implausible on its face. QuidelOrtho has a well-established business centered entirely around diagnostic healthcare products, most—if not all—of which successfully received FDA clearance. *See, e.g.*, Ex. 28 at 5–10, 16. And Quidel already had proven during the COVID-19 pandemic that it could ramp up production of products as necessary to meet demand. Ex. 12 at 3–4. The notion that the Company would spend significant capital, resources, and time betting on a horse it knew would lose is neither "cogent" nor "compelling."

Plaintiff's theory of fraud regarding COVID-19 revenue guidance similarly is implausible. That QuidelOrtho changed its projections over time reflected Defendants' efforts to adjust to changes in the testing market for a previously unknown disease and to communicate those changes to investors. *See Bajjuri v. Raytheon Techs. Corp.*, 641 F. Supp. 3d 735, 744 (D. Ariz. 2022) (holding that the competing inference of non-fraudulent intent prevailed where the defendant disclosed the "disrupting" effect of COVID-19 on its business). Plaintiff acknowledges, for instance, that "testing needs would reduce" as COVID-19 reached an endemic stage. ¶ 4. And QuidelOrtho disclosed, for example, that it had "experienced significant volatility in demand for

33

[its] COVID-19 products," including periods of "dramatic decreases in demand."  Ex. 28 at 57.

Under these circumstances, it is unsurprising that QuidelOrtho needed to adjust estimates of how

the Company would perform over time.[31]  And in any event, the Company *achieved* its 2023

guidance for endemic COVID-19 revenue.  Compl. at 103 n.13.

The most plausible inference drawn from Plaintiff's allegations is that the long-term effects

of COVID-19 were difficult to predict in a dynamic business environment, and Defendants did

their best to update investors and make good-faith projections from the information available to

them at the time.  Plaintiff's unsupported contrary theory—that QuidelOrtho's senior officers must

have intended to defraud investors by describing their expectations about a new product and

COVID-19 revenue guidance because some of those expectations ultimately were not met—is pure

fraud by hindsight and is insufficient to meet Plaintiff's burden of pleading scienter.

## III.    Plaintiff Fails to Plead Scheme Liability

Plaintiff also fails to plead that Defendants engaged in a scheme to defraud investors under

Rule 10b-5(a) or (c).  This case involves none of the inherently bad acts that typically form the

basis of scheme liability—*e.g.*, executing manipulative stock trades, creating or financing a sham

entity, or colluding to defraud others.  *See SEC v. Lee*, 720 F. Supp. 2d 305, 334 (S.D.N.Y. 2010)

(listing examples); *see also SEC v. China Ne. Petroleum Holdings Ltd.*, 27 F. Supp. 3d 379, 385

(S.D.N.Y. 2014) (related-party transactions funneled company's net revenue into family accounts);

---

[31] The absence of personal motive also undercuts any inference of fraud.  No Individual Defendant is alleged to have sold stock or otherwise gained a personal benefit from the alleged fraud.  Rather, Plaintiff suggests Defendants (1) concealed alleged problems to obtain higher bonuses and because of "significant pressure" to launch Savanna and (2) wanted to "flip the script" on COVID-19 revenue to please analysts.  ¶¶ 359, 375, 381.  But generic motives "possessed by most corporate directors and officers," such as "the desire for the corporation to appear profitable" or "to keep stock prices high to increase officer compensation," are insufficient.  *Kalnit*, 264 F.3d at 139.

*SEC v. GPL Ventures LLC*, 2022 WL 158885, at *10 (S.D.N.Y. Jan. 18, 2022) (defendants "were the puppetmasters of a scheme to launder their investments for profit").

Instead, Plaintiff attempts to bootstrap a scheme liability theory onto its allegations of misrepresentations and omissions. *See, e.g.*, ¶ 1 ("This case arises from a series of material misrepresentations[.]"). But "alleged misrepresentations or omissions," cannot be the "sole basis" for scheme liability. *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 177 (2d Cir. 2005); *see also In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 161 (S.D.N.Y. 2012) (scheme liability "under subsections (a) and (c) of Rule 10b-5 hinges on the performance of an inherently deceptive act that is distinct from an alleged misstatement" (citation omitted)). Otherwise, virtually any claim alleging misrepresentations or omissions liability also would state a claim for scheme liability. That is why "courts have routinely rejected … attempt[s] to bypass the elements necessary to impose 'misstatement' liability under subsection (b) by labeling the alleged misconduct a 'scheme' rather than a 'misstatement.'" *SEC v. Kelly*, 817 F. Supp. 2d 340, 343 (S.D.N.Y. 2011). Because each of the deceptive acts "merely repackage the misrepresentation allegations," they are not the sort of distinct, inherently deceptive acts required to allege scheme liability. *Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 277 F. Supp. 3d 500, 520 (S.D.N.Y. 2017).

## IV.    Plaintiff's Section 20(a) Claims Must Be Dismissed

Section 20(a) imposes control person liability where, among other things, a plaintiff pleads a "primary" violation of the securities laws. *See* 15 U.S.C. § 78t(a). "Because Plaintiffs have not stated a primary violation, they also have not stated a claim of control-person liability." *In re AstraZeneca plc Sec. Litig.*, 2022 WL 4133258, at *10 (S.D.N.Y. Sept. 12, 2022).

## CONCLUSION

Defendants respectfully request that the Court dismiss the Complaint with prejudice.

Dated: April 4, 2025  
      New York, New York

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By: */s/ Colin B. Davis*  
     Colin B. Davis

3161 Michelson Drive  
Suite 1200  
Irvine, CA 92612  
Tel: (949) 451-3800  
cdavis@gibsondunn.com  
(*admitted pro hac vice*)

Brian M. Lutz  
One Embarcadero Center  
Suite 2600  
San Francisco, CA 94111  
Tel: (415) 393-8200  
blutz@gibsondunn.com

Dana E. Sherman  
200 Park Avenue  
New York, NY 10166  
Tel: (212) 351-4000  
dsherman@gibsondunn.com

*Attorneys for Defendants*

**CERTIFICATE OF COMPLIANCE**

I, Colin B. Davis, hereby certify that this memorandum of law complies with the length restrictions in Local Civil Rule 7.1(c), as modified by § 5(A) of this Court's Individual Practices in Civil Cases and the Court's Order granting Defendants' Letter Motion for Leave to File Excess Pages. *See* Local Rule 7.1(c) (allowing that a court may "permit[] a party to submit briefs longer than [Local Rule 7.1(c)'s] limits"); Dkt. No. 46.

I further certify that this memorandum of law contains 8,191 words, including any footnotes or endnotes and excluding only those sections of the brief that are exempted under Local Rule 7.1(c) and Your Honor's Individual Practices. In preparing this certificate of compliance, I have relied on the word count of the word-processing system used to prepare this memorandum of law.

/s/ Colin B. Davis
Colin B. Davis

37