# Exhibit 3

DEFM14A 1 d273090ddefm14a.htm DEFM14A

**Table of Contents**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, DC 20549**

## SCHEDULE 14A

**Proxy Statement Pursuant to Section 14(a) of the
Securities Exchange Act of 1934**

Filed by the Registrant  ☒

Filed by a Party other than the Registrant  ☐

Check the appropriate box:

☐    Preliminary Proxy Statement

☐    **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**

☒    Definitive Proxy Statement

☐    Definitive Additional Materials

☐    Soliciting Material Pursuant to Rule 14a-12

# QUIDEL CORPORATION
**(Name of Registrant as Specified in its Charter)**

**(Name of Person(s) Filing Proxy Statement, if other than the Registrant)**

Payment of Filing Fee (Check the appropriate box):

☒    No fee required

☐    Fee paid previously with preliminary materials.

☐    Fee computed on table in exhibit required by Item 25(b) per Exchange Act Rules 14a6(i)(1) and 0-11

**Table of Contents**



**BUSINESS COMBINATIONS PROPOSED—YOUR VOTE IS VERY IMPORTANT**

April 11, 2022

On December 22, 2021, Quidel Corporation ("Quidel") and Ortho Clinical Diagnostics Holdings plc ("Ortho") entered into a Business Combination Agreement (the "BCA") by and among Quidel, Ortho, Coronado Topco, Inc. ("Topco"), Orca Holdco, Inc. ("U.S. Holdco Sub") and Laguna Merger Sub, Inc. ("U.S. Merger Sub"), each wholly owned subsidiaries of Topco, and Orca Holdco 2, Inc., a wholly owned subsidiary of U.S. Holdco Sub ("U.S. Holdco Sub 2"), which provides for the acquisition of Ortho and Quidel by Topco. The combined company will unite world-class technologies and platforms to benefit customers with expanded access to clinical chemistry, immunoassay, molecular diagnostics, immunohematology, donor screening and point-of-care diagnostics offerings. We are extremely pleased about this transaction and look forward to the opportunities it presents. We are sending you this joint proxy statement/prospectus to ask you to vote in favor of these transactions and other related matters.

Pursuant to the BCA, the "Combinations" are expected to be implemented by means of (i) a scheme of arrangement to be undertaken by Ortho under Part 26 of the UK Companies Act (the "Ortho Scheme"), pursuant to which the Scheme Shares (as defined in the Scheme of Arrangement (hereinafter mentioned)) will be acquired by a nominee of Topco (or, if such nominee holds the Ortho Shares today, transferred within the nominee), such that Ortho will become a wholly owned subsidiary of Topco and (ii) a merger (the "Quidel Merger") of U.S. Merger Sub with and into Quidel immediately following consummation of the Ortho Scheme, with Quidel surviving the merger as a wholly owned subsidiary of Topco. At the effective time of the Ortho Scheme, each Ortho Share, other than Ortho Shares held by Ortho in treasury, will be acquired by a nominee (or, if such nominee holds the Ortho Shares today, transferred within the nominee) on behalf and for the benefit of Topco in exchange for 0.1055 shares of common stock of Topco (the "Topco Shares") and $7.14 in cash. At the effective time of the Quidel Merger, each share of common stock of Quidel (each, a "Quidel Share"), other than Quidel Shares held by Quidel, Ortho or U.S. Merger Sub, will be converted into the right to receive one Topco Share. The number of Topco Shares that Quidel stockholders will receive in the Quidel Merger and that Ortho shareholders will receive in the Ortho Scheme is based on a fixed exchange ratio that will not be adjusted to reflect changes in the market value of Quidel Shares or Ortho Shares. The parties intend to list the Topco Shares to be issued in the Combinations on the Nasdaq Global Select Market ("Nasdaq").

Under the terms of the BCA, which was unanimously approved by the board of directors of each of Quidel and Ortho, Quidel and Ortho are entering into a business combination under Topco, a new holding company, in which Ortho will be acquired for the per-share consideration described above, including $1.75 billion of cash in the aggregate, funded through cash on the Quidel balance sheet and expected incremental borrowings. Following the closing of the Combinations, Ortho's current net debt of $2.0 billion is expected to continue to be outstanding. If the Combinations are completed, Ortho shareholders are expected to own approximately 38% of Topco and Quidel stockholders are expected to own approximately 62% of Topco on a fully diluted basis, based on the respective capitalizations of Ortho and Quidel as of the date the parties entered into the BCA.

This document, which forms part of a registration statement on Form S-4 filed with the U.S. Securities and Exchange Commission (the "SEC") by Topco, is a joint proxy statement/prospectus for Quidel and Ortho to solicit proxies for (i) the Quidel stockholders' meeting to approve and adopt the BCA and the Quidel Merger and (ii) the Ortho shareholder meetings to approve the Ortho Scheme, amend the articles of association of Ortho and authorize the directors of Ortho to take all such action as they may consider necessary or appropriate for carrying the Ortho Scheme into effect. The registration statement includes the scheme circular with respect to the Ortho Scheme (as required by the UK Companies Act) and registers the Topco Shares to be issued in the Combinations.

Table of Contents

**Your vote is very important.** We cannot complete these transactions unless the Quidel stockholders vote to approve the BCA, the Quidel Merger and certain matters related thereto, and the Ortho shareholders vote to approve the Ortho Scheme and certain matters related thereto. The Ortho Scheme also requires the sanction of the High Court of Justice of England and Wales (the "Court"). IT IS IMPORTANT THAT AS MANY ORTHO SHAREHOLDERS AS POSSIBLE VOTE AND/OR PROVIDE VOTING INSTRUCTIONS ON THE ORTHO SCHEME SO THAT THE COURT MAY BE SATISFIED THAT THERE IS A FAIR AND REASONABLE REPRESENTATION OF THE OPINION OF HOLDERS OF INTERESTS IN ORTHO SHARES.

**Please carefully read this entire document, including the section entitled "Risk Factors" for a discussion of the risks relating to the Combinations and Topco following the Combinations. None of the SEC, any state securities regulatory authority or the UK Financial Conduct Authority (the "FCA") has approved or disapproved of the Combinations or the securities to be issued in the Combinations or has passed upon the adequacy or accuracy of the disclosure in this joint proxy statement/prospectus. Any representation to the contrary is a criminal offense.**

**For the avoidance of doubt, this joint proxy statement/prospectus is not intended to be, and is not, a prospectus for the purposes of the Prospectus Rules made under Part 6 of the UK Financial Services and Markets Act 2000 (as set out in the FCA's Handbook).**

**The accompanying joint proxy statement/prospectus is dated April 11, 2022, and is first being mailed to Quidel stockholders and Ortho shareholders on or about April 11, 2022.**

**Table of Contents**

# Ortho Clinical Diagnostics Holdings plc

*(Incorporated and registered in England and
Wales with registered number 13084624)*

**NOTICE OF COURT MEETING
TO BE HELD ON MAY 16, 2022**

**IN THE HIGH COURT OF JUSTICE**                                          CR-2022-00034
**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**
**COMPANIES COURT (ChD)**

**IN THE MATTER OF ORTHO CLINICAL DIAGNOSTICS HOLDINGS PLC**

**– and –**

**IN THE MATTER OF THE UK COMPANIES ACT**

**NOTICE IS HEREBY GIVEN** that, by an order dated February 16, 2022, made in the above matters, the High Court of Justice of England and Wales (the "Court") has given permission for a meeting (the "Ortho Court Meeting") to be convened of the holders of Scheme Shares (as defined in the Scheme of Arrangement hereinafter mentioned) as at the Voting Record Time (each such term having the meaning given to it in the Scheme, as defined below) for the purpose of considering and, if thought fit, approving (with or without modification) a scheme of arrangement proposed to be made pursuant to Part 26 of the Companies Act 2006 (the "UK Companies Act") between Ortho Clinical Diagnostics Holdings plc ("Ortho") and the holders of the Scheme Shares (the "Scheme" or the "Scheme of Arrangement") and that the Ortho Court Meeting will be held at Latham & Watkins LLP, 1271 Avenue of the Americas, New York, NY 10020, United States on May 16, 2022, at 11:30 a.m. (Eastern Standard Time) and 4:30 p.m. (London time) at which place and time all Scheme Shareholders (as defined in the Scheme of Arrangement) are requested to attend by following the step by step procedures (see the below section entitled "Instructions for Accessing the Virtual Meeting Platform").

A copy of the Scheme and a copy of the explanatory statement required to be published pursuant to Section 897 of the UK Companies Act are incorporated in the accompanying joint proxy statement/prospectus of which this notice forms part.

Unless the context requires otherwise, any capitalized term used but not defined in this notice shall have the meaning given to such term in the accompanying joint proxy statement/prospectus.

Voting on the resolution to approve the Scheme will be by poll, which shall be conducted as the Chair of the Ortho Court Meeting may determine. The poll shall remain open for a period of thirty minutes following the discussion of the matters to be determined at the Ortho Court Meeting to enable Scheme Shareholders to amend their vote, if they so wish.

*Right to Appoint a Proxy; Procedure for Appointment*

Scheme Shareholders are strongly encouraged to submit proxy appointments and instructions for the Ortho Court Meeting as soon as possible, using any of the methods (by post, online or telephone) set out in the below Notes to this notice. Scheme Shareholders are also strongly encouraged to appoint the Chair of the Ortho Court Meeting as their proxy. If any other person is appointed as proxy, he or she will not be permitted to attend the Ortho Court Meeting in person, but will be able to attend, submit written questions and vote at the Ortho Court Meeting remotely via the Virtual Meeting Platform (as defined below). Instructions for accessing the Virtual Meeting Platform and information on how to appoint a proxy are set out in the below Notes to this notice.

Table of Contents

*Voting Record Time*

Entitlement to attend (remotely, via the Virtual Meeting Platform) and vote (remotely, via the Virtual Meeting Platform, or by proxy) at the Ortho Court Meeting or any adjournment thereof and the number of votes which may be cast at the Ortho Court Meeting will be determined by reference to the register of members of Ortho at the "Voting Record Time," which is 1:00 p.m. (Eastern Standard Time) and 6:00 p.m. (London time) on May 12, 2022 the date that is two Business Days (as defined herein) prior to the Ortho Court Meeting, or, if the Ortho Court Meeting is adjourned, 1:00 p.m. (Eastern Standard Time) and 6:00 p.m. (London time) on the date which is two Business Days before the date fixed for the adjourned meeting. Changes to the register of members of Ortho after the relevant time shall be disregarded in determining the rights of any person to attend (remotely, via the Virtual Meeting Platform) and vote (remotely, via the Virtual Meeting Platform, or by proxy) at the Ortho Court Meeting.

*Joint Holders*

In the case of joint holders of Scheme Shares, the vote or appointment by (as applicable) the most senior who tenders a vote, whether remotely, via the Virtual Meeting Platform, or by proxy, will be accepted to the exclusion of the vote(s) or purported appointment(s) (as applicable) of the other joint holder(s). For this purpose, seniority will be determined by the order in which the names stand in the register of members of Ortho in respect of the joint holding.

*Corporate Representatives*

As an alternative to appointing a proxy, any holder of Scheme Shares which is a corporation may appoint one or more corporate representatives who may exercise on its behalf all its powers as a member, provided that if two or more corporate representatives purport to vote in respect of the same shares, if they purport to exercise the power in the same way as each other, the power is treated as exercised in that way, and in other cases the power is treated as not exercised.

By the said order, the Court has appointed Christopher Smith, or failing him, any other Ortho director to act as Chair of the Ortho Court Meeting and has directed the Chair to report the result thereof to the Court. The Scheme of Arrangement will be subject to the subsequent sanction of the Court.

**YOUR VOTE IS IMPORTANT**

**Your vote at the Ortho Court Meeting is very important. You are strongly encouraged to submit proxy appointments and instructions for the Ortho Court Meeting as soon as possible.**

Dated April 11, 2022
Latham & Watkins (London) LLP
99 Bishopsgate
London EC2M 3XF
*Solicitors for the Company*

Table of Contents

**BUSINESS OF QUIDEL AND CERTAIN INFORMATION ABOUT QUIDEL**

Quidel commenced operations in 1979 and was originally incorporated as Monoclonal Antibodies, Inc. in California. In 1987, Quidel re-incorporated as Quidel Corporation in the State of Delaware. Quidel's executive offices are located at 9975 Summers Ridge Road, San Diego, California 92121, and its telephone number is (858) 552-1100. Additional information about Quidel and its subsidiaries is included in documents incorporated by reference into this joint proxy statement/prospectus. See the section entitled "Where You Can Find More Information" of this joint proxy statement/prospectus.

**Overview of Business**

Quidel's primary mission is to advance diagnostics to improve human health. Quidel has a leadership position in the development, manufacturing and marketing of rapid diagnostic testing solutions. Quidel separates these into four product categories: rapid immunoassay, cardiometabolic immunoassay, molecular diagnostic solutions and specialized diagnostic solutions. Quidel currently sells its products directly to end users and distributors, in each case, for professional use in physician offices, hospitals, clinical laboratories, reference laboratories, urgent care clinics, leading universities, retail clinics, pharmacies and wellness screening centers, as well as for individual, non-professional, OTC use. More recently, Quidel has begun to reach significant new markets as it introduced its QuickVue® At-Home OTC COVID-19 test for reopening schools, and for health departments, employers, entertainment centers and many other locations. Quidel markets its products through a network of distributors and a direct sales force. Quidel operates in one business segment that develops, manufactures and markets its products globally.

Quidel launched its first products, dipstick-based pregnancy tests, in 1983. Since such time, Quidel's product base and technology platforms have expanded through internal development and acquisitions of other products, technologies and companies. Quidel's diagnostic solutions aid in the detection and diagnosis of many critical diseases and other medical conditions, including infectious diseases, cardiovascular diseases and conditions, women's health, gastrointestinal diseases, autoimmune diseases, bone health and thyroid diseases.

In 2017, Quidel acquired the Triage® MeterPro® cardiovascular and toxicology business, and B-type Natriuretic Peptide ("BNP") assay business run on Beckman Coulter analyzers from Alere Inc., which added an extensive cardiovascular and toxicology menu to its innovative medical diagnostics portfolio.

**Products**

Quidel provides diagnostic testing solutions under various brand names, including, among others, the following: Quidel®, QuickVue, QuickVue+®, QVue™, Sofia®, Triage, Solana®, Virena®, MicroVue™, Lyra®, FreshCells™, D3®, FastPoint®, ReadyCells®, Super E-Mix™, InflammaDry®, AdenoPlus®, ELVIRA®, ELVIS®, Thyretain® and Savanna®.

The products and platforms under each product category are described below.

*Rapid Immunoassay*. The rapid immunoassay product category includes the Sofia and Sofia 2 analyzers and the QuickVue, InflammaDry and AdenoPlus products. Sofia is the brand name for Quidel's fluorescent immunoassay systems. The easy-to-use Sofia and Sofia 2 analyzers combine unique software and Sofia fluorescent immunoassay tests to yield an automatic, objective result that is readily available on the instrument's screen, in a hard-copy printout, and in a transmissible electronic form that can network via a lab information system to hospital and medical center databases. Quidel launched the Sofia analyzer in 2011 and Sofia 2 in 2017. These systems provide for different operational modes to accommodate both small and large laboratories, as well as other features designed to facilitate use in a variety of healthcare settings, including hospitals, medical centers, and small clinics. Sofia 2 systems include additional benefits and features at a cost point that allows us to better address the lower-volume segment of the diagnostic testing market. Sofia 2 analyzers also incorporate enhanced optics, which provide added performance benefits and enable positive test results to be read in as few as three minutes. In 2021, Quidel also received an emergency use authorization to market its Sofia Q platform that offers similar features and benefits to the Sofia analyzers in a smaller and less expensive format.

QuickVue is the brand name for Quidel's rapid, visually-read, lateral flow immunoassay products. Quidel has been a leader in the development and production of high-quality lateral flow diagnostics since the early 1990s and offers a broad portfolio of products to diagnose a wide variety of infectious diseases and medical conditions. The QuickVue At-Home OTC COVID-19 test has also recently become a leading at-home COVID-19 product for home use and is available through many retail and online outlets.

170

Table of Contents

The InflammaDry and AdenoPlus products are rapid, lateral-flow based, point-of-care ("POC") products for the detection of infectious and inflammatory diseases and conditions of the eye. InflammaDry is a test that detects elevated levels of MMP-9, a key inflammatory marker for dry eye. AdenoPlus is a test that differentiates between a viral and bacterial infection of acute conjunctivitis (pink eye).

*Cardiometabolic Immunoassay*. The cardiometabolic immunoassay product category includes the Triage MeterPro, Quidel's portable testing platform that runs a comprehensive menu of tests that enable physicians to promote improved health outcomes through the rapid diagnosis of critical diseases and health conditions, as well as the detection of certain drugs of abuse. This system aids in the diagnosis, assessment and risk stratification of patients having critical care issues, including congestive heart failure, acute coronary syndromes, and acute myocardial infarction, and can reduce hospital admissions and improve clinical and economic outcomes. Triage cardiovascular rapid tests include immunoassays for BNP, creatine kinase-MB, d-dimer, myoglobin, troponin I and N-terminal pro-Brain Natriuretic Peptide ("NT-proBNP"). Triage tests for Troponin I, high sensitivity Troponin I, PlGF and NT-proBNP, as well as certain test panels which include a combination of immunoassays, are not available for sale in the United States. Quidel has also offered a version of the Triage BNP Test for use on Beckman Coulter Inc. lab analyzers historically but has nearly completed the transition of this business to Beckman Coulter following entry into agreements with Beckman Coulter to resolve litigation between Quidel and Beckman Coulter and provide for the transition of the BNP business to Beckman Coulter. Quidel will continue to supply Beckman Coulter products related to this business and receive payments of between $70 and $75 million per year through 2029 under these arrangements.

In addition to the cardiovascular menu, Quidel offers urine-specific screening tests for the detection of drug and/or the urinary metabolites for multiple drug classes, including Quidel's new Triage TOX Drug Screen and a PlGF test for diagnosis of preterm pre-eclampsia in pregnant women.

*Molecular Diagnostic Solutions*. The molecular diagnostic solutions product category includes the Lyra assays and the Solana and Savanna systems. Lyra is Quidel's open system molecular assays run on several thermocyclers currently on the market. Lyra Molecular Real-Time Polymerase Chain Reaction assays provide important benefits to the customer, including, among others, room temperature storage, reduced process time and ready-to-use reagent configurations.

The Solana system was developed using Quidel's proprietary isothermal Helicase Dependent Amplification technology. Solana is an easy to run amplification and detection system that has the ability to concurrently run up to 12 assays at a time.

In late 2021, Quidel launched in Europe its CE-Marked Savanna multiplex molecular analyzer system and Savanna RVP4 assay. The Savanna system is a low-cost, fully-integrated, sample-to-result automated in vitro molecular diagnostic platform that enables analysis of up to 12 pathogens or targets, plus controls, from a single assay run in less than 30 minutes. The Savanna RVP4 assay is a rapid, multiplexed nucleic acid test intended for use with the Savanna instrument for the simultaneous qualitative detection and differentiation of influenza A, influenza B, respiratory syncytial virus and SARS-CoV-2 RNA isolated from human nasal or nasopharyngeal swabs. Quidel plans to launch the Savanna system in the United States in 2022.

*Specialized Diagnostic Solutions*. The specialized diagnostic solutions product category includes a wide variety of traditional cell lines, specimen collection devices, media and controls for use in laboratories that culture and test for many human viruses, including, among others, respiratory and herpes family viruses. Quidel provides cell-based products under the FreshCells brand in multiple formats, including tubes, shell vials and multi-well plates. Quidel's virology product category includes the FDA-cleared bioassay, Thyretain, which is used for the differential diagnosis of an autoimmune disease called Graves' Disease.

Quidel also provides a variety of biomarkers for bone health and produces both clinical and research products for the assessment of osteoporosis and the evaluation of bone resorption/formation, which, including Quidel's metabolic bone markers, are used to monitor the effectiveness of therapy in pharmaceutical and related research. In the area of autoimmune disease, Quidel has developed enzyme linked immunosorbent assays and reagents for the detection of activation products from the three main complement pathways. Assays are developed on a microwell platform and are currently marketed to clinicians and researchers under the Quidel and MicroVue brands.

**Digital and Telehealth Solutions**

In 2022, Quidel introduced QVue Business, a mobile application that supports employee at-home testing using QuickVue At-Home OTC COVID-19 tests and a reporting system for employers to help track and trend COVID-19 test results within

Table of Contents

the workplace. The QVue Business application enables employees, contractors and other visitors to provide COVID-19 test results in near real time to employers. The application offers an at-home testing alternative to reduce the cost and effort of on-site testing and provides detailed videos to guide the user through the testing and reporting process. QVue Business is a flexible application that can be configured to an employer's desired testing frequency to track employees' symptoms or exposure risk and provide employees with a digital health passport for safe access into the workplace. Quidel plans to further expand its digital and telehealth solutions from the at-home testing, identity verification and reporting functions to the telehealth setting where patients can use Quidel's digital testing and reporting functions to further interact with health care professionals for diagnosis, treatment and care.

**Connectivity and Data Management**

Virena is a wireless cellular data management and surveillance system that operates as a cloud-based solution connecting Sofia and Solana instruments across a healthcare system and automatically transmitting de-identified test results to a secure database. With Virena, a health system, physician office laboratory ("POL"), urgent care center or retail clinic has the ability to compile, analyze, map and generate reports of de-identified test results, improving operational efficiencies, quality and patient outcome initiatives.

**Marketing and Distribution**

Quidel's current business strategy is designed to serve the continuum of healthcare delivery needs globally, starting with POC clinicians located in doctor's office practices, to moderately complex POLs, and to highly complex hospital and clinical reference laboratories in North America and a variety of settings internationally. Within the inherent operational diversity of these various segments, Quidel focuses on differentiating itself and enhancing its market leadership by specializing in the diagnosis and monitoring of select disease states and conditions.

Quidel's marketing strategy includes ensuring that its key product portfolios are supported by clinical validation and health economic and outcomes research that demonstrate that its tests deliver fast, high quality results, are cost-effective to use and improve patient outcomes.

Quidel's North America distribution strategy takes into account the highly fragmented POC market, with many small or medium-sized customers. To reach customers using POC diagnostic tests, a network of national and regional distributors is employed, as well as Quidel's own sales force. This sales force works closely with Quidel's key distributors to drive market penetration of its products in the POC market.

The sales, distribution and service of Quidel's cell culture tests are controlled primarily by Quidel. Quidel reaches laboratory end-users in hospitals and clinical reference laboratories using these diagnostic tests through Quidel's direct sales force and technical support services that have specialized training and understanding of this product portfolio. Quidel sells products globally and markets and distributes products worldwide in a variety of ways, including a mix of direct and indirect distribution strategies.

**Manufacturing**

Quidel has five manufacturing sites. Two are in San Diego, California, one in Carlsbad, California, one in Athens, Ohio and one in Europe. Quidel seeks to conduct its manufacturing in compliance with Quality Management System ("QMS") regulatory requirements of the United States, Australia, Brazil, Canada, Japan, Europe, South Korea and certain other countries. Quidel's manufacturing facilities have passed routine regulatory inspections confirming compliance with the QMS regulatory requirements. Its facilities are registered with various regulatory bodies, including the FDA and the Department of Public Health of the State of California for its San Diego and Carlsbad facilities.

**Business Strategy**

Quidel's strategy is to target market segments that represent significant total market opportunities, and in which Quidel can be successful by applying its expertise and know-how to develop differentiated technologies and products. Quidel's diagnostic testing solutions are designed to provide specialized results that serve a broad range of customers by addressing the market requirements of ease of use, reduced cost, increased test accuracy and reduced time to result. In order to achieve its mission of advancing diagnostics to improve human health, Quidel's strategy is to do the following:

- focus on innovative products and markets and leverage core competency in new product development for the QuickVue, Sofia and Triage immunoassay brands and next-generation products;

172

Table of Contents

- leverage manufacturing expertise to address increasing demand for Quidel's products, including through expanded manufacturing capacity;

- utilize Quidel's molecular assay development competencies to further develop its molecular diagnostics franchise that includes distinct testing platforms, such as Lyra, Solana and Savanna; and

- strengthen Quidel's position with distribution partners and end-user customers to gain more emphasis on its products and enter new markets.

173

[Table of Contents](#)

**Health, Safety and Environmental**

Ortho's operations and facilities are subject to various laws and regulations domestically and around the world governing the protection of the environment and health and safety, including the discharge and emissions of pollutants to air and water and the handling, management and disposal of hazardous substances.

Ortho is committed to employee health and safety in the workplace and has an excellent safety record. In the United States, its manufacturing facilities hold various certifications depending on the site. Our Raritan, NJ and Rochester, NY sites have both received the gold award for American Heart Association Workplace Solutions for the fourth year in a row. The Raritan and Rochester sites are also certified as part of the OSHA Voluntary Protection Programs. Ortho's facility in Pencoed, Wales has received recognition by the Welsh government for facility safety and environmental performance.

Ortho believes that all of its manufacturing and distribution facilities are operated in compliance with existing environmental requirements in all material respects, including the operating permits required thereunder. Although Ortho does not currently expect the costs of compliance with existing environmental requirements to have a material impact on its financial position, Ortho may incur additional costs or obligations to comply with environmental and health and safety requirements as a result of changes in law or customer demands, including those relating to its products. In addition, many of its manufacturing sites have a long history of industrial operations, and remediation is or may be required at a number of these locations. Although Ortho does not currently expect outstanding remediation obligations to have a material impact on its financial position, the ultimate cost of remediation is subject to a number of variables and is difficult to accurately predict. See "Risk Factors—Risks Relating to Ortho's Business—Ortho could incur costs complying with environmental and health and safety requirements, or as a result of liability for contamination or other potential environmental harm or liability caused by its operations."

**Government Regulation**

Ortho's products and operations are subject to extensive regulation by the FDA and other federal and state authorities in the United States, as well as comparable authorities in foreign jurisdictions. In the United States, its products are regulated as either medical devices under the Federal Food, Drug, and Cosmetic Act ("FDCA") and its implementing regulations, or as biological products under the FDCA and the Public Health Service Act ("PHSA") and their implementing regulations, each as amended and enforced by the FDA. The FDA regulates the development, design, non-clinical and clinical research, manufacturing, safety, efficacy, labeling, packaging, storage, installation, servicing, recordkeeping, premarket clearance or approval, adverse event reporting, advertising, promotion, marketing and distribution, and import and export of medical devices and biological products to ensure that such products distributed domestically are safe and effective for their intended uses and otherwise meet the applicable requirements of the FDCA and PHSA.

*U.S. Regulation of Medical Devices*

The majority of Ortho's diagnostic products and analyzers are regulated by the FDA as medical devices in the United States. Unless an exemption applies, each medical device commercially distributed in the United States requires either FDA clearance of a 510(k) premarket notification, or approval of a PMA application. Under the FDCA, medical devices are classified into one of three classes-Class I, Class II or Class III-depending on the degree of risk associated with each medical device and the extent of manufacturer and regulatory control needed to ensure its safety and effectiveness. Class I devices are those with the lowest risk to the patient and are those for which safety and effectiveness can be assured by adherence to the FDA's General Controls for medical devices, which include compliance with the applicable portions of current good manufacturing practices ("cGMPs") for medical devices known as the Quality System Regulation ("QSR") facility registration and product listing, reporting of adverse medical events, and truthful and non-misleading labeling, advertising, and promotional materials. Class II devices are subject to the FDA's General Controls, and special controls as deemed necessary by the FDA to ensure the safety and effectiveness of the device. These special controls can include performance standards, post-market surveillance, patient registries and FDA guidance documents. Devices deemed by the FDA to pose the greatest risks, such as life sustaining, life supporting or some implantable devices, or devices that have a new intended use, or use advanced technology that is not substantially equivalent to that of a legally marketed device, are placed in Class III.

While most Class I devices are exempt from the 510(k) premarket notification requirement, manufacturers of most Class II devices are required to submit to the FDA a premarket notification under Section 510(k) of the FDCA requesting permission to commercially distribute the device. The FDA's permission to commercially distribute a device subject to a 510(k)

190

Table of Contents

premarket notification is generally known as 510(k) clearance. Class III devices require approval of a PMA application evidencing safety and effectiveness of the device. Ortho currently markets the majority of its diagnostic products in the United States pursuant to 510(k) clearances and PMA approvals.

To obtain 510(k) clearance, a manufacturer must submit a premarket notification demonstrating to the FDA's satisfaction that the proposed device is "substantially equivalent" to another legally marketed device that itself does not require PMA approval (a predicate device). A predicate device is a legally marketed device that is not subject to premarket approval, i.e., a device that was legally marketed prior to May 28, 1976 (pre-amendments device) and for which a PMA is not required, a device that has been reclassified from Class III to Class II or I, or a device that was found substantially equivalent through the 510(k) process. The FDA's 510(k) clearance process usually takes from three to twelve months, but often takes longer. FDA may require additional information, including clinical data, to make a determination regarding substantial equivalence. In addition, the FDA collects user fees for certain medical device submissions and annual fees for medical device establishments.

If the FDA agrees that the device is substantially equivalent to a lawfully marketed predicate device, it will grant 510(k) clearance to authorize the device for commercialization. If the FDA determines that the device is "not substantially equivalent," the device is automatically designated as a Class III device. The device sponsor must then fulfill more rigorous PMA requirements, or can request a risk-based classification determination for the device in accordance with the de novo classification process, which is a route to market for novel medical devices that are low to moderate risk and are not substantially equivalent to a predicate device.

After a device receives 510(k) clearance, any modification that could significantly affect its safety or effectiveness, or that would constitute a major change or modification in its intended use, will require a new 510(k) clearance or, depending on the modification, PMA approval or de novo classification. The FDA requires each manufacturer to determine whether the proposed change requires submission of a 510(k), de novo classification request or a PMA in the first instance, but the FDA can review any such decision and disagree with a manufacturer's determination. If the FDA disagrees with a manufacturer's determination not to seek a new 510(k) or other form of marketing authorization for the modification to the 510(k)-cleared product, the FDA can require the manufacturer to cease marketing and/or request the recall of the modified device until 510(k) clearance or PMA approval is obtained or a de novo classification is granted.

The PMA process is more demanding than the 510(k) premarket notification process. In a PMA, the manufacturer must demonstrate that the device is safe and effective, and the PMA must be supported by extensive data, including data from preclinical studies and human clinical trials. All clinical investigations of devices to determine safety and effectiveness must be conducted in accordance with the FDA's investigational device exemption ("IDE") regulations which govern investigational device labeling, prohibit promotion of the investigational device, and specify an array of recordkeeping, reporting and monitoring responsibilities of study sponsors and study investigators. If the device presents a "significant risk," to human health, as defined by the FDA, the FDA requires the device sponsor to submit an IDE application to the FDA, which must become effective prior to commencing human clinical trials. A significant risk device is one that presents a potential for serious risk to the health, safety or welfare of a patient and either is implanted, used in supporting or sustaining human life, substantially important in diagnosing, curing, mitigating or treating disease or otherwise preventing impairment of human health, or otherwise presents a potential for serious risk to a subject. In addition, the study must be approved by, and conducted under the oversight of, an Institutional Review Board ("IRB") for each clinical site. The IRB is responsible for the initial and continuing review of the IDE, and may pose additional requirements for the conduct of the study. If the device presents a non-significant risk to the patient, a sponsor may begin the clinical trial after obtaining approval for the trial by one or more IRBs without separate approval from the FDA, but must still follow abbreviated IDE requirements, such as monitoring the investigation, ensuring that the investigators obtain informed consent, and labeling and record-keeping requirements.

In addition to clinical and preclinical data, the PMA must contain a full description of the device and its components, a full description of the methods, facilities, and controls used for manufacturing, and proposed labeling. Following receipt of a PMA, the FDA determines whether the application is sufficiently complete to permit a substantive review. If FDA accepts the application for review, it has 180 days under the FDCA to complete its review of a PMA, although in practice, the FDA's review often takes significantly longer, and can take up to several years. An advisory panel of experts from outside the FDA may be convened to review and evaluate the application and provide recommendations to the FDA as to the approvability of the device. The FDA may or may not accept the panel's recommendation. In addition, the FDA will generally conduct a pre-approval inspection of the applicant or its third-party manufacturers' or suppliers' facilities to ensure compliance with the QSR.

191

Table of Contents

The FDA will approve the new device for commercial distribution if it determines that the data and information in the PMA constitute valid scientific evidence and that there is reasonable assurance that the device is safe and effective for its intended use(s). The FDA may approve a PMA with post-approval conditions intended to ensure the safety and effectiveness of the device, including, among other things, restrictions on labeling, promotion, sale and distribution, and collection of long-term follow-up data from patients in the clinical study that supported PMA approval or requirements to conduct additional clinical studies post-approval. The FDA may condition PMA approval on some form of post-market surveillance when deemed necessary to protect the public health or to provide additional safety and efficacy data for the device in a larger population or for a longer period of use. In such cases, the manufacturer might be required to follow certain patient groups for a number of years and to make periodic reports to the FDA on the clinical status of those patients. Failure to comply with the conditions of approval can result in material adverse enforcement action, including withdrawal of the approval. Certain changes to an approved device, such as changes in manufacturing facilities, methods, or quality control procedures, or changes in the design performance specifications, which affect the safety or effectiveness of the device, require submission of a PMA supplement, or in some cases a new PMA.

In addition to the 510(k) clearance, PMA, and de novo classification pathways to market, the Commissioner of the FDA, under delegated authority from the Secretary of HHS may, under certain circumstances in connection with a declared public health emergency, allow for the marketing of a product that does not otherwise comply with FDA regulations by issuing an EUA for such product. Before an EUA may be issued by HHS, the Secretary must declare an emergency based on a determination that a public health emergency exists that effects or has the significant potential to affect, national security, and that involves a specified biological, chemical, radiological, or nuclear agent or agents, or a specified disease or condition that may be attributable to such agent or agents. On February 4, 2020, the HHS Secretary determined that the novel coronavirus presented a public health emergency that has a significant potential to affect national security or the health and security of U.S. citizens living abroad and declared that circumstances existed justifying the authorization of emergency use of in vitro diagnostics for detection and/or diagnosis of the novel coronavirus that causes COVID-19.

In order to be the subject of an EUA, the FDA Commissioner must conclude that, based on the totality of scientific evidence available, it is reasonable to believe that the product may be effective in diagnosing, treating, or preventing a disease attributable to the agents described above, that the product's potential benefits outweigh its potential risks and that there is no adequate, approved alternative to the product. Products subject to an EUA must still comply with the conditions of the EUA, including labeling and marketing requirements. Moreover, the authorization to market products under an EUA is limited to the period of time the public health emergency declaration is in effect. In the U.S., Ortho markets its VITROS Anti-SARS-CoV-2 IgG Antibody test and calibrators and controls and VITROS Anti-SARS-CoV-2 Total Antibody test and calibrators and controls pursuant to EUAs originally granted by the FDA in April 2020, and Ortho markets its VITROS Anti-SARS-CoV-2 Antigen Test pursuant to an EUA originally granted by the FDA on January 11, 2021.

After a device is cleared or approved or otherwise authorized for marketing, numerous pervasive regulatory requirements continue to apply unless explicitly exempt. These include:

- establishment registration and device listing with the FDA;

- QSR requirements, which require manufacturers, including third-party manufacturers, to follow stringent design, testing, control, documentation and other quality assurance procedures during all aspects of the design and manufacturing process;

- labeling and marketing regulations, which require that promotion is truthful, not misleading, fairly balanced and provide adequate directions for use and that all claims are substantiated, and also prohibit the promotion of products for unapproved or "off-label" uses and impose other restrictions on labeling; FDA guidance on off-label dissemination of information and responding to unsolicited requests for information;

- clearance or approval of product modifications to 510(k)-cleared devices that could significantly affect safety or effectiveness or that would constitute a major change in intended use of one of its cleared devices;

- medical device reporting regulations, which require that a manufacturer report to the FDA if a device it markets may have caused or contributed to a death or serious injury, or has malfunctioned and the device or a similar device that it markets would be likely to cause or contribute to a death or serious injury, if the malfunction were to recur;

- correction, removal and recall reporting regulations, which require that manufacturers report to the FDA field corrections and product recalls or removals if undertaken to reduce a risk to health posed by the device or to remedy a violation of the FDCA that may present a risk to health;

192

**Table of Contents**

## THE COMBINATIONS

*This section of the joint proxy statement/prospectus describes material aspects of the Combinations. The description in this section and elsewhere in this joint proxy statement/prospectus is qualified in its entirety by reference to the complete text of the BCA, a copy of which is attached to this joint proxy statement/prospectus as Annex A and is incorporated by reference into this joint proxy statement/prospectus. This summary may not contain all of the information that is important to you. You should carefully read this entire document, including the full text of the BCA and the other documents referred to in this document, for a more complete understanding of the Combinations. This section is not intended to provide you with any factual information about Ortho or Quidel. Such information can be found elsewhere in this joint proxy statement/prospectus and in the public filings Quidel and Ortho make with the SEC, as described in the section entitled "Where You Can Find More Information" of this joint proxy statement/prospectus.*

**The Combinations**

As discussed throughout this joint proxy statement/prospectus, Ortho is asking its shareholders to approve the Ortho Scheme and Quidel is asking its stockholders to adopt the BCA, pursuant to which Ortho and Quidel will enter into a business combination and operate under Topco, a new holding company incorporated in Delaware. The Combinations will be implemented in two main steps, which are the Ortho Scheme and the Quidel Merger.

In the Ortho Scheme:

- each Ortho Share will be acquired by a nominee of Topco (or, if such nominee holds the Ortho Shares today, transferred within the nominee), such that Ortho will become a wholly owned subsidiary of Topco; and

- at the effective time of the Ortho Scheme, each Ortho Share, other than Ortho Shares held by Ortho in treasury (if any), will be acquired by a nominee (or, if such nominee holds the Ortho Shares today, transferred within the nominee) on behalf and for the benefit of Topco in exchange for 0.1055 Topco Shares and $7.14 in cash.

In the Quidel Merger:

- U.S. Merger Sub will merge with and into Quidel immediately following consummation of the Ortho Scheme, with Quidel surviving the merger as a wholly owned subsidiary of Topco; and

- at the effective time of the Quidel Merger, each Quidel Share, other than Quidel Shares held by Quidel, Ortho or U.S. Merger Sub, will be converted into the right to receive one Topco Share.

As a result of the Combinations, Ortho and Quidel will each become wholly owned subsidiaries of Topco, and Ortho shareholders and Quidel stockholders will become Topco stockholders. Based on the respective capitalizations of Ortho and Quidel as of the date the parties entered into the BCA, immediately following consummation of the Combinations, it is expected that former Ortho shareholders will receive approximately $1.7 billion in cash in the aggregate (based on the number of Ortho Shares outstanding as of December 31, 2021) and will own approximately 38% of Topco and former Quidel stockholders will own approximately 62% of Topco, on a fully diluted basis, based on the respective capitalizations of Ortho and Quidel as of the date the parties entered into the BCA.

Based on the number of Ortho Shares and Quidel Shares outstanding as of December 31, 2021, Topco is expected to issue approximately 25,018,161 Topco Shares to the Ortho shareholders upon completion of the Ortho Scheme and approximately 41,686,165 Topco Shares to the Quidel stockholders upon completion of the Quidel Merger.

The parties intend to list the Topco Shares to be issued in the Combinations on Nasdaq.

**Background of the Combinations**

In the ordinary course of their respective businesses, senior management and the boards of directors of each of Quidel and Ortho regularly review, assess and discuss developments in their markets, their company's performance, strategy and competitive position and potential strategic initiatives and alternatives in light of economic and market conditions. From time
to time Quidel and Ortho have also reviewed and discussed with other parties potential business combinations, joint ventures, strategic alliances and other strategic transactions that might advance their strategic objectives and enhance stockholder

Table of Contents

value. As part of these ongoing reviews and discussions with respect to the Combinations, Quidel and Ortho have each considered, among other things, the significant opportunity presented by the Combinations to enhance their respective offerings in a rapidly evolving industry and the current strategic environment.

Prior to and following completion of its initial public offering, continuing into 2021, Ortho engaged in discussions with a number of potential strategic parties regarding potential strategic transactions, among other things, acquisition transactions consistent with Ortho's growth strategy, strategic alliances and potential business combinations. From time to time during this period, Ortho engaged in discussions with a strategic party referred to as Party A with respect to a potential business combination transaction. Although Ortho and Party A discussed terms for a potential business combination transaction at a high level, Ortho and Party A mutually agreed in spring 2021 not to proceed further with negotiations.

During early 2021, consistent with Quidel's growth strategy, Quidel engaged in discussions with several potential strategic parties regarding potential strategic transactions or acquisitions, including to assess strategic fit, financial fit and ability to execute. The Quidel board of directors determined that each such potential transaction was not a strategic fit at that time.

As part of Ortho's ongoing consideration of strategic transaction opportunities, on May 18, 2021, Ortho held an M&A strategy session in Denver, Colorado with members of Ortho's senior management, representatives of Carlyle (attending virtually) and representatives of Goldman Sachs & Co. LLC ("Goldman Sachs"), at which a range of potential strategic transaction opportunities were discussed, including potential transformative business combination transactions with three parties. At the conclusion of the meeting, Ortho senior management asked Goldman Sachs to initiate outreach to certain potential strategic partners, including Quidel, a strategic party referred to as "Party B" and a strategic party referred to as "Party C," with respect to potential strategic transactions.

Following the meeting, as requested by Ortho senior management, a representative of Goldman Sachs contacted Doug Bryant, Quidel's President and Chief Executive Officer, to seek approval to provide Mr. Bryant's contact information to Christopher Smith, Ortho's Chairman and Chief Executive Officer. On May 20, 2021, Mr. Bryant and Mr. Smith were introduced by email.

In addition, following the May 18 strategy session, representatives of Goldman Sachs contacted Party B and Party C to explore the possibility of strategic discussions with Ortho. Mr. Smith exchanged messages with the chief executive officer of Party B, but these messages did not result in any transaction proposals or substantive discussions. Party C indicated to representatives of Goldman Sachs that it would consider a transaction at an attractive valuation, but after further analysis, Ortho senior management concluded that a transaction with Party C was not an optimal strategic fit with Ortho, and that the transaction would result in limited growth opportunities.

On May 25, 2021, Mr. Bryant and Mr. Smith met telephonically to discuss potential transactions between Quidel and Ortho, including collaboration and partnership opportunities. In particular, Mr. Bryant and Mr. Smith discussed Quidel's Sofia and Savanna platforms and how such platforms could complement Ortho's larger-scale instrumentation for clinical chemistry and high-throughput immunoassay platforms. Mr. Bryant and Mr. Smith also discussed Ortho's interests in expanding its product offerings into molecular testing products and leveraging Ortho's global footprint and international sales force, along with the complementary nature of Quidel's and Ortho's customer bases and potential opportunities for the two companies to collaborate. In addition, Mr. Bryant and Mr. Smith discussed Quidel's potential interest in exploring how their company might benefit from Ortho's larger global commercial footprint for the launch of Quidel's Savanna instrument. A potential combination of Quidel and Ortho was briefly discussed; however, Mr. Bryant and Mr. Smith agreed at that point to focus solely on jointly exploring various collaboration structures and to assess how working together might benefit both companies. Following the meeting, Mr. Bryant and Mr. Smith each agreed that they would convene a small group of executives to further explore collaboration opportunities and review publicly available investor relations materials about the other company.

On June 8, 2021, members of Quidel's and Ortho's senior management met at Ortho's temporary office facility in Denver, Colorado to learn about the other company's business at a high level and discuss potential collaboration frameworks. As a result of the discussions at the meeting, the parties identified complementary aspects of the businesses and determined that a collaboration had the potential to benefit both companies by fostering the ability through greater scale and scope to compete with larger diagnostic companies. Specifically, for Quidel, a collaboration would provide access to a larger global commercial footprint, and for Ortho, a collaboration would provide access to higher-growth IVD segments, including molecular and point-of care testing platforms. Quidel and Ortho also discussed potential opportunities for joint or

223

Table of Contents

complementary technology development to advance both companies' R&D pipelines. The parties also decided to put in place a Confidentiality Agreement to initiate the exploration of potential collaboration frameworks.

On June 12, 2021, Quidel sent Ortho a draft Confidentiality Agreement, that included updates to an expired agreement entered into between the parties in August 2018. On June 18, 2021, Quidel and Ortho entered into a Confidentiality Agreement, covering the sharing of confidential information. The Confidentiality Agreement did not include a stand-still provision.

On June 25, 2021, at a business update meeting of the Quidel board of directors, members of Quidel's senior management provided a summary of potential collaborations and other business development opportunities for Quidel, including potential collaboration opportunities with Ortho, as well as the potential acquisition of another target company. The Quidel board of directors and members of Quidel's management reviewed preliminary information regarding factors relating to a potential acquisition of such target company prepared by representatives of Perella Weinberg, who Quidel management and the Quidel board of directors regularly consulted in the ordinary course of business regarding potential merger and acquisition transactions. The Quidel board of directors approved an outreach to such target company at the board meeting, but that outreach did not progress beyond an initial contact.

On July 8, 2021, Mr. Bryant and Mr. Smith met in Orange County, California to discuss each company's goals for a potential collaboration. Mr. Bryant noted a collaboration could be a good strategic fit for Quidel, and could provide Quidel with an opportunity to expand its geographic reach and to compete more effectively with larger diagnostic players, especially in supporting the launch of Quidel's Savanna platform. Mr. Smith agreed and noted that a collaboration could assist Ortho in expanding its product offerings, but emphasized that the collaboration would need to result in long-term sustainable growth for both companies.

Also on July 8, 2021, members of Quidel senior management discussed with representatives of Perella Weinberg preliminary financial information regarding a potential combination transaction with Ortho, assuming all-stock, all-cash or 50 percent stock/50 percent cash consideration. Quidel management had requested such information to assist them in developing preliminary thoughts on potential financial implications if the discussions with Ortho moved beyond a potential collaboration to a potential combination.

On July 19, 2021, Mr. Smith met with representatives of J.P. Morgan at their offices in New York, New York to discuss the strategic rationale for opportunities to collaborate with Quidel and engagement of J.P. Morgan for financial advice on such opportunities. A follow-up discussion on such matters occurred on July 23, 2021.

On July 20, 2021, members of Quidel's and Ortho's senior management met at Quidel's offices in San Diego, California to continue discussions regarding potential collaboration and partnership opportunities between the two companies. During the meetings, members of management of each of Ortho and Quidel provided overviews of their respective businesses and discussed potential opportunities to collaborate.

On July 23, 2021, Mr. Bryant and Mr. Smith met telephonically to discuss the July 20 meeting and agreed that each company's respective teams would continue working to assess whether and how the parties might collaborate. Mr. Bryant told Mr. Smith that he would provide the Quidel board of directors at the board meeting later that day with a brief update on the potential opportunities being discussed with Ortho. Mr. Bryant also told Mr. Smith that Mr. Bryant intended to provide the Quidel board of directors with a more detailed assessment of the potential opportunities identified by the companies at the regularly scheduled quarterly board meeting on August 30, 2021. During that same discussion, Mr. Smith informed Mr. Bryant that Ortho had begun working with J.P. Morgan to provide financial advice regarding the opportunities being discussed with Quidel. Mr. Bryant and Mr. Smith agreed to meet in person in New York in early September.

Later on July 23, 2021, at a business update meeting of the Quidel board of directors, members of Quidel's senior management provided an update on the potential collaboration opportunity with Ortho, and the Quidel board of directors and management discussed potential financial advisors who might be able to advise the board and management with respect to the potential opportunities, including Perella Weinberg.

On August 5, 2021, as a follow-up to the July 20 meeting, Ed Russell, Quidel's Senior Vice President, Business Development, Rhys de Callier, Quidel's Vice President, Strategy and Portfolio Management, Michael S. Iskra, Ortho's Executive Vice President of Commercial Excellence and Strategy, and Thomas Robinson, Ortho's Vice President, Strategy and Corporate Development, met telephonically to discuss preliminary collaboration ideas and frameworks.

224

Table of Contents

On December 21, 2021, Ortho entered into an engagement letter with J.P. Morgan confirming the engagement of J.P. Morgan as its financial advisor.

On December 22, 2021, Mr. Bryant and Mr. Smith agreed in principle that the board of directors of the combined company would have 12 members, with four directors from Ortho and eight directors from Quidel.

On December 22, 2021, at a meeting of the Quidel board of directors that was attended by certain members of Quidel's senior management and representatives from Perella Weinberg, Ms. Hodges provided an overview of the directors' fiduciary duties in connection with their evaluation of the proposed transaction, and summarized the terms of the proposed transaction, as reflected in the BCA and the Stockholders Agreement. In the course of their deliberation, the Quidel board of directors reviewed a variety of materials, including the forecasts prepared by Quidel management and Ortho management, including the Ortho Synergies Estimates. The Quidel board of directors did not give any particular materials more weight than any other materials in its decision making process. Representatives of Perella Weinberg then reviewed with the Quidel board of directors Perella Weinberg's financial analysis with respect to the Consideration of 0.1055 Topco Shares and $7.14 in cash per Ortho Share to be paid by Quidel pursuant to the BCA, taking into account the Quidel Exchange Ratio of one Topco Share per Quidel Share to be received by the Quidel stockholders in the Combinations and rendered an oral opinion, subsequently confirmed in writing, to the Quidel board of directors that, as of such date and based upon and subject to the various assumptions made, procedures followed, matters considered, and qualifications and limitations set forth therein, the consideration of 0.1055 Topco Shares and $7.14 in cash per Ortho Share to be paid by Quidel pursuant to the BCA was fair, from a financial point of view, to Quidel, taking into account the Quidel Exchange Ratio, as described in the section entitled "The Combinations—Opinion of Perella Weinberg Partners LP as Financial Advisor to Quidel" of this joint proxy statement/prospectus. Ms. Hodges then presented a set of proposed resolutions approving the BCA and the transactions contemplated thereby. On a motion duly made and seconded, the Quidel board of directors approved the resolutions by a unanimous vote.

Later on December 22, 2021, at a meeting of the Ortho board of directors that was attended by certain members of Ortho's senior management and representatives from J.P. Morgan and Latham, representatives of J.P. Morgan summarized the current proposal of consideration equal to $7.14 in cash and 0.1055 Topco Shares per Ortho Share, which would represent an implied premium of 25% when compared to Ortho's closing stock price on December 22, 2021. Representatives of J.P. Morgan then reviewed with the Ortho board of directors the strategic rationale for the transaction and their financial analysis with respect to the proposed consideration, and rendered an oral opinion, subsequently confirmed in writing that, subject to customary qualifications and as of such date, the consideration of $7.14 in cash and 0.1055 Topco Shares per Ortho Share was fair from a financial perspective to Ortho shareholders, as described in the section entitled "The Combinations—Opinion of J.P. Morgan Securities LLC as Financial Advisor to Ortho" of this joint proxy statement/prospectus. Representatives of Latham then summarized key terms of the BCA, Stockholders Agreement and Irrevocable Undertaking, and summarized fiduciary duties of the members of the Ortho board of directors as directors of a UK company. On a motion duly made and seconded, the Ortho board of directors approved the resolutions previously circulated to the directors by a unanimous vote, unanimously agreed that Mr. Smith and Robert Schmidt of Carlyle were authorized to approve final changes to the BCA and transaction documents, and then adjourned the meeting.

Later on December 22, 2021, Ortho and Quidel executed the BCA. Also on December 22, 2021, Carlyle executed its Irrevocable Undertaking and Carlyle, Ortho and Quidel executed the Stockholders Agreement.

On December 23, 2021, Quidel entered into an engagement letter with Citi confirming the engagement of Citi as its financial advisor.

On December 23, 2021, Ortho and Quidel issued a joint press release announcing the transaction.

**Ortho Scheme Consideration to Ortho Shareholders**

The BCA provides that, at the Ortho Effective Time, each Ortho Share issued and outstanding immediately prior to the Scheme Record Time (other than Ortho Shares that are held in treasury by Ortho, if any (each, an "Excluded Ortho Share")), will be acquired by GTU Ops Inc. (a Computershare entity) or another company mutually acceptable to Quidel and Ortho and falling within Section 67(6) of the Finance Act 1986 (the "DR Nominee") (or, if the DR Nominee holds the Ortho Shares today, transferred within the DR Nominee) on behalf and for the benefit of Topco in exchange for (a) 0.1055 Topco Shares and (b) $7.14 in cash (collectively, the "Ortho Scheme Consideration"). As of the Ortho Effective Time, holders of Ortho Shares (and any holders of depositary interests in Ortho Shares) shall cease to have any rights with respect to Ortho Shares, except their rights under the Ortho Scheme to receive the Ortho Scheme Consideration.

Table of Contents

**Quidel Reasons for the Combinations and Recommendation of the Quidel Board of Directors**

The Quidel board of directors has determined that the Combinations, including the Quidel Merger and the other transactions contemplated by the BCA, are consistent with and will further the business strategies and goals of Quidel, and are in the best interests of Quidel and its stockholders. At its meeting on December 22, 2021, the Quidel board of directors (a) unanimously approved and declared advisable the BCA and Combinations, including the Quidel Merger and the transactions contemplated by the BCA, and (b) determined, subject to its duties under applicable law, to recommend that the Quidel stockholders adopt the BCA and the transactions contemplated by the BCA, including the Quidel Merger.

The Quidel board of directors recommends that Quidel stockholders vote:

1.    "**FOR**" the Merger Proposal;

2.    "**FOR**" the Advisory Merger Compensation Proposal;

3.    "**FOR**" the Adjournment Proposal;

4.    "**FOR**" the Election of Directors Proposal;

5.    "**FOR**" the Advisory Executive Compensation Proposal;

6.    "**FOR**" the Independent Registered Public Accounting Firm Proposal;

7.    "**FOR**" the Equity Incentive Plan Proposal; and

8.    "**FOR**" the ESPP Proposal.

The Quidel board of directors considered many factors in reaching its conclusion that the transactions contemplated by the BCA as a whole, including the Combinations, are fair to, and in the best interests of Quidel and its stockholders. In arriving at its conclusion, the Quidel board of directors consulted with Quidel's management and its legal, financial and other advisors, reviewed a significant amount of information (including information prepared by its advisors) and considered the following factors in its deliberations:

*Strategic Considerations.* The Quidel board of directors believes that the Combinations present, and are expected to provide, a number of significant strategic opportunities and benefits to Quidel and its stockholders, including the following:

- the belief that the combined company will meet patient testing needs at all points of the care continuum, including reference labs, hospitals, physicians' offices, urgent care centers and at-home / retail locations, due to the complementary nature of the companies' products and markets;

- the belief that Ortho's commercial team will better position and support a successful launch of Quidel's new flagship product, the Savanna molecular platform, by providing access to more customers in the United States and worldwide;

- the belief that the transaction will accelerate development of a global commercial footprint for sales of other Quidel products by utilizing Ortho's commercial teams, customer support, regulatory teams and other infrastructure across over 130 countries and provide accelerated international commercial opportunities for products such as Sofia;

- the belief that the transaction will provide immediate potential product development opportunities, including dry film technology expansion opportunities for Quidel's point of care customers and immunoassay expansion opportunities for Ortho's instruments, particularly given the strength of each company's research and development capabilities;

- the belief that the combined company will unite world-class technologies and platforms to benefit customers with multiple modalities to address increasingly diverse clinical and customer needs and expanded access to clinical chemistry, immunoassay, molecular diagnostics, immunohematology, donor screening and point-of-care diagnostics offerings;

- the expectation that the transaction would provide Quidel with organic and inorganic expansion opportunities into significant new and emerging markets, including for continued diversification in telehealth technology and digital health;

- the belief that the transaction will position Quidel as a leader in the diagnostics industry, bringing together innovative, complementary products, solutions and services that enhance the health and well-being of patients

238

Table of Contents

across the globe, including a larger more broad-based company with greater flexibility to support our communities in their testing needs;

- the expectation that the combined company will realize approximately $90 million of run-rate cost-related synergies, excluding one-time costs, by the end of year three, driven primarily from operational efficiencies, supply chain optimization, and shared administrative functions, including public company costs, and has the potential to realize even greater synergies;

- the expectation that the transaction will generate strong cross-selling revenue synergies in excess of $100 million by 2025 and meaningful adjusted EBITDA benefits, which are expected to be driven by the enhanced global commercial reach and expansive product portfolio of the combined company;

- the expectation that the combined company will have improved talent attractiveness, offering more opportunities to employees functionally and globally;

- the cultural alignment between Quidel and Ortho, which both have talented and experienced employees who share a commitment to customers, patients and the communities the companies serve;

- the expectation that the transactions will result in a more diversified combined company with more stable and consistent revenue profile that can also continue to benefit from seasonal opportunities, and with a strong balance sheet with significant cash generation potential; and

- the belief that the transaction provides an attractive use of Quidel's cash and presents significant potential growth and value creation.

*Other Factors Considered by the Quidel Board of Directors.* In addition to considering the strategic factors described above, the Quidel board of directors considered the following additional factors, all of which it viewed as supporting its decision to approve the Combinations and make its recommendations to Quidel stockholders:

- the fact that eight of the members of the 12-member Topco board of directors will be designated by Quidel, and that the committees of the Topco board of directors will be comprised of one director designated by Ortho and at least two directors designated by Quidel;

- the fact that Douglas Bryant, current President and Chief Executive Officer of Quidel, will serve as the Chief Executive Officer of Topco and Chair of the Topco board of directors and that Robert Bujarski, current Chief Operating Officer of Quidel, will serve as the President and Chief Operating Officer of Topco;

- the belief that the above-described governance matters would position the combined company for a successful integration process, future success and synergies realization;

- the fixed exchange ratio of one Ortho Share for 0.1055 Topco Shares, which, by its nature, would not adjust to compensate for increases or declines in the price of Ortho Shares prior to completion of the transaction;

- the fixed exchange ratio of one Quidel Share for one Topco Share, which, by its nature, would not adjust to compensate for increases or declines in the price of the Quidel Shares prior to completion of the Combinations;

- the fact that, based on the shares outstanding as of the date of the BCA, Quidel's former stockholders will own approximately 62% of the combined company following completion of the Combinations and will continue to participate in potential appreciation in equity value of the combined company;

- the fact that, in certain circumstances, the Quidel board of directors has the right under the BCA to change its recommendation to Quidel stockholders that they adopt the BCA;

- its knowledge and understanding of the Quidel business, operations, financial condition, earnings, strategy, risks and future prospects;

- information and discussions with Quidel's management regarding Ortho's business, operations, financial condition, earnings, strategy and future prospects, and the results of Quidel's due diligence review of Ortho;

- the current and prospective business environment in which Quidel and Ortho operate, including the impact of the COVID pandemic, international, national and local economic conditions, the competitive and regulatory environment, and the likely effect of these factors on Quidel and the combined company;

- the recommendation of Quidel's senior management in favor of the Combinations;

239

Table of Contents

- the financial analyses presented by Perella Weinberg to the Quidel board of directors and the opinion of Perella Weinberg delivered to the Quidel board of directors to the effect that, as of December 22, 2021, and based upon and subject to the various assumptions made, procedures followed, matters considered and qualifications and limitations set forth in Perella Weinberg's written opinion, the Ortho Scheme Consideration of 0.1055 Topco Shares and $7.14 in cash per Ortho Share to be paid by Quidel pursuant to the BCA was fair, from a financial point of view, to Quidel, taking into account the Quidel Exchange Ratio of one Topco Share per Quidel Share, as more fully described in the section entitled "The Combinations—Opinion of Perella Weinberg Partners LP as Financial Advisor to Quidel" of this joint proxy statement/prospectus;

- the likelihood that the Combinations will be completed on a timely basis and the belief that antitrust clearance could be obtained without the imposition of conditions that would be materially adverse to the combined company;

- the fact that the Quidel Merger is subject to approval by the Quidel stockholders;

- the fact that, subject to certain limited exceptions, Ortho is prohibited from soliciting, participating in any discussions or negotiations with respect to, providing non-public information to any third party with respect to or entering into any agreement providing for, the acquisition of Ortho;

- the fact that Ortho may be required to pay Quidel a termination fee of approximately $46.9 million and/or reimburse Quidel for certain reasonable costs, fees and expenses it incurs if the BCA is terminated under certain circumstances specified in the BCA; and

- the fact that the Quidel Exchange Ratio will not be negatively affected in the event of a decrease in the share price of the Quidel Shares prior to the Quidel Effective Time and that the terms of the BCA do not include termination rights for Ortho triggered in the event of an increase of the value of Ortho relative to the value of Quidel.

The Quidel board of directors also considered the following specific aspects of the BCA:

- the representations and warranties of Ortho and Quidel, as well as the interim operating covenants requiring the parties to conduct their respective businesses in the ordinary course prior to completion of the Combinations, subject to specific limitations, which are generally reciprocal;

- the likelihood of consummation of the Combinations and the Quidel board of directors' evaluation of the likely time period necessary to complete the Combinations;

- the nature of the closing conditions included in the BCA, including the exceptions to the events that would constitute a material adverse effect with respect to Ortho or Quidel for purposes of the BCA, as well as the likelihood of satisfaction of all conditions to consummation of the Combinations;

- Quidel's right to engage in negotiations with, and provide information to, a third party that makes an unsolicited Acquisition Proposal for Quidel (as defined in the section entitled "The Business Combination Agreement—Acquisition Proposals" of this joint proxy statement/prospectus), if the Quidel board of directors determines in good faith, after consultation with its outside legal and financial advisors, that such proposal constitutes or would reasonably be expected to lead to, a Superior Proposal (as defined in the section entitled "The Business Combination Agreement—Acquisition Proposals" of this joint proxy statement/prospectus);

- the Quidel board of directors' ability to change its recommendation that Quidel stockholders vote in favor of the adoption of the BCA if it determines in good faith after consultation with its outside counsel that failure to take such action would be inconsistent with its fiduciary duties under applicable law, subject to compliance by Quidel with certain obligations;

- the requirement for the parties to use reasonable best efforts to obtain all regulatory approvals or clearances;

- the restrictions in the BCA on Ortho's ability to respond to and negotiate certain alternative transaction proposals from third parties and the requirement that Ortho pay Quidel an approximately $46.9 million termination fee if the BCA is terminated under certain circumstances;

- certain other provisions in the BCA, including the termination provisions; and

- the belief that the size of the termination fee that might be payable to Ortho pursuant to the BCA (i) was reasonable in light of the overall terms of the BCA, (ii) was within the range of termination fees in other transactions of this size and nature and (iii) would not be likely to preclude another party from making a competing proposal for Quidel.

240

Table of Contents

The Quidel board of directors weighed these advantages and opportunities against a number of potentially negative factors in its deliberations concerning the BCA and the Combinations, including:

- the Ortho Exchange Ratio will not be reduced in the event of an increase in the share price of Quidel Shares prior to the Quidel Effective Time, and that the terms of the BCA do not include termination rights for Quidel triggered in the event of a decrease in the value of Ortho relative to the value of Quidel;

- the cash consideration payble to the Ortho shareholders by Quidel under the BCA is fixed and will not be reduced in the event of a decrease in the share price of Ortho Shares prior to the Effective Time;

- the potential that the fixed exchange ratio under the BCA could result in Quidel delivering greater value to the Ortho shareholders than had been anticipated by Quidel should the value of the Quidel Shares increase relative to Ortho Shares after the date of execution of the BCA;

- the significant costs to be incurred in connection with the Combinations, including the substantial cash and other costs required to integrate the businesses of Quidel and Ortho, as well as transaction expenses;

- the fact that projections of future results of operations and synergies are necessarily estimates based on assumptions, the risk of not realizing the estimates of synergies anticipated by Quidel's management to result from the Combinations and cost savings between Quidel and Ortho, or that such benefits may take longer than expected to be realized, if at all;

- the difficulties inherent in the combination of two companies of the size and scope of Quidel and Ortho, including (i) challenges related to integrating and retaining management and employees and (ii) the possible diversion of management focus and resources from operational matters and other strategic opportunities for an extended period of time;

- the adverse impact that business uncertainty prior to the closing of the Combinations and during the post-closing integration period could have on the ability of both Quidel and Ortho to attract, retain and motivate key personnel;

- the potential adverse effect that the Combinations could have on Quidel's business and relationships with employees, customers, suppliers, regulators and the communities in which it operates;

- the risk that governmental entities may not approve the Combinations or may impose conditions on Quidel or Ortho in order to gain approval for the Combinations that may adversely impact the ability of Topco to realize the estimates of synergies anticipated by Quidel's management to result from the Combinations;

- the limited circumstances under which Quidel could terminate the BCA or refuse to consummate the Combinations;

- that Quidel, subject to customary exceptions, is prohibited during the term of the BCA from soliciting, participating in any discussions or negotiations with respect to, and providing nonpublic information to any third party with respect to, the acquisition of Quidel and that Quidel is prohibited from terminating the BCA to enter into any agreement providing for the acquisition of Quidel;

- that certain provisions of the BCA, although reciprocal, may have the effect of discouraging alternative proposals involving Quidel;

- the risk that, pursuant to the terms of the BCA, Quidel may become obligated to pay a termination fee of approximately $207.8 million and/or reimburse Ortho for certain reasonable costs, fees and expenses it incurs in certain circumstances;

- the generally reciprocal restrictions on operations until completion of the Combinations which could have the effect of preventing Quidel from pursuing certain other strategic transactions during the pendency of the BCA as well as taking certain other actions relating to the conduct of its business without the prior consent of Ortho;

- the fact that, if the Quidel board of directors effects a Change in Laguna Recommendation (as defined in the BCA) (a "Quidel Change in Recommendation"), Quidel will nonetheless be obligated to hold the Quidel Stockholders' Meeting and submit the proposals described in this joint proxy statement/prospectus to its stockholders for their vote unless Quidel terminates the BCA or except in the case of a Quidel All Cash Superior Proposal;

- that failure to complete the Combinations could cause Quidel to incur significant fees and expenses and could lead to negative perceptions among investors, potential investors, customers and employees;

241

Table of Contents

- the potential for litigation relating to the Combinations and the associated costs, time, burden and inconvenience involved in defending those proceedings;

- the risk that Ortho shareholders or Quidel stockholders, as applicable, may vote down the proposals at the Ortho Court Meeting or Quidel Stockholders' Meeting; and

- the other risks of the type and nature described under the sections entitled "Risk Factors" and "Cautionary Statement Concerning Forward-Looking Statements" of this joint proxy statement/prospectus.

The Quidel board of directors concluded that the uncertainties, risks and potentially negative factors relevant to the Combinations were outweighed by the potential benefits that it expected Quidel and the Quidel stockholders would achieve as a result of the Combinations.

The foregoing discussion of the information and factors considered by the Quidel board of directors is not exhaustive but is intended to reflect the material factors considered by the Quidel board of directors in its consideration of the business combination with Ortho. In view of the large number of factors considered and their complexity, the Quidel board of directors, both individually and collectively, did not find it practicable to and did not attempt to quantify or assign any relative or specific weight to the various factors. Rather, the Quidel board of directors based its recommendation on the totality of the information presented to and considered by it. In addition, individual members of the Quidel board of directors may have given different weights to different factors. The foregoing discussion of the information and factors considered by the Quidel board of directors is forward-looking in nature. This information should be read in light of the factors described under the section entitled "Cautionary Statement Concerning Forward-Looking Statements" of this joint proxy statement/prospectus.

**Ortho Reasons for the Combinations and Recommendation of the Ortho Board of Directors**

The Ortho board of directors has determined, having consulted with J.P. Morgan, financial advisor to Ortho in connection with the Combinations, that the transactions contemplated by the BCA, including the Ortho Scheme, are fair to, and in the best interests of, Ortho and its shareholders. At its meeting on December 22, 2021, the Ortho board of directors, among other things, (a) determined that the Ortho Scheme and the transactions contemplated by the BCA as a whole are in the best interests of Ortho, would further the business goals and strategies of Ortho and would promote the success of Ortho for the benefit of its shareholders as a whole, (b) approved the terms of the BCA, including but not limited to the Ortho Scheme, (c) directed that the Ortho Scheme be recommended to Ortho's shareholders and, subject to receiving the vote of Ortho shareholders, that the Ortho Scheme be approved and (d) approved the execution and delivery of the BCA by any director of Ortho.

**The Ortho board of directors recommends that Ortho shareholders vote "FOR" each of the proposals at the Ortho Court Meeting and "FOR" each of the proposals at the Ortho General Meeting.**

The Ortho board of directors considered many factors in reaching its conclusion that the transactions contemplated by the BCA as a whole, including the Combinations, are fair to, and in the best interests of Ortho and its shareholders. In arriving at its conclusion, the Ortho board of directors consulted with Ortho's management and its legal, financial and other advisors, reviewed a significant amount of information and considered the following factors in its deliberations:

- the belief that the combination will result in the creation of a leader in the diagnostics industry with top-tier research and development capabilities, a more diverse product pipeline and a broader geographic footprint;

- the belief that Ortho's and Quidel's product and service offerings are highly complementary and provide opportunities to capture significant growth globally while enhancing cross-selling opportunities across a diversified customer and channel mix, including by enhancing the ability to meet patient needs at all points of the care continuum;

- the belief that Ortho and Quidel have complementary cultures and that their respective management teams will successfully integrate the two businesses after closing of the Combinations and provide a strong foundation for the combined management team to accelerate growth, stimulate the sharing of expertise and support faster innovation;

- the belief that the combination will accelerate innovative product expansion through complementary capabilities and product development synergies;

242

Table of Contents

- the belief that the combination will allow Topco to achieve estimated cost synergies of $95 million by the end of the third year after closing of the Combinations, driven primarily by operational efficiencies, supply chain optimization and shared administrative functions, and cross-selling revenue synergies in excess of $100 million by 2025, as well as opportunities for adjusted EBITDA margin expansion, supporting enhanced cash generation;

These beliefs are based in part on the following factors that the Ortho board of directors considered:

- its knowledge and understanding of Ortho's business, operations, financial condition, earnings, strategy and future prospects;

- information and discussions with Ortho's management regarding Quidel's business, operations, financial condition, earnings, strategy and future prospects, and the results of Ortho's due diligence review of Quidel;

- the fact that one-third of the Topco board of directors following completion of the Combinations will be designated by Ortho;

- the fact that the Topco board of directors shall have an Audit Committee, a Nominating and Corporate Governance Committee and a Compensation Committee, each of which will include one director designated by Ortho at the closing of the Combinations;

- the fact that Joseph M. Busky, the current chief financial officer of Ortho, will be the chief financial officer of Topco and Michael Iskra, the current executive vice president of commercial excellence and strategy of Ortho, will be the chief commercial officer of Topco;

- the current and prospective economic climate generally and the competitive climate in the industries in which Ortho and Quidel operate, including the combination of certain other companies in such industries;

- the fact that, based on the shares outstanding as of the date of signing of the BCA, Ortho's former shareholders will own approximately 38% of Topco following completion of the Combinations and will continue to participate in potential appreciation in the equity value of Topco;

- the financial analyses presented by J.P. Morgan and the oral opinion of J.P. Morgan delivered to the Ortho board of directors on December 22, 2021, which was confirmed by delivery of a written opinion, dated as of December 23, 2021, to the effect that, as of such date and based upon and subject to the assumptions made, procedures followed, matters considered and limitations on the review undertaken by J.P. Morgan in preparing its opinion, the Ortho Scheme Consideration was fair, from a financial point of view, to the holders of Ortho Shares, as more fully described below in the section entitled "Opinion of J.P. Morgan Securities LLC as Financial Advisor to Ortho" of this joint proxy statement/prospectus (with the full text of the written opinion of J.P. Morgan, dated as of December 23, 2021, which sets forth, among other things, the assumptions made, procedures followed, matters considered and limitations on the review undertaken by J.P. Morgan in preparing its opinion, attached as Annex E to this joint proxy statement/prospectus and incorporated herein by reference);

- the review by the Ortho board of directors with its legal advisor of the structure of the proposed business combination transaction and the terms of BCA, including the conditions to their respective obligations and the termination provisions, as well as the likelihood of consummation of the Combinations and the Ortho board of directors' evaluation of the likely time period necessary to complete the Combinations:

  - the degree of mutuality and symmetry of representations, obligations and rights of the parties under the BCA, the conditions to each party's obligation to close the transaction and the circumstances in which each party is permitted to terminate the BCA, and the likelihood that the Combinations will be completed on a timely basis and the belief that antitrust clearance could be obtained without the imposition of conditions that would be materially adverse to Topco;

  - the nature of the closing conditions included in the BCA, including the exceptions to the events that would constitute a material adverse effect with respect to Ortho or Quidel for purposes of the BCA, as well as the likelihood of satisfaction of all conditions to consummation of the Combinations;

  - Ortho's right to engage in negotiations with, and provide information to, a third party that makes an unsolicited Acquisition Proposal for Ortho (as defined in the section entitled "The Business Combination Agreement—Acquisition Proposals" of this joint proxy statement/prospectus), if the Ortho board of directors determines in good faith, after consultation with its legal and financial advisors, that such proposal constitutes or would reasonably be expected to lead to a Superior Proposal (as defined in the section entitled "The Business Combination Agreement—Acquisition Proposals" of this joint proxy statement/prospectus);

243