**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

IN RE QUIDELORTHO CORPORATION
SECURITIES LITIGATION

No. 24-cv-02804-JAV

<u>ORAL ARGUMENT REQUESTED</u>

<u>**LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**</u>

**TABLE OF CONTENTS**

GLOSSARY OF CERTAIN DEFINED TERMS..............................................................viii

INTRODUCTION AND STATEMENT OF FACTS ...................................................... 1

I.      Savanna RVP4 Misstatements Scheme ............................................................ 1

II.     Endemic COVID Revenue Misstatements Scheme............................................ 3

III.    Revelation Of The Truth Harmed QO Investors................................................ 4

IV.     Defendants' Falsity And Scienter Challenges Fail ............................................ 4

ARGUMENT ................................................................................................................ 6

I.      Defendants Made Misstatements Concerning Savanna RVP4 .......................... 6

        A.      Defendants Made Misstatements About The Success Of RVP4's EU
                Launch.................................................................................................... 7

        B.      Defendants Made Misstatements About RVP4's Development, Readiness
                For A US Launch, And Ability To Satisfy Known FDA Criteria ........ 12

        C.      Defendants Made Misstatements About RVP4 Manufacturing Capability.......... 18

II.     Defendants Made Misstatements Regarding QO's Endemic COVID Revenue............... 20

III.    The Complaint Adequately Alleges a Strong Inference of Defendants' Scienter ............ 24

        A.      Defendants Knew Or Were Reckless In Making The Savanna
                Misstatements ....................................................................................... 25

        B.      Defendants Knew Or Recklessly Made Endemic COVID-19
                Misstatements ....................................................................................... 30

        C.      Defendants' Scienter Arguments Fail To Raise An Innocent Inference............... 32

IV.     The Complaint Adequately Pleads Scheme Liability ....................................... 34

V.      The Complaint's Section 20(a) Claim Is Adequately Alleged ........................ 35

CONCLUSION........................................................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Aceto Corp. Sec. Litig.*,
2019 WL 3606745 (E.D.N.Y. Aug. 6, 2019)..............................................................14

*Akerman v. Arotech Corp.*,
608 F. Supp. 2d 372 (E.D.N.Y. 2009) ......................................................................28

*In re Alibaba Grp. Holding Ltd. Sec. Litig.*,
2023 WL 2601472 (S.D.N.Y. Mar. 22, 2023) ....................................................12, 18

*Anderson News, L.L.C. v. Am. Media, Inc.*,
680 F.3d 162 (2d Cir. 2012)........................................................................................6

*In re AppHarvest Sec. Litig.*,
684 F. Supp. 3d 201 (S.D.N.Y. 2023)..........................................................14, 34, 35

*In re Apple Inc. Sec. Litig.*,
2020 WL 6482014 (N.D. Cal. Nov. 4, 2020) ...........................................................30

*In re Aratana Therapeutics Inc. Sec. Litig.*,
315 F. Supp. 3d 737 (S.D.N.Y. 2018)......................................................................17

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007).......................................................................................29

*Bettis v. Aixtron SE*,
2016 WL 7468194 (S.D.N.Y. Dec. 20, 2016) ..........................................................30

*In re BHP Billiton Ltd. Sec. Litig.*,
276 F. Supp. 3d 65 (S.D.N.Y. 2017).................................................................11, 17

*Bishins v. CleanSpark, Inc.*,
2023 WL 112558 (S.D.N.Y. Jan. 5, 2023) ..............................................................23

*Bricklayers & Masons Loc. Union No. 5 Ohio Pension Fund v. Transocean Ltd.*,
866 F. Supp. 2d 223 (S.D.N.Y. 2012)......................................................................11

*In re CarLotz, Inc. Sec. Litig.*,
2024 WL 1348749 (S.D.N.Y. Mar. 29, 2024) ..........................................................27

*In re Chembio Diagnostics, Inc. Sec. Litig.*,
616 F. Supp. 3d 192 (E.D.N.Y. 2022) .....................................................................27

*In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*,
  2018 WL 2382600 (S.D.N.Y. May 24, 2018) ..................................................................23

*City of N. Miami Beach Police Officers' & Firefighters' Ret. Plan v. Nat'l Gen.*
  *Holdings Corp.*,
  2021 WL 212337 (S.D.N.Y. Jan. 21, 2021) ...................................................................26

*City of Providence v. Aeropostale, Inc.*,
  2013 WL 1197755 (S.D.N.Y. Mar. 25, 2013) ................................................................18

*City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*,
  875 F. Supp. 2d 359 (S.D.N.Y. 2012).............................................................................27

*Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc.*,
  22 F.4th 1 (1st Cir. 2021)...............................................................................................27

*In re DraftKings Inc. Sec. Litig.*,
  650 F. Supp. 3d 120 (S.D.N.Y. 2023).............................................................................32

*Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*,
  794 F.3d 297 (2d Cir. 2015).............................................................................................6

*In re Estée Lauder Co., Inc. Sec. Litig.*,
  2025 WL 965686 (S.D.N.Y. Mar. 31, 2025) .............................................................15, 25

*In re EVCI Colls. Holding Corp. Sec. Litig.*,
  469 F. Supp. 2d 88 (S.D.N.Y. 2006)..........................................................................32, 34

*F.T.C. v. Tax Club, Inc.*,
  994 F. Supp. 2d 461 (S.D.N.Y. 2014)..............................................................................11

*In re Facebook, Inc. IPO Sec. & Deriv. Litig.*,
  986 F. Supp. 2d 487 (S.D.N.Y. 2013)..............................................................6, 10, 14, 22

*In re Facebook, Inc. Sec. Litig.*,
  87 F.4th 934 (9th Cir. 2023) ...........................................................................................22

*Freudenberg v. E\*Trade Fin. Corp.*,
  712 F. Supp. 2d 171 (S.D.N.Y. 2010)..............................................................................33

*Galestan v. OneMain Holdings, Inc.*,
  348 F. Supp. 3d 282 (S.D.N.Y. 2018).....................................................................24, 27, 34

*Gauquie v. Albany Molecular Rsch., Inc.*,
  2016 WL 4007591 (E.D.N.Y. July 26, 2016)....................................................................26

*In re Gen. Elec. Sec. Litig.*,
  857 F. Supp. 2d 367 (S.D.N.Y. 2012)..............................................................................30

*Gillis v. QRX Pharma Ltd.*,
    197 F. Supp. 3d 557 (S.D.N.Y. 2016)....................................................................................17

*Heller v. Goldin Restructuring Fund, L.P.*,
    590 F. Supp. 2d 603 (S.D.N.Y. 2008)....................................................................................29

*In re Hi-Crush Partners L.P. Sec. Litig.*,
    2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013) .........................................................................28

*In re iDreamSky Tech. Ltd. Sec. Litig.*,
    236 F. Supp. 3d 824 (S.D.N.Y. 2017).............................................................................16, 23

*In re Inv. Tech. Grp., Inc. Sec. Litig.*,
    251 F. Supp. 3d 596 (S.D.N.Y. 2017)......................................................................................6

*In re Lehman Bros. Sec. & ERISA Litig.*,
    2013 WL 3989066 (S.D.N.Y. July 31, 2013) ........................................................................33

*In re Longtop Fin. Techs. Ltd. Sec. Litig.*,
    2012 WL 2512280 (S.D.N.Y. June 29, 2012) ..................................................................10, 15

*Lorenzo v. Sec. & Exch. Comm'n*,
    587 U.S. 71 (2019)................................................................................................................35

*In re Lottery.com, Inc. Sec. Litig.*,
    715 F. Supp. 3d 506 (S.D.N.Y. 2024)...................................................................................23

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
    601 U.S. 257 (2024)..............................................................................................................14

*Meyer v. Jinkosolar Holdings Co.*,
    761 F.3d 245 (2d Cir. 2014)................................................................................................6, 14

*In re MF Glob. Holdings Ltd. Sec. Litig.*,
    982 F. Supp. 2d 277 (S.D.N.Y. 2013)...................................................................................23

*In re Mylan N.V. Sec. Litig.*,
    2018 WL 1595985 (S.D.N.Y. Mar. 28, 2018) .......................................................................26

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
    455 F. App'x 10 (2d Cir. 2011) ............................................................................................34

*In re NIO, Inc. Sec. Litig.*,
    2021 WL 3566300 (E.D.N.Y. Aug. 12, 2021)..................................................................13, 32

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000).......................................................................................14, 17, 24

iv

*Nutriband, Inc. v. Kalmar*,
  2020 WL 4059657 (E.D.N.Y. July 20, 2020)..........................................................................26

*Okla. Firefighters Pension & Ret. System v. Musk*,
  2025 WL 951231 (S.D.N.Y. Mar. 28, 2025) ..........................................................................34

*Omnicare, Inc v. Laborers Dist. Council Const. Indus. Pension Fund*,
  575 U.S. 175 (2015).................................................................................................................11

*Pirnik v. Fiat Chrysler Autos., N.V.*,
  2016 WL 5818590 (S.D.N.Y. Oct. 5, 2016) ..........................................................................25

*Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*,
  11 F.4th 90 (2d Cir. 2021) ......................................................................................................35

*Plumbers & Pipefitters Loc. Union No. 630 Pension-Annuity Tr. Fund v. Arbitron
  Inc.*,
  741 F. Supp. 2d 474 (S.D.N.Y. 2010).......................................................................................9

*Plumbers & Pipefitters Nat'l Pension Fund v. Davis*,
  2020 WL 1877821 (S.D.N.Y. Apr. 14, 2020)...........................................................................9

*Plumbers & Pipefitters Nat. Pension Fund v. Orthofix Int'l N.V.*,
  89 F. Supp. 3d 602 (S.D.N.Y. 2015)......................................................................................33

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004)....................................................................................................10

*S.E.C. v. Rio Tinto
  plc*, 41 F.4th 47, 49 (2d Cir. 2022)........................................................................................35

*In re Sadia, S.A. Sec. Litig.*,
  643 F. Supp. 2d 521 (S.D.N.Y. 2009).....................................................................................31

*In re Salix Pharm, Ltd.*,
  2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016).......................................................25, 29, 31, 34

*San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*,
  732 F. Supp. 3d 300 (S.D.N.Y. 2024)..............................................................17, 25, 28, 32

*In re Sanofi Sec. Litig.*,
  87 F. Supp. 3d 510 (S.D.N.Y. 2015)..........................................................................16, 27, 30

*Set Cap. LLC v. Credit Suisse Grp. AG*,
  996 F.3d 64 (2d Cir. 2021)......................................................................................................22

*Sharette v. Credit Suisse Int'l*,
  127 F. Supp. 3d 60 (S.D.N.Y. 2015)..........................................................................................6

*Sharma v. Rent the Runway, Inc.*,
751 F. Supp. 3d 82 (E.D.N.Y. 2024) .................................................................15

*Silverman v. Motorola, Inc.*,
2008 WL 4360648 (N.D. Ill. Sept. 23, 2008) ....................................................17

*Sinnathurai v. Novavax, Inc.*,
645 F. Supp. 3d 495 (D. Md. 2022) ...................................................................19

*Skiadas v. Acer Therapeutics Inc.*,
2020 WL 3268495 (S.D.N.Y. June 16, 2020) ....................................................13

*In re SolarEdge Techs., Inc. Sec. Litig.*,
2025 WL 1031154 (S.D.N.Y. Apr. 6, 2025).....................................................9, 26

*Speakes v. Taro Pharm. Indus., Ltd.*,
2018 WL 4572987 (S.D.N.Y. Sept. 24, 2018)................................................25, 26

*In re St. Jude Med., Inc. Sec. Litig.*,
836 F. Supp. 2d 878 (D. Minn. 2011)................................................................30

*Stadium Cap. LLC v. CoDiagnostics, Inc.*,
2024 WL 456745 (S.D.N.Y. Feb. 5, 2024).....................................................25, 26

*Sun v. TAL Educ. Grp.*,
2023 WL 6394413 (S.D.N.Y. Sept. 29, 2023)....................................................33

*In re Symbol Techs., Inc. Sec. Litig.*,
2013 WL 6330665 (E.D.N.Y. Dec. 5, 2013) ......................................................21

*Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*,
531 F.3d 190 (2d Cir. 2008)..............................................................................25

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007)........................................................................24, 28, 29

*Varghese v. China Shenghuo Pharm. Holdings, Inc.*,
672 F. Supp. 2d 596 (S.D.N.Y. 2009)...............................................................31

*In re Virtu Fin., Inc. Sec. Litig.*,
2025 WL 847824 (E.D.N.Y. Mar. 17, 2025).......................................................31

*In re Vivendi Universal, S.A. Sec. Litig.*,
381 F. Supp. 2d 158 (S.D.N.Y. 2003)...............................................................6, 29

*In re Vivendi, S.A. Sec. Litig.*,
838 F.3d 223 (2d Cir. 2016).............................................................................6, 10

vi

*Wang v. Cloopen Grp. Holding Ltd.*,
   661 F. Supp. 3d 208 (S.D.N.Y. 2023)............................................................................... *passim*

*Weston v. DocuSign, Inc.*,
   669 F. Supp. 3d 849 (N.D. Cal. 2023) .................................................................................33

*Wilson v. LSB Indus., Inc.*,
   2017 WL 7052046 (S.D.N.Y. Mar. 2, 2017) .......................................................................18

*Yannes v. SCWorx Corp.*,
   2021 WL 2555437 (S.D.N.Y. June 21, 2021) ................................................................28, 31

## GLOSSARY OF CERTAIN DEFINED TERMS

| | |
|---|---|
| 510(k) | Section 510(k) of the Food, Drug and Cosmetic Act. *See* ¶101, n.4. |
| Action | *In re Quidelortho Corporation Securities Litigation*, No. 1:24-cv-02804-JAV (S.D.N.Y.) |
| Bryant | Douglas Bryant, the Company's former CEO. |
| Bujarski | Robert J. Bujarski, the Company's former Chief Operating Officer. |
| Busky | Joseph Busky, the Company's former CFO. |
| CAPA | Corrective and Preventive Actions. ¶178. |
| CE Mark | The Conformitè Europëenne Mark, which, during the Class Period for Savanna RVP4, reflected the Company's self-certifying declaration that its product complied with the EU's requirements for sale. |
| CCO | Chief Commercial Officer. |
| CEO | Chief Executive Officer. |
| CFO | Chief Financial Officer. |
| Class Period | The period of time from after market close on February 17, 2022 through April 1, 2024, inclusive. |
| COO | Chief Operating Officer. |
| Company | Collectively, Quidel and QO during the Class Period. |
| Complaint | Lead Plaintiff's Amended Class Action Complaint for Violations of the Federal Securities Laws (ECF No. 42). References to the Complaint herein appear as "¶___". |
| COVID | Coronavirus disease 2019, a disease caused by the SARS-CoV-2 virus. |
| DB | Defendants' Memorandum of Law in Support of Defendants' Motion to Dismiss the Amended Class Action Complaint (ECF No. 48). |
| Defendants | QO (and its predecessor entity Quidel) and the Individual Defendants. |
| EU | The European Union. |
| EUA | FDA Emergency Use Authorization |

| | |
|---|---|
| FE-1 | Former Senior Director, Regulatory Affairs from January 2020 through April 2024. |
| | Allegations attributable to FE-1: ¶¶16, 46, 129-30, 139-41, 164, 198-205, 330, 363-64, 371. |
| FE-2 | Former Senior Director, Systems Engineering from February 2020 through September 2023 who worked on developing the engineering for the Savanna RVP4 test as well as the RVP4 cartridges used in that test. |
| | Allegations attributable to FE-2: ¶¶16, 47, 145-46, 152-57, 193, 208, 212, 217-19, 224-25, 324, 331-32, 334, 341, 363-64, 371. |
| FE-3 | Former employee in Ortho and then QO's Sales and Business Development group from prior to the start of the Class Period through April 2024. |
| | Allegations attributable to FE-3: ¶¶48, 147, 235-38, 252-54, 257, 302, 346-47, 379. |
| FE-4 | Former employee who was a scientist who held senior level marketing roles from mid-2020 until Fall 2023 and led the EU launch of Savanna RVP4 and drafted Savanna marketing materials. |
| | Allegations attributable to FE-4: ¶¶11, 16, 49, 77, 143-44, 163, 165-71, 173-75, 185-86, 206-07, 212, 223, 323, 325, 329, 331, 338, 359, 362, 369. |
| FE-5 | Former Territory Account Manager and Acute Account Manager from May 2021 to July 2023 responsible for sales in the state of Michigan. |
| | Allegations attributable to FE-5: ¶¶50, 149, 220. |
| FE-6 | Former Cost Accounting Manager from 2010 through April 2024 who worked with Operations on the cost accounting for the Savanna RVP4 test and reported directly to FE-10. |
| | Allegations attributable to FE-6: ¶¶11, 51, 165, 189, 214-15, 223, 228-29, 323, 340-42, 367, 372. |
| FE-7 | Former Marketing Manager, Molecular Dx (EMEA) from March 2021 until May 2024, who was responsible for marketing products including RVP4 in the EU, and who "didn't remember any market launch that was so full of issues" as the RVP4 EU launch. |
| | Allegations attributable to FE-7: ¶¶11, 52, 166, 170-72, 174, 176, 180-88, 190, 226, 322, 325, 329, 340-41, 362, 366, 369. |
| FE-8 | Former member of the Quality Assurance team from October 2020 until July 2024, who was responsible for coordinating Corrective and Preventive Actions (CAPA). |
| | Allegations attributable to FE-8: ¶¶53, 177-78, 326, 366, 368. |

ix

| FE-9 | Former Vice President, Sales and Marketing, Europe from October 2017 through June 2024, who was responsible for sales and marketing efforts for the Company's products in Germany, Austria, Switzerland, the Benelux region, Italy, and the United Kingdom, and reported directly to the former Senior Vice President of International Commercial Operations. |
| | Allegations attributable to FE-9: ¶¶54, 179, 184, 250, 353. |
| FE-10 | Former Finance Director from Fall 2020 until Fall 2023, who was one reporting level away from Defendant Busky from May 2022 through Fall 2023. |
| | Allegations attributable to FE-10: ¶¶16, 20, 55, 193-96, 223, 270-80, 324, 340, 349, 354, 377. |
| FE-11 | Former Territory Account Manager (2017 – April 2022) Manager, Field Sales Training East Coast (April 2022 - February 2023), and Channel Sales Manager (February 2023 – July 2024), who, in his last role, managed two sales teams and worked with the Company's distributors in the Mid-Atlantic and Northeast regions. |
| | Allegations attributable to FE-11: ¶¶56, 197, 199, 233-34, 331, 346-47, 353, 371. |
| FE-12 | Former Senior Scientist from January 2023 until June 2024, who worked exclusively on Savanna and RVP4. |
| | Allegations attributable to FE-12: ¶¶57, 209-11, 323, 326, 359. |
| FE-13 | Former Cost Accountant from February 2022 until March 2023 who worked on the Triage and Savanna products. |
| | Allegations attributable to FE-13: ¶¶58, 213, 216, 326, 363, 367, 381. |
| FE-14 | Former Engineer/Associate Director from before the Class Period to the second half of 2023. |
| | Allegations attributable to FE-14: ¶¶9, 59, 132-36, 340, 342, 360, 370, 381. |
| FE-15 | Former Territory Manager from September 2015 until June 2023, who was responsible for selling QO's respiratory products to customers in California and Nevada, and who attended weekly, quarterly, and monthly sales calls in which the Company's C-Suite participated. |
| | Allegations attributable to FE-15: ¶¶60, 240-43, 346-47, 353. |
| FE-16 | Former Account Manager from late 2022 through September 2023, who sold, among other things, QO tests for COVID, flu, and RSV to customers located in Northeast United States. |
| | Allegations attributable to FE-16: ¶¶61, 244-46, 256, 346, 348. |

x

| | |
|---|---|
| FE-17 | Former Account Executive through early 2024, who grew QO's business through its sales to distributors of QO's respiratory testing products. Allegations attributable to FE-17: ¶¶62, 247, 346. |
| FE-18 | Former Senior Global Product Manager, Immunoassay in Vitro Diagnostic Tests from May 2021 until May 2024 who reported to Director of Global Product Management Sean Redmond. Allegations attributable to FE-18: ¶¶63, 248-49. |
| FE-19 | Former Account Manager Inside Sales and Associate Program Director at QO from January 2023 until April 2024, who worked with national commercial accounts and reported to former Vice President of Sales John Meckles. Allegations attributable to FE-19: ¶¶64, 235, 238, 258-59, 378. |
| FE-20 | Former Senior Sales Performance and Compensation Analyst from September 2019 until May 2024, who was responsible for calculating sales incentive compensation for the Company's 400 U.S.-based salespeople, who was one reporting level away from Defendant Bujarski pre-Merger and Defendant Busky post-Merger. Allegations attributable to FE-20: ¶¶65, 260-68, 348, 378. |
| FE-21 | Former global director level executive from January 2022 to April 2024, who was responsible for creating and implementing sales training programs for the global sales team, and was two reporting levels below the C-suite. Allegations attributable to FE-21: ¶¶66, 255. |
| FDA | U.S. Food and Drug Administration |
| Individual Defendants | Collectively, Defendants Bryant, Busky, Steward, Bujarski, Iskra, and Ranalli. |
| Iskra | Michael Iskra, the Company's former Executive Vice President, CCO and Interim CEO. |
| Kroll | Werner Kroll, the Company's Senior Vice President, Research and Development who was heavily involved in the development of Savanna RVP4. |
| Merger | On May 27, 2022, Quidel and Ortho consummated a business combination, upon which QO became the successor issuer to Quidel pursuant to Rule 12g-3(a) under the Exchange Act. |
| Misstatements | Defendants' 104 false and/or misleading statements described in full in the Complaint, Section V, and set forth and numbered in Plaintiff's Appendix |

| | A with identification of the Misstatement's location in the Complaint.<br><br>For ease of reference, each Misstatement will be referenced herein by "Misstatement #." |
|---|---|
| Motion | Defendants' Motion to Dismiss the Amended Complaint (ECF No. 47) |
| MTS | Lead Plaintiff's Motion to Strike the Declaration of Colin B. Davis, Exhibits Attached Thereto, and Defendants' Appendix A Pursuant to Rules 12(d) And 12(f) |
| Ortho | Ortho Clinical Diagnostics Holdings PLC. |
| Plaintiff or Lead Plaintiff | Lead Plaintiff Central States, Southeast and Southwest Areas Health and Welfare Fund and Teamsters Local 710 Pension Fund. |
| Plaintiff's Appendix A | Chart listing and numbering all 104 Misstatements, identifying the date and speaker of each Misstatement, along with relevant Complaint citations and identification of Defendants' DB challenges. |
| PX __ | Plaintiff's exhibits attached to the Declaration of Lauren A. Ormsbee in Support of Lead Plaintiff's Opposition to Defendants' Motion to Dismiss the Amended Complaint and Motion to Strike the Davis Declaration. |
| Quidel | Quidel Corporation |
| QO | QuidelOrtho Corporation (the post-Merger successor entity to Quidel and Ortho, but this term, like the "Company," refers to the corporate Defendant for the entire Class Period). |
| Ranalli | Tamara Ranalli, the Company's Senior Vice President, Molecular Diagnostics and Point of Care. |
| RVP4 or Savanna RVP4 | The Savanna RVP4 test assay. |
| SEC | U.S. Securities and Exchange Commission. |
| Steward | Randall Steward, the Company's former CFO. |

**INTRODUCTION AND STATEMENT OF FACTS**

Defendants' Motion should be denied. The Complaint provides detailed evidence, including allegations concerning internal reports, meetings, complaints, discussions, and *21* former employee accounts demonstrating that Defendants' Misstatements concerning the illusory success of Savanna RVP4—"the *most important product in the Company's history*"—as well as Misstatements concerning the sudden decision to double QO's "endemic" COVID revenue guidance when company sales were "*grossly declining*," were knowingly or recklessly false when made throughout the Class Period that spans from February 17, 2022 through April 1, 2024.[1]

**I.      Savanna RVP4 Misstatements Scheme**

QO experienced astronomical success through the Company's development and sales of COVID testing products. ¶¶3, 70-74. As the COVID crisis calmed, in need of a new growth driver, Defendants heralded QO's Savanna RVP4 testing platform, which had just launched in the EU but still lacked FDA approval for the US market, as a "*key driver*" behind its Merger with Ortho. ¶¶78-88. Savanna and its RVP4 test were touted as a molecular diagnostic testing solution that would provide rapid, low cost "PCR" testing for multiple infections at once. ¶¶79-81.

Throughout the Class Period, Defendants provided investors with regular, uniformly positive RVP4 updates, categorized into three buckets. *First*, Defendants extolled the success of the RVP4 EU launch, touting the test's "*very positive customer feedback*," strong demand, and performance. Misstatements 1-19; Complaint §IV.D. *Second*, Defendants spoke to investors about the "*on track*" progress of RVP4 development, positive clinical trial performance, the completion of development, RVP4 "cartridge ramp up," and, as a result, QO's readiness for RVP4

---

[1] Unless otherwise noted, emphasis has been added, internal citations and quotations are omitted, and all capitalized and defined terms have the meaning ascribed in the Complaint or the Glossary. For ease of reference, each alleged false and misleading statement will be referred to as Misstatement #, as listed in **Plaintiffs' Appendix A** with all Complaint citations noted therein.

FDA submission and ability to secure approval for its US launch. Misstatements 20-48; Complaint §IV.D. **Third**, Defendants described how, once approved by the FDA, RVP4 could immediately monetize because the Company was ready to manufacture the tests at a scale necessary to achieve hundreds of millions of dollars in forecasted near-term revenues. Misstatements 49-76; Complaint §IV.D. Analysts clung to Defendants' RVP4 messaging, repeating the Company's positive updates and incorporating the aggressive $75-$100 million Merger synergies and $300 million revenue targets into their reporting. ¶¶95-104.

In reality, Defendants' rosy accounts of positive EU customer feedback could not have been farther from the truth. *See generally* Complaint §IV.F, V.A-C; *infra* Section I.A. Multiple former employees with personal knowledge of the EU launch describe astronomical customer complaints and negative feedback, with the "very alarming" RVP4 "invalid" fail rate of 25%. ¶¶160-90. QO's EU Marketing Manager described how in his 20-year career, he "**didn't remember any market launch that was so full of issues**." ¶190. Other FEs explained how, in the US, RVP4 faced manufacturability issues that prevented the test from ever satisfying the known FDA criteria of demonstrating 95% sensitivity and, if ever approved, from producing the test reliably and at scale. ¶¶191-229. For example, the person responsible for validating RVP4 test results for FDA submissions told FE-4 and FE-2 that RVP4 "**does not work**," "**isn't even a product**," and did not meet FDA validation criteria. ¶¶206-09. FE-10 recounted internal discussions about Savanna where employees joked that the product was a fraud—**QO's "Theranos**." ¶196. The Complaint is packed with allegations that support the compelling scienter inference that Defendants knew, or at a minimum, were severely reckless in not knowing the true dismal facts about RVP4's EU launch, development status, inability to satisfy known FDA approval criteria, and manufacturing failures. *See* Complaint §IV.F; ¶¶357-74; *infra* Section III.A.

2

## II.    Endemic COVID Revenue Misstatements Scheme

While Defendants pushed their false Savanna RVP4 success story on investors, they engaged in a second fraudulent scheme targeted to raise investors' valuation of the Company's COVID test sales and, therefore, the Company's stock price. By the end of 2022, it was clear that the Company's COVID testing revenues were being impacted by more than industry-wide declining testing trends, but that QO's COVID testing products were rapidly losing market share, leading to "grossly declining" revenues, and disgruntled sales and account managers who, as a result of those declining sales, missed their COVID sales quotas and bonuses "by a mile." ¶¶231-68, 378. As a result, QO's COVID test inventory levels piled up with major distributors who had no future need for these expiring products. ¶¶269-80. Multiple former employees describe how concerning negative sales trends were communicated to Defendants Bryant and Busky, beginning no later than the end of 2022, through various reports and meetings and conversations. ¶¶377-78.

For the first ten months of the Class Period, Defendants Bryant and Busky warned investors that based on both market data and QO's own sales data, now that COVID was no longer a pandemic requiring the same volume of COVID testing, "endemic" COVID revenues in the foreseeable future would be $150 million to $200 million annually, an 86% decrease from 2021. ¶¶18, 232-80. This was consistent with internal trends that, as referenced above, showed QO COVID revenues declining not just from the market forces but from increased competition and lack of demand for QO's products. This messaging changed dramatically, virtually overnight, following a lackluster "Investor Day" update on December 13, 2022 and a resulting 17% stock decline, QO's largest stock drop in over two years. ¶¶19, 113-14, 231, 375. Initiating damage control, CFO Busky engaged in a series of investor meetings during which he magically doubled QO's endemic COVID revenue guidance, raising it in the space of days from $150 to $200 million, to $200 to $400 million, and QO shares rose to their pre-December pricing. ¶¶115-16.

Defendants maintained this messaging for over one year, while internal COVID sales data worsened, rendering those statements patently false. *See* Misstatements 77-104; ¶¶117-27.

## III.   Revelation Of The Truth Harmed QO Investors

The truth about both the Savanna and COVID Misstatements was revealed between February 13, 2024 and April 2, 2024, resulting in significant harm to QO's shareholders. On February 13, 2024, just weeks after indicating that existing guidance would remain unchanged, QO released 2023 and Q4 financial results. Among other things, QO lowered its endemic COVID revenue forecast from the range of $200-$400 million back to its initial 2022 guidance of $200 million, while continuing to make positive statements about RVP4's performance and FDA approval. ¶¶281-89. Impact was immediate. QO stock dropped 32% and Defendant Bryant was fired the very next day (and Defendants Bujarski and Iskra were fired in July 2024). ¶¶290-302; 307-09. On April 2, 2024, QO reported that it had "withdrawn" its FDA RVP4 submission, taking the Company back to square one in its now thirteen-year odyssey to launch Savanna. ¶¶303-04. QO stock fell over 10%, and analysts noted that "the team needs to earn back credibility." ¶¶305-11. In the wake of these disclosures, the Company, under new management, lowered COVID endemic revenue further, to $150 million annually, in May. ¶¶316-18. RVP4's problems remained unresolved and have worsened. ¶¶310-15; *see* MTS at 10.

## IV.   Defendants' Falsity And Scienter Challenges Fail

Ignoring the Complaint's allegations and the direct evidence of falsity and scienter, Defendants improperly seek dismissal (on falsity and scienter grounds only) by mischaracterizing the Complaint, relying on improper factual narratives derived from cherry-picked language in external documents, and offering implausible excuses for their misconduct. The PSLRA may impose heightened pleading requirements, but it does not permit Defendants to disclaim their own statements or entitle them to implausible inferences on a motion to dismiss.

Defendants contend that each of the 104 Misstatements were true when made. DB 17-24. Citing only four cases in support (each inapposite), Defendants lodge an improper and inaccurate factual counter-narrative based on information far outside the four corners of the Complaint. Indeed, Defendants' "Statement of the Facts" and falsity challenges ignore the well-pled Complaint allegations, including the accounts of 13 of the 21 FEs, and instead rely on information and statements made in *46* exhibits. As fully set forth in Plaintiff's accompanying Motion to Strike ("MTS"), Defendants' excessive reliance on improper, extrinsic documents has no place here. Moreover, Defendants' improper factual arguments do nothing to negate, or even weaken, the Complaint's incredibly strong allegations of material falsity and each Defendants' scienter. Defendants' remaining legal challenges to falsity—that 67 of the Misstatements were forward looking and entitled to a "safe harbor" (even if false and misleading) (DB 10-15), that 52 of the Misstatements were immaterial puffery (DB 15-16), and that 37 Misstatements are inactionable opinions (DB 11, n.3) all fail, as described herein.

Defendants' scienter and scheme liability challenges (DB 24-35) fare no better. Defendants broadly aver that the 21 FE accounts cannot support a strong inference of the Individual Defendants' knowledge or reckless disregard of the falsity of the Misstatements because only some, but not all, directly interacted with Defendants, and their accounts of, for example, negative RVP4 feedback and overwhelming customer complaints, 25% RVP4 failure rates, and an inability to meet FDA criteria, were "unmoored" or "untethered in time." DB 2, 26-27. Not so. As Plaintiff alleges in painstaking and corroborative detail, the FEs—many of whom were senior-level executives who reported directly or one level away to senior management and Defendants—describe how RVP4's problems, as well as QO's tanking COVID sales were constant, if not worsening, throughout the Class Period. These accounts are "tethered" to the Class

5

Period—the entirety of the Class Period, as described in the Complaint and herein. Defendants' other piecemeal attempts to create an "innocent" scienter inference all fail and, as with their falsity challenges, rely on counterfactual narratives far outside the Complaint's allegations.

Defendants' Motion should be denied in full and this case should proceed to discovery.

## ARGUMENT

The Court must "accept all factual claims in the complaint as true and draw all reasonable inferences in the plaintiff's favor." *Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 307 (2d Cir. 2015). "[F]act-specific question[s] cannot be resolved on the pleadings." *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012) (alteration in original). Plaintiff has adequately alleged both material falsity and scienter for the alleged Misstatements, and Defendants do not challenge the Complaint's allegations of loss causation, reliance, or damages.

## I.    Defendants Made Misstatements Concerning Savanna RVP4

To allege falsity, a plaintiff must identify the statements, "the speaker, state where and when the statements were made, and explain why the statements were fraudulent," *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 184 (S.D.N.Y. 2003), by pleading facts "sufficient to support a *reasonable belief* as to the misleading nature of the statement or omission," *Sharette v. Credit Suisse Int'l,* 127 F. Supp. 3d 60, 89 (S.D.N.Y. 2015) (emph. in original). "[O]nce a company speaks on an issue or topic, there is a duty to tell the whole truth" in a "complete and accurate" manner. *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250-51 (2d Cir. 2014); *see In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 240 (2d Cir. 2016); *In re Facebook, Inc. IPO Sec. & Deriv. Litig.*, 986 F. Supp. 2d 487, 515 (S.D.N.Y. 2013). Statements may only be dismissed if "reasonable minds could not differ" on whether they were misleading. *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 609 (S.D.N.Y. 2017).

In the Complaint, Plaintiff clearly categorized Defendants' 104 Misstatements into four

6

distinct categories, provided the statements in context, **bolded and italicized** the portions alleged to be materially false and misleading, summarized the reasons for falsity (Complaint §V.A-D), and expanded on the Misstatements' falsity in greater detail in corresponding sections in the portion of the Complaint titled "Substantive Allegations of Fraud" (Complaint §IV). *See* Plaintiff's Appendix A for each Misstatement and its corresponding Complaint reference(s).[2]

### A.    Defendants Made Misstatements About The Success Of RVP4's EU Launch

QO launched RVP4—"***the most important product in [the C]ompany's history***" (¶82)—in the EU by the end of 2021. The success of the EU launch was highly material to investors as it was the key to achieving hundreds of millions of dollars in Savanna-related synergies and revenues and proving RVP4's ability to secure FDA approval (¶¶82, 85-88). Defendants made 19 Misstatements about RVP4's EU launch, each of which is clearly alleged to be a materially false and misleading statement of present fact that is afforded no protection by the PSLRA safe harbor.

According to Defendant Bryant, RVP4's EU launch was a great success that "***portends well for the rest of the globe***" (Misstatement 7). Bryant clearly and consistently represented between February 2022 and January 2024 that (a) QO had "***received very positive customer feedback to date***" (Misstatement 2); (b) Savanna was "***[p]erforming very nicely in Europe***" and the Company was "***receiving some really nice feedback***" (Misstatement 3-4); (c) QO was "***seeing demand in Europe***," which supported "***accelerate[d]***" "***placements and revenue***" in 2023 (Misstatement 10); (d) RVP4 "***continue[d] to perform well in the EU***" (Misstatement 17); (f) "***the feedback at this point has been encouraging***" (Misstatement 18); and (g) "***we already have evidence both in Europe and ex-US and now in the United States that we're going to be***

---

[2] Defendants' Appendix A (ECF No. 48-1) should be stricken. *See MTS* at 6, 10-12, 17. Defendants' claim of "puzzle pleading" by arguing that they categorized the false statements (DB 17) is in itself puzzling given the Complaint's organized structure, adopted by Defendants.

*extremely competitive*" (Misstatement 19). *See also* Misstatements 5, 6, 9, 13, 14, 16. Defendant Ranalli, the SVP of Molecular Diagnostics similarly told the public that the Company received "*great feedback from our initial customers*." (Misstatement 8); *see also* Misstatement 12. Analysts cared deeply, asking about Savanna during *every* Class Period conference call. ¶357.

In reality, the EU launch was an unmitigated failure, and Defendants knew Savanna was not ready for the EU or US markets. ¶¶160-90; 322-26. One former employee (FE-6) described the rush to market as "flying a plane while building it" (¶165) and another, personally involved in the launch (FE-7), recounted how in his 20 years in the industry, he "*didn't remember any market launch that was so full of issues*." ¶190. RVP4's negative feedback, minimal demand, overwhelming number of complaints and persistent test failures were unprecedented.

Critically, Defendants do not dispute the highly specific accounts of six former employees (FE-1, FE-4, FEs-6-9), all directly involved in marketing or monitoring RVP4, that support the falsity of Defendants' statements. *See* ¶¶163-90. For example, two former senior level marketing executives (FE-4 and FE-7) describe how—*throughout the Class Period*—they participated in monthly and weekly discussions, many attended by Defendant Ranalli and other senior product and marketing executives, discussing the barrage of EU customer complaints and RVP4 failures. ¶¶171-73, 181-88. These and other former well-placed employees describe with specificity how (a) *60%-80% of all RVP4 customer feedback was negative* with QO "firefighting" in its efforts to respond to complaints (¶¶182, 186); (b) *25% of the RVP4 tests and instruments that made it to Europe (and weren't scrapped on the production line) were invalid*—"the worst result for a clinician"—and needed to be replaced (often with other invalid tests), leaving customers "irate" (¶¶173-76, 179); (c) problems worsened in mid-2023, when a CAPA investigation was opened (unresolved as of July 2024) (¶¶177-78); and (d) how, by example, a 2023 report showed that

8

there were more complaints being addressed than actual devices (¶188). *See also* ¶¶322-26.

The Complaint's detailed allegations are actionable. *See, e.g.*, *Plumbers & Pipefitters Nat'l Pension Fund v. Davis*, 2020 WL 1877821, at *9 (S.D.N.Y. Apr. 14, 2020) (statements about "strong demand" and "positive feedback" were "specific, factual statements" alleged to be false based on contrary internal accounts of customer "dissatisfaction"); *In re SolarEdge Techs., Inc. Sec. Litig.*, 2025 WL 1031154, at *8, n.10 (S.D.N.Y. Apr. 6, 2025) ("strong demand" in Europe allegations were false and misleading when a former employee described how "demand in Europe was weak"); *Plumbers & Pipefitters Loc. Union No. 630 Pension-Annuity Tr. Fund v. Arbitron Inc.*, 741 F. Supp. 2d 474, 484-85 (S.D.N.Y. 2010), *as corrected* (Sept. 30, 2010) (statements of ongoing performance successes were materially false when defendants' "positive statements flew in the face of the alleged inadequacies" of the recently rolled out technology).

***Defendants' Falsity Challenge Fails***. In a single paragraph lacking any credible explanation or legal citation, Defendants claim that each of the EU launch Misstatements was literally true and not misleading when made. DB 17-18. Defendants point to one sentence from a December 2023 analyst report noting that QO had corrected "some error codes" and "challenges in cartridge manufacturing." DB 17-18, DX 38. The analyst report should be excluded (*see* MTS at 16). Even if considered, the analyst report has no bearing on the falsity of the Misstatements. Indeed, as alleged in the Complaint, the CAPA investigation into Savanna error codes was unresolved as of the end of the Class Period and complaints increased in 2023. ¶¶177-78.

***No Safe Harbor***. Defendants argue that 8 of the 19 Misstatements concerning RVP4's EU launch are protected by the PSLRA's "safe harbor" provision for forward-looking statements. DB 11 n.4 & 12 n.6 (listing without specific discussion Misstatements 1, 6, 7, 10, 13, 14, 16, 19).

The PSLRA safe harbor offers protection ***only*** if a statement is actually forward-looking

9

*and* (1) is "identified and accompanied by meaningful cautionary language"; or (2) "the plaintiff fails to prove that [the forward-looking statement] was not made with actual knowledge that it was false or misleading." *In re Vivendi*, 838 F.3d at 245. No safe harbor is available here because the challenged statements fail the first critical threshold—they are not forward-looking. Each contains and is derived from present or historical statements of fact. *See, e.g.*, Misstatement 6 ("Our limited European launch of Savanna with RVP4 *continues to go well with some early wins*"); Misstatement 7 ("*[w]e've been pretty pleased with what we've done in Europe* with the Savanna launch early on and I would say it *portends well for the rest of the globe*"); Misstatement 10 ("[W]e are *seeing demand in Europe and are increasingly confident that Savanna placements and revenue will accelerate* throughout 2023"); 13 ("*We've demonstrated in Europe and elsewhere that there is demand.*"); Misstatement 19 ("*we already have evidence both in Europe and ex-US and now in the United States that we're going to be extremely competitive*"). At most, "these statements are only partially forward-looking and not protected." *In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 2012 WL 2512280, at *9 n.141 (S.D.N.Y. June 29, 2012).

Even if forward-looking, these Misstatements were not accompanied by "meaningful cautionary language." The only applicable cautionary language cited by Defendants (DB 14 ("there is no assurance . . . our efforts to develop new technologies, products or markets will be successful . . . or commercially viable")) is meaningless because the events warned of had already materialized. RVP4 was not "successful" or "commercially viable" in Europe given the consistent avalanche of customer complaints and product failures. Cautionary language does not "insulate from liability the failure to disclose that the risk ha[d] transpired." *Facebook,* 986 F. Supp. 2d at 515; *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004). Defendants also knew their positive statements about the EU launch were false, removing safe harbor protection. *Infra* Section III.A.

10

***The Misstatements Are Material***. Defendants argue that 16 of the 19 EU launch Misstatements are immaterial puffery on which no reasonable investor could have relied. DB 15-16 (citing Misstatements 2-11, 13-19). Defendants are wrong. Defendants discussed QO's "***most important product***" at every call, noting that it was "***a flagship product***" whose launch was one of three "***things that [] matter most for the business overall***." ¶¶82, 321, 357. Repeated statements, often made in response to an analyst's inquiry, about the "very positive customer feedback to date," RVP4 performance, and market demand are not immaterial by any stretch of the imagination. Indeed, materiality is generally a "delicate, fact-intensive" question that depends on all surrounding circumstances and must be applied with "great caution". *See Bricklayers & Masons Loc. Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 244 (S.D.N.Y. 2012). It is assured that for each statement, there is ***at least*** a fact question as to their importance when viewed in context. *See Wang v. Cloopen Grp. Holding Ltd.*, 661 F. Supp. 3d 208, 229 (S.D.N.Y. 2023) (fact-based expressions alleged to be misleading are not puffery); *In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 79 (S.D.N.Y. 2017) (statements that, "viewed in isolation, may be mere puffery," "become material to investors" if repeated in a way that reassures investors about important matters).

***The Misstatements Are Not Inactionable Opinions***. Defendants' sweeping footnote argument that 37 of the 104 Misstatements, including 7 of the 19 EU launch Misstatements, are "sincere statement[s] of pure opinion" (DB 11 n.3 (listing Misstatements 1, 3, 5, 7, 13, 15, 16)) fails. "It is well settled, however, that a court need not consider arguments relegated to footnotes or raised for the first time in a reply brief." *F.T.C. v. Tax Club, Inc.*, 994 F. Supp. 2d 461, 471 (S.D.N.Y. 2014). Also, these are not "pure opinion" statements subject to protection. *See Omnicare, Inc v. Laborers Dist. Council Const. Indus. Pension Fund,* 575 U.S. 175, 183 (2015).

*See, e.g.*, Misstatement 7 (Bryant "***pretty pleased with what we've done in Europe with the Savanna launch early on and I would say it portends well for the rest of the globe***"); Misstatement 13 ("***We've demonstrated in Europe and elsewhere that there is demand.***"). Even if opinions, the challenged Misstatements are actionable because Defendants lacked a reasonable basis for their assertions of "really nice feedback" and "strong demand." *See In re Alibaba Grp. Holding Ltd. Sec. Litig.*, 2023 WL 2601472, at *11 (S.D.N.Y. Mar. 22, 2023).

**B.    Defendants Made Misstatements About RVP4's Development, Readiness For A US Launch, And Ability To Satisfy Known FDA Criteria**

Defendants made 29 Misstatements about the development status of RVP4, QO's ability to satisfy FDA approval criteria, and readiness for a U.S. launch. *See* Misstatements 20-48; ¶¶128-59; 191-220; 327-38. These representations were highly material to investors. ¶¶79-88, 95-104. The falsity of each Misstatement is supported by the detailed accounts of multiple former employees. For example, while Defendants provided RVP4 development updates, noting in May 2023 that QO was "***more reliably making and stocking instruments***" and in August 2023 that "with respect to the respiratory launch, I think ***we're in really good shape here in the US***" (Misstatement 28; *see also* Misstatements 23, 26-27, 30-32, 35, 37-38), former employees such as the Senior Director of Systems Engineering (FE-2) described how RVP4's defects were not fixed at the start of the Class Period and were still not fixed when he left in late 2023. ¶¶193. FE-10, who reported directly to Defendant Busky through Fall 2023, described how problems with RVP4 were so prevalent and well-known that he and his colleagues joked that Savanna was a fraud and QO's version of the fraudulent diagnostic device Theranos. ¶¶196, 324. A Senior Scientist (FE-12) with QO through the first half of 2024 confirmed that RVP4 just did not work, with "across the board" high rates of invalid results and false positives. ¶209. *See also* ¶¶191-220.

Moreover, while Bryant stated in May 2023 that he had "***no reason to believe that [RVP4]***

12

*will not be [approved]*" and that "***Savanna meets the criteria that the FDA are looking for***,"[3] former employees, such as FE-1 (Senior Director, Regulatory Affairs through April 2024), as well as FE-2, FE-4, FE-11 and FE-12 confirmed that (a) the FDA communicated the criteria for RVP4 approval—satisfaction of a sensitivity of 95% for detectability and accuracy (¶¶198-99; 330); (b) RVP4 never satisfied that criteria (¶¶200-05); (c) the scientist responsible for the RVP4 FDA submission acknowledged that RVP4 did not satisfy FDA requirements and told others that the RVP4 test "does not work" and "isn't even a product" (¶¶206-09); and (d) senior management including Defendant Bryant were made aware of RVP4's issues, failure rate, and assay problems (¶¶362-68). *See Skiadas v. Acer Therapeutics Inc.*, 2020 WL 3268495, at *4-9 (S.D.N.Y. June 16, 2020) (misstatement actionable when it was "near certain" that concerns raised about the product did not comply with FDA standards). Given RVP4's issues, Defendants' statements about QO's ability to generate hundreds of millions of dollars of revenue from Savanna in the near term (Misstatements 25, 27, 29, 31) had no basis. Moreover, Misstatements 44-48 regarding the development of additional Savanna test panels were also untrue, with former employees describing how their development was "a pipe dream." ¶¶167-69. *See In re NIO, Inc. Sec. Litig.*, 2021 WL 3566300, at *9 (E.D.N.Y. Aug. 12, 2021) (statement that a factory is "currently under construction" actionable when the construction project had not begun at all).

***Defendants' Falsity Challenges Fail.*** Defendants raise a handful of piecemeal factual challenges to the falsity of Misstatements 20-48 (DB 18-21), each of which fails.

***First***, Defendants claim that the allegation that up to 30% of RVP4's were "invalid" and had to be replaced—as compared to the industry standard rate of 1%-2%— (¶¶170-76; 328-29)

---

[3] Misstatement 30. Defendants incorrectly state that Busky made this statement. Not so. *See* Plaintiffs' Appendix A & PX A; MTS at 11-12. *See also* Misstatements 26-27, 32, 35, 37.

did not render a statement about having "completed development activities for all Savanna panels" misleading because the allegations related to "an unspecified point in time." DB 18. Not so. RVP4's invalid test results were perennial throughout the Class Period. *See, e.g.*, ¶¶172-74 (invalid test results "from the very beginning"); ¶179 (RVP4 assays problems as late as June 2024); ¶193 (engineering issues before E.U. launch were never fixed). *See In re AppHarvest Sec. Litig.*, 684 F. Supp. 3d 201, 248 (S.D.N.Y. 2023) (rejecting argument that FE statements were unmoored in time when meetings and training issues occurred throughout relevant period).[4]

**Second**, Defendants raise an improper factual challenge to the falsity of FDA compliance statements by citing several unrelated statements from documents about ongoing discussions with the FDA. DB 18-19 (relying on DX 15, 34, 35); *see* MTS at 14-15. This fails. Not only do Defendants not challenge the multiple FE accounts, but these accounts were confirmed when RVP4 failed to meet the required sensitivity. *See* ¶203; ¶¶313-14 (July 2024 clinical study).

**Third**, Defendants' fraud by hindsight argument misstates the Complaint. DB 19. Bryant's early 2023 statement that he expected FDA EUA approval "worst case" in "early May" and further that QO would "generate $30 million to $40 million in Savanna revenue" in 2023 (Misstatement 27) was false when made. Defendants mischaracterize the Complaint as relying on prospective 2023 revenue figures, when in fact, Plaintiff alleges that the QO's 2022 Savanna revenue was *less* than the later-reported 2023 revenues of $2.56 million. ¶333.[5] **Fourth**, Defendants argue that several Misstatements are not false "in context" because the statements

---

[4] Defendants' citation to *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 263 (2024), for the proposition that Rule 10b-5 "does not proscribe pure omissions" (DB 18 n.16) has no bearing here. Defendants' statements were both affirmatively false and misleading half-truths, not pure omissions. *See JinkoSolar*, 761 F.3d at 250; *Facebook,* 986 F. Supp. 2d at 515.

[5] Defendants' case law is distinguishable for these reasons. *See In re Aceto Corp. Sec. Litig.*, 2019 WL 3606745, at *4 (E.D.N.Y. Aug. 6, 2019) (plaintiff did not allege relevant facts that existed at the time the statements were made); *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) (same).

were directed more toward the Savanna instrument as opposed to RVP4, or FDA EUA rather than 510(k) approval. DB 19-20. These factual disputes fail. For example, whether Bryant's statement that "***Savanna meets the criteria that the FDA are looking for***" (Misstatement 30) was directed to EUA and not 510(k) approval, the Complaint alleges that RVP4 did not meet FDA approval criteria. ¶¶199-208. ***Fifth***, Defendants raise improper factual disputes to challenge Misstatements 44-48 concerning the "***very much on track***" development of additional Savanna panels (DB 20-21) because they were nothing more than "a pipe dream" and not in actual development. ¶¶167-69. Moreover, the EU promotional materials drafted by FE-4, were circulated throughout the Class Period, rendering their temporal arguments invalid. ¶¶166-68.[6]

**No Safe Harbor**. Defendants argue safe harbor protection for 22 of these 29 Misstatements. *See* DB 11-13 (challenging Misstatements 20-21, 24-29, 31-32, 34, 36-39, 42-48). No such protection applies. ***First***, these statements are not forward looking as they contain and are derived from present or historical statements of fact. *See Longtop*, 2012 WL 2512280, at *9 n.141. *See, e.g.*, Misstatement 21 ("we are incredibly proud of ***the progress made to date***").[7] ***Second***, even if forward-looking, these Misstatements were not accompanied by "meaningful cautionary language." Defendants cite to general risk factors concerning the commercial viability of the Company's products, uncertainty surrounding regulatory review for its products, the FDA's

---

[6] Defendants' challenge to FE-4's "qualifications" fails. FE-4 was a scientist who also held various senior level marketing roles during the Class Period and was responsible for drafting Savanna brochures—a position that requires knowledge of the status of products and its panels. ¶¶49, 166, 212. *See In re Estée Lauder Co., Inc. Sec. Litig.*, 2025 WL 965686, at *5 (S.D.N.Y. Mar. 31, 2025); *Sharma v. Rent the Runway, Inc.*, 751 F. Supp. 3d 82, 105 (E.D.N.Y. 2024).

[7] *See also, e.g.*, Misstatement 26 ("we're ***very much on track for the launch*** . . .***the instrument build issues have been largely resolved…. And we're at the point where we're most – most of the effort right now is around cartridge ramp up***…."); Misstatement 28 ("***having solved supply chain issues and now more reliably making and stocking instruments***."); Misstatement 47 ("the assays that I mentioned in the script ***are very much on track***….").

"more rigorous demonstration of production performance" for all 510(k) applications, and that its "complex" clinical studies are not guaranteed to generate data that demonstrates substantial equivalence of the evaluated product. DB 14. These warnings are meaningless because the events warned of had already materialized; Defendants knew that RVP4 could not meet FDA criteria for approval and knew that the RVP4 panel had engineering and design defects that precluded commercialization in the U.S. *See* Section III.A; *see also In re iDreamSky Tech. Ltd. Sec. Litig.*, 236 F. Supp. 3d 824, 833 (S.D.N.Y. 2017) (knowledge of falsity precludes safe harbor).[8]

*The Misstatements Are Material*. Defendants argue that 18 of these 29 Misstatements are puffery because no reasonable investor "could have interpreted these statements 'as a guarantee' that the FDA would clear RVP4 and that QuidelOrtho would launch RVP4" in the US. DB 16 (citing Misstatements 20-22, 26, 28-29, 31, 33-34, 36-38, 40-42, 45, 47-48). This ignores the language of the challenged Misstatements, which were not mere aspirational statements concerning FDA approval, but were misleading statements about the *present* status of RVP4 development, production and testing that made FDA approval likely. *See, e.g.*, Misstatement 26 ("instrument build issues have been largely resolved"); Misstatement 28 ("we now have the second line nearly validated on the cartridge manufacturing"); Misstatement 34 ("as we're about to enter our largest opportunity, our largest market, we will have resolved some of the things that would have needed to be resolved had we not launched somewhere else first"). These statements are distinguishable from Defendants' authority, where the statement: "[a]ssuming approval, [QRX] anticipate[s] product launch ... before the end of [the] calendar year" was deemed immaterial because it would not reasonably be interpreted as a "guarantee" of FDA approval

---

[8] Defendants' citation to *In re Sanofi Securities Litigation* is distinguishable. *See* 87 F. Supp. 3d 510, 536 (S.D.N.Y. 2015), *aff'd sub nom. Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016) (warning of very specific grounds for FDA denial).

because it was hedged by conditional statements of "if and when approved by FDA." *See Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 596 (S.D.N.Y. 2016). The Misstatements were not so hedged. *See, e.g.,* Misstatement 36 ("**we're in good shape. And I would <u>commit</u> to being in market before the end of the quarter**."). Materiality is further supported by analyst acceptance of the Misstatements, a barometer of the "reasonable investor." *See, e.g.*, ¶¶96, 103. *See Silverman v. Motorola, Inc.*, 2008 WL 4360648, at *10 (N.D. Ill. Sept. 23, 2008) ("The materiality of these statements is supported by the fact that an analyst specifically asked if the 3G products were on track"). Moreover, statements that would in some circumstances amount to puffery, such as "on track" and "in good shape" are actionable here based on the facts and context in which the statement was made. *See Novak*, 216 F.3d at 315; *BHP Billiton*, 276 F. Supp. 3d at 79; *San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, 732 F. Supp. 3d 300, 316 (S.D.N.Y. 2024); *Cloopen*, 661 F. Supp. 3d at 229.[9]

     ***The Misstatements Are Not Inactionable Opinions***. Defendants' footnote argument challenging certain statements as inactionable opinion statements should be ignored. *Supra* 11-12. If considered, Defendants' unspecified contention that 12 of the 29 Misstatements referenced in this section are "sincere statement[s] of pure opinion" is without merit. DB 11 n3. On their face, these Misstatements are not ones of "pure opinion" subject to protection.[10] Moreover, even if some are fairly characterized as opinions, the challenged Misstatements are actionable because

---

[9] Defendants' citation to *In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 761 (S.D.N.Y. 2018) (DB 16) is inapposite as there is no indication there that the general "on track" statements there were accompanied by detailed false facts rendering it more than hopeful spin.

[10] *E.g.*, Misstatement 26 ("We think we are already at the capacity to have a meaningful launch" because "**the instrument build issues have been largely resolved [and] most of the effort right now is around cartridge ramp up**…."); Misstatement 28 ("I think we're in reasonably good shape to be ahead of the upcoming respiratory season" because, *inter alia¸* "**our confidence comes from having solved supply chain issues and now more reliably making and stocking instruments**").

Defendants did not have a reasonable basis for their assertions that the Company was "very much on track" or "in really good shape in term of volumes that we require in 2023 and 2024" for a large-scale RVP4 U.S. launch. *Supra* 11-12. *See Alibaba*, 2023 WL 2601472, at *11; *see also Wilson v. LSB Indus., Inc.*, 2017 WL 7052046, at *1-3 (S.D.N.Y. Mar. 2, 2017) (projections were actionable statements of opinion); *City of Providence v. Aeropostale, Inc.*, 2013 WL 1197755, at *12 (S.D.N.Y. Mar. 25, 2013) ("safe harbor does not apply to material omissions.").

### C.    Defendants Made Misstatements About RVP4 Manufacturing Capability

Defendants made 28 Misstatements about QO's ability to manufacture thousands of devices and millions of RVP4 tests once the FDA approval materialized, a capability that was essential to recognizing near-term profits on RVP4 post-approval. *See* Misstatements 49-76; ¶¶221-29; 340-43. *See, e.g.*, Misstatement 61 (Feb. 15, 2023 statement: "***Supply chain and instrument manufacturing issues that were a challenge for us are largely resolved, and we now have the capacity to begin to ship the analyzers that we had anticipated all along***"); Misstatement 71 (Nov. 1, 2023 analyst response assuring that once FDA clearance was obtained, QO was "***fully manufacturing cartridges and so I don't see any other constraint***" to expansion).

Those and similar Misstatements were affirmatively false when made and further concealed material information necessary to make the statements not misleading. *See* ¶¶221-29; 340-42. The Complaint alleges, for example, how: (a) FE-4 reported that QO scrapped between 50% and 90% of its RVP4 assays yield due to manufacturing defects, which was "very alarming" (¶223), corroborated by FE-6 and FE-10; (b) FE-2 explained up to 50% of the tests were thrown out off of the production line, far exceeding the standard industry failure rate (¶¶224-25); and (c) FE-6 and FE-7 described how QO spent "upwards of $80 to $100 million" into building a fully automated (as opposed to its current error-ridden manual line) line, but that the line was never constructed (¶¶226-28). By choosing to discuss QO's manufacturing capabilities and readiness

18

for a US RVP4 launch, Defendants triggered a duty to disclose the various manufacturing barriers that foreclosed any possibility of this large-scale U.S. launch. *See Sinnathurai v. Novavax, Inc.*, 645 F. Supp. 3d 495, 520 (D. Md. 2022) (finding duty to disclose contamination issues in manufacturing process when choosing to speak about approval timeline and process).

***Defendants' Falsity Challenges Fail***. Defendants argue that FE-6's description of QO's "alarming" 30% to 40% production yields for RVP4 was "unspecified" as to timing. DB 21. Defendants again ignore that these allegations applied equally throughout the entire Class Period, making them uniquely specified. *See* ¶¶223, 229 (describing monthly meetings, and classwide manufacturing failures). Defendants also argue that the statements concerning QO's plans to achieve hundreds of millions of dollars of synergies in the near term were not false because they were conditioned on QO's ability to manufacture RVP4. DB 22. This is a circular argument that revenue projections cannot be misleading when premised on other false statements about having overcome manufacturing challenges. Defendants' revenues and synergies statements were false because they lacked a basis to forecast a successful launch when QO was plagued with manufacturing issues that prevented launch. This argument also fails because it relies on documents that should be stricken. *Id.* at 21-22 (citing DX 5, 12, 15, 29). *See* MTS at 8-9, 12-16.

***Defendants Other Legal Challenges Fail***. Defendants argue that 20 of the 28 Misstatements in this category are entitled to safe harbor protection and make unspecified footnote arguments that 8 each of the 28 Misstatements are inactionable opinions or puffery. These challenges face the same legal infirmities as those discussed above, *supra* 11-12 & 16-18. For example, Bryant's statement that the "Savanna cartridge automated manufacturing line is expected to being its ramp-up and outfit over 1 million cartridges per month" (Misstatement 53) was not forward looking when QO had no "cartridge automated manufacturing line" built (or in

19

process of being built) when the statement was made. *See* ¶¶222; 227-29; 340-41.

## II.    Defendants Made Misstatements Regarding QO's Endemic COVID Revenue

The Complaint also pleads 28 Misstatements about QO's endemic COVID annual revenues. (Misstatements 77-104). These Misstatements began after investors reacted negatively to QO's low guidance and growth targets reported during its December 13, 2022 Investor Day, causing the stock to crash. ¶¶112-14. To stop the bleeding, Defendants almost immediately doubled their assessment of endemic COVID annual revenue from $150-$200 million to $200-$400 million despite internal reports of materially declining sales. ¶¶115-27. These Misstatements were revealed as false on February 13, 2024, when Defendants slashed QO's endemic COVID revenue guidance, and Defendant Bryant was immediately fired. ¶¶281-302.

Defendants continuously reaffirmed QO's "*realistic*" endemic COVID revenue figure of $200-$400 million through 2023 while concealing that sales were declining and inventory building, stating, for example, that "*part of beating expectations is to set the expectations correctly … we're pretty humble with the street [and] don't get ahead of our skis, as they say*" (Misstatement 79); "*we don't have much of a demand problem right now*" (Misstatement 77); "*there's really no change there with that endemic level of annual revenue being it's $200 million to $400 million*" (Misstatement 83); "*our respiratory business became significantly larger due to more testing in general*" (Misstatement 94); and "*for 2024, we probably will be higher than the midpoint for COVID still*" (Misstatement 97).

The materially misleading nature of Defendants' statements doubling endemic revenue to prop up QO's share price is supported by detailed accounts from *ten* former employees describing how Defendants were aware that QO's COVID sales were declining as inventory piled up. ¶¶230-80; 346-54. For example: (a) QO's Channel Sales Manager (FE-11) confirmed that QO lost customers to competitors (¶¶233-34); (b) FE-3 explained that QO missed COVID and respiratory

sales quotas in every quarter of 2023 given a lack of demand for QO's portfolio of products (¶¶235-38); (c) FE-15 stated that 30-40% of his customers stopped purchasing QO COVID tests and turned to newer tests from competitors beginning in Fall 2022 (¶¶239-43); (d) FE-16 stated that hospital facilities had excess QO COVID tests stockpiled in closets after Q4 2022 (¶¶244-46); (e) FE-17 explained that QO distributors purchased "significantly" fewer COVID tests in 2022 and 2023 (¶247); (f) FE-18 explained that sales for COVID tests declined "across the board" in 2023 and QO lost customers to competitors with cheaper alternatives (¶¶248-49); (g) FE-9 stated that 50 Chinese companies entered the European market and sold significantly cheaper tests (¶250); and (h) FE-19 stated that COVID test sales "dropped off" in 2023 and that "a lot" of hospitals stopped ordering COVID tests from QO during this time (¶258). The Company's declining COVID-19 sales performance was also evident from the significant volume of unused inventory. *See* ¶¶269-280 (accounts from FE-10 of inventory buildup due to lack of demand). Moreover, multiple former employees confirm that COVID sales quotas were dramatically missed in 2023 as sales plummeted. ¶¶252-68. Despite these red flags, Defendants Bryant and Busky pumped up their baselessly high endemic COVID-19 representations throughout 2023. *See In re Symbol Techs., Inc. Sec. Litig.*, 2013 WL 6330665, at *5 (E.D.N.Y. Dec. 5, 2013) (finding forecasts misleading based on defendants' scheme to inflate revenues by setting "unattainable" sales and inventory reduction goals and offloading inventory on its largest distributor).

***Defendants' Falsity Challenges Fail***. Defendants raise three unpersuasive arguments challenging the falsity of these Misstatements. DB 22-24. ***First***, Defendants conflate QO's recognition of $407 million in COVID-related revenue in 2023 with Defendants' misstatements about "endemic" COVID revenue projections for the period post-2023. *Id.* at 22-23. As the Complaint alleges, the 2023 reported revenue was inflated by $147 million from one-off

21

government orders that Defendants explicitly excluded from their endemic revenue representations (¶¶110, 117, 296 n.13), and the remaining $260 million in COVID-19 revenue was artificially boosted by Defendants' attempt to flood the market with their products (¶296, n.13).[11] ***Second***, Defendants argue that Misstatements 81 and 94 are not false because they relate to QO's share of the respiratory market as a whole, "not COVID-19 specifically." DB 23. This ignores that COVID testing made up a majority of the market for testing respiratory diseases. *See* ¶350. Defendants' statements omitted critical qualifying information regarding QO's decrease in market share for COVID tests. *See Facebook*, 986 F. Supp. 2d at 515 ("literally true statements that create a materially misleading impression—will support claims for securities fraud").

***Third***, Defendants argue that their statements were not false because they warned investors of the challenges in estimating COVID-related trends. DB at 23-24. However, these purported warnings cannot absolve Defendants from liability when they simultaneously touted that their endemic COVID revenue representations were "***humble***" and set "***correctly***" (Misstatement 79) despite having doubled the range to $200-$400 million abruptly to inflate a falling stock price and quell investor concerns. Likewise, their position that these statements were not misleading fails. Defendants' doubled endemic revenue statements resulted in an increased stock price, ¶¶108-16, and when corrected, caused a 32% drop in QO's stock price. ¶293.

***Defendants' Other Legal Challenges Fail***. Defendants argue that 17 of the 28 Misstatements regarding COVID revenue were forward-looking statements protected by the safe harbor. DB 11-15 (citing Misstatements 78, 81-87, 90-92, 95-98, 101-02). However, many of

---

[11] Misstatements 103-04 were false and misleading because they warned of hypothetical risks and failed to disclose that then-known material risks that negatively impacted the Company's business had already transpired (¶¶350–54). *See In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 950 (9th Cir. 2023), *cert. dismissed as improvidently granted sub nom. Facebook, Inc. v. Amalgamated Bank*, 604 U.S. 4 (2024); *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 85 (2d Cir. 2021).

these Misstatements are clearly based on present facts (*e.g.*, Misstatement 81 ("***[w]e expect to continue* to capture and grow our share of the respiratory market**…"), and therefore are afforded no safe harbor. *See In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, 2018 WL 2382600, at *8 (S.D.N.Y. May 24, 2018) (safe harbor provision does not apply to statements of present fact).

To the extent these Misstatements are forward-looking, no cautionary language can safeguard Defendants from baselessly doubling QO's endemic COVID-19 annual revenue to quell investor concerns. *Bishins v. CleanSpark, Inc.*, 2023 WL 112558, at *9 (S.D.N.Y. Jan. 5, 2023) ("[t]he Estimates are best characterized as material omissions, which the PSLRA's safe harbor does not protect."); *iDreamSky*, 236 F. Supp. 3d at 833 (defendants' knowledge that statement is false precludes application of the PSLRA safe harbor). Indeed, the cautionary language that Defendants cite (DB 15) does not disclose that QO was losing market share to competitors with alternative tests that were cheaper or used better technology. *See In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 304–05 (S.D.N.Y. 2013) (misleading cautionary language "cannot be meaningful" under the statute).[12] As explained in Section III.B *infra*, Defendants knew that these Misstatements were materially false and misleading when made.

Finally, Defendants broadly contend that 11 of the 28 Misstatements are immaterial puffery (Misstatements 79, 87-89, 93-96, 99, 103-104) and 10 of 28 inactionable opinions (Misstatements 86-87, 90-92, 95-98, 102). DB 11 n.3, 15-16. These challenges are without merit. The challenged Misstatements were clearly material to investors. Analysts focused on QO's ability to sustain COVID revenue. *See, e.g.*, Misstatements 83, 92, 97, 101-102; *see also* ¶¶121,

---

[12] Defendants' authority is distinguishable. *See In re Lottery.com, Inc. Sec. Litig.*, 715 F. Supp. 3d 506, 538-39 (S.D.N.Y. 2024) (company disclosed that it had identified an existing "material weakness in [its] internal control over financial reporting," that the weakness "remain[ed] unremediated," and that this weakness "could result" in additional material misstatements).

123, 125-27. In fact, when QO ultimately disclosed that it was reverting its endemic COVID-19 annual revenue back to $200 million (¶284), analysts exclaimed that Defendants' previous statements no longer "make sense" based on "prior outlook." ¶292. *See Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 303 (S.D.N.Y. 2018) (finding analyst report reflected the state of market knowledge and reliance on defendants' statements). The opinion statement challenges, relegated to a footnote, also fail for similar reasons outlined above, namely that they are based on objective facts that were untrue. *See, e.g.*, Misstatement 95 ("one key takeaway" is "***QuidelOrtho's position in the overall diagnostics market, including respiratory, is much stronger as a combined company than either company was on a standalone basis. Contrary to some recent opinions, we believe <u>as evidenced by our results</u>, the market, the diagnostics market is positioned for continued durable growth for many years to come***").

### III.    The Complaint Adequately Alleges a Strong Inference of Defendants' Scienter

In determining whether scienter is pled, "courts must, as with any motion to dismiss . . . , accept all factual allegations in the complaint as true." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 309 (2007). Scienter allegations must be viewed holistically. The issue is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id*. at 322-23.

Scienter is pled where a complaint alleges facts that give rise to a strong inference of recklessness by pleading that defendants "knew facts or had access to information suggesting that their public statements were not accurate" or "failed to check information they had a duty to monitor." *Novak*, 216 F.3d at 307, 311. Such a showing supports "the inference that the defendants knew, or more importantly, should have known that they were misrepresenting material facts." *Cloopen*, 661 F. Supp. 3d at 233. The inference "need not be irrefutable, *i.e.*, of the 'smoking gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs*, 551 U.S.

24

at 324. "When the competing inferences rest in equipoise, the tie . . . goes to the plaintiff." *In re Salix Pharm, Ltd.*, 2016 WL 1629341, at *13 (S.D.N.Y. Apr. 22, 2016). The Individual Defendants' scienter is imputer to the Company. *See Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).

### A. Defendants Knew Or Were Reckless In Making The Savanna Misstatements

Defendants intentionally or recklessly misled investors about RVP4's launch, development, manufacturing and FDA criteria satisfaction, *see* ¶¶357-74 and summarized below.

*First*, the Individual Defendants were "intimately involved" and "privy to important details" regarding Savanna (¶¶357-58, 361-65, 369), supporting scienter. *See Cloopen*, 661 F. Supp. 3d at 234. For example, FE-13 confirmed that issues with Savanna were communicated to the C-Suite "all the time," given that Savanna was set to be the Company's next big "money maker" in the face of other failed R&D projects. ¶¶213, 326, 363, 367. Indeed, Defendants told investors they were "***heavily focused on [Savanna]***" ¶358. This is a classic indication of scienter. *See Dentsply*, 732 F. Supp. 3d at 318 (defendants' own statements that "[w]e watch inventory very closely" suggested they knew about inventory backlog and reduced demand); *Stadium Cap. LLC v. CoDiagnostics, Inc.*, 2024 WL 456745, at *6 (S.D.N.Y. Feb. 5, 2024) (defendants' statements that "we keep a close eye" on orders supported inference of scienter); *Pirnik v. Fiat Chrysler Autos., N.V.*, 2016 WL 5818590, at *7 (S.D.N.Y. Oct. 5, 2016) (scienter where CEO stated that the company had "begun to take a harder look" at an issue). ***Second***, QO had a "dedicated team" for Savanna in its Executive Steering Committee, on which Defendants Steward, Bujarski, and R&D head Werner Kroll were members. ¶370; *Estée*, 2025 WL 965686, at *9 (finding scienter where the company had a "dedicated team" for tracking specific sales).

*Third*, Defendants spoke about Savanna on every earnings call and routinely responded to analyst questions about its progress. ¶357. *See Speakes v. Taro Pharm. Indus., Ltd.*, 2018 WL

25

4572987, at *9 (S.D.N.Y. Sept. 24, 2018) (inferring CEO and CFO's scienter where they spoke specifically to the issues on earnings calls); *Gauquie v. Albany Molecular Rsch., Inc.*, 2016 WL 4007591, at *2-3 (E.D.N.Y. July 26, 2016) (same). **Fourth**, as the highest-ranking executives at QO, it "requires no stretch of the imagination to infer that . . . Defendants 'knew facts or had access to information suggesting that their public statements' . . . 'were not accurate.'" *In re Mylan N.V. Sec. Litig.*, 2018 WL 1595985, at *12 (S.D.N.Y. Mar. 28, 2018); *see Nutriband, Inc. v. Kalmar*, 2020 WL 4059657, at *11 (E.D.N.Y. July 20, 2020) ("[G]iven that the Individual Defendants were the highest-ranking executives of the Corporate Defendants, it would 'strain[ ] credulity' to believe they were not involved (and aware of) these misrepresentations.").[13]

**Fifth**, Defendants received reports and had access to information "contrary to their public declarations." *Cloopen*, 661 F. Supp. 3d at 233-34. Such "access to information contradicting [Defendants'] public statements," including "monthly reports of sales and inventory," is sufficient to demonstrate reckless disregard for that contradictory information. *See SolarEdge*, 2025 WL 1031154, at *13. The Complaint contains many examples of information Defendants received or had access to, but disregarded, including: (a) monthly calls regarding RVP4 and its "significant failures" attended by Defendant Ranalli, who reported directly to Defendant Bryant (¶185); (b) Werner Kroll, who "knew everything," reported directly to the Board on R&D matters, and as a member of the Savanna Executive Steering Committee alongside Defendants Steward and Bujarski, provided product updates on Savanna to senior management (¶¶219, 363); (c) a formal

---

[13] Defendants' reliance on *City of N. Miami Beach Police Officers' & Firefighters' Ret. Plan v. Nat'l Gen. Holdings Corp.*, 2021 WL 212337, at *10 (S.D.N.Y. Jan. 21, 2021) is misplaced (DB 32), as here, Plaintiff alleges that Defendants "were exposed to specific information demonstrating how problematic [Savanna] had become." *Id*. Further, courts recognize that the core operations doctrine "reflects the commonsense assumption that executives are likely to know more about things central to their business." *Stadium Cap.*, 2024 WL 456745, at *5.

26

complaint system for logging complaints from the EU launch sent directly to Defendant Ranalli and quarterly reports sent to US headquarters (¶183); (d) a formal CAPA investigation into RVP4 error codes that confirmed issues with Savanna shared in monthly or quarterly internal business unit reports to upper management (¶178); (e) monthly discussions with Defendant Busky reporting increased R&D costs to address Savanna's continued failures (¶229); and (f) routine reports from engineers and scientists to senior management in PowerPoint presentations, including Kroll and Ranalli, direct reports of Bujarski and Bryant (¶217). These facts alone are sufficient to establish strong circumstantial evidence of scienter. *See City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012) (scienter found where "strong circumstantial evidence that [defendants] were receiving some form of specific information" on the topic existed).[14] This inference is even further bolstered by the fact that Savanna "ha[d] never once done what it is supposed to do" and "the complaint does not leave open the possibility that [ ] management was somehow in the dark about [its] true status." *Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc.*, 22 F.4th 1, 10 (1st Cir. 2021).

Although the Complaint's allegations of "access to information" is plainly sufficient, the Complaint further alleges specificity as to those reports. *In re CarLotz, Inc. Sec. Litig.*, 2024 WL 1348749, at *16 (S.D.N.Y. Mar. 29, 2024). The various reports sent to senior management and related calls during which issues with Savanna were discussed (¶¶362-67, 369) support a strong inference of scienter. *See Galestan*, 348 F. Supp. 3d at 301 (crediting FE allegations that demonstrated "which reports were circulated during the Class Period," "that these reports reached

---

[14] For these reasons, this case is unlike *In re Chembio Diagnostics, Inc. Sec. Litig.*, 616 F. Supp. 3d 192, 198-99 (E.D.N.Y. 2022) (DB 29), as the Complaint alleges the "Defendants were directly monitoring [Savanna's] development." *Sanofi* is similarly irrelevant, where the facts alleged here clearly demonstrate a "reckless disregard for truth." *Sanofi*, 87 F. Supp. 3d at 534.

27

senior executives," and that the individual defendants attended meetings and conference calls where related issues were discussed); *Akerman v. Arotech Corp.*, 608 F. Supp. 2d 372, 387 (E.D.N.Y. 2009) (scienter based on meetings where defendants "received . . . monthly sales projection and monthly inventory reports").[15]

*Sixth*, the Individual Defendants' scienter is bolstered by the core operations doctrine, which "supports the inference that the defendant knew or should have known the statements were false when made" where the alleged misstatements "concern[ ] the core operations of the company." *Yannes v. SCWorx Corp.*, 2021 WL 2555437, at *5 (S.D.N.Y. June 21, 2021) (finding core operations supported scienter inference where deal was "exceptionally important" to the company). Indeed, Defendants touted Savanna as "***the most important flagship product in the history of the Company***" and a "***major growth driver***" for the Company. ¶¶82, 321(a), 357-58. Further, the Company credited Savanna as a key reason for its merger with Ortho and the source of a majority of the Merger revenue synergies.[16] ¶¶78, 357. Defendant Bryant went so far to say that Savanna "is a flagship product for us. If I'm wrong, you won't see me next year. I'll be hiding." ¶357. And the fact that other key R&D projects had been scrapped heightened pressure to launch RVP4. ¶¶150-59; *see Hi-Crush*, 2013 WL 6233561, at *26 ("Core operations include

---

[15] Defendants ignore these allegations and incorrectly posit that the Complaint does not specify the exact information contained in the pervasive and increasing customer complaints about Savanna or whether Defendant Ranalli ever reviewed the complaints sent directly to her. DB 30. *But see Dentsply*, 732 F. Supp. 3d at 320 (*citing Tellabs*, 551 U.S. at 324) ("Although Plaintiffs don't identify the specific document containing the contradiction, they don't need to."). Defendants' argument regarding the FE's particularity fails for the same reasons. DB 28.

[16] Defendants' attempt to minimize Savanna's importance as a percentage of global revenue (DB 32) proves rather than disproves scienter because while RVP4 was promised to investors, Defendants hid the truth about the test's many insurmountable (to date) existential problems. However, the fact that Savanna was touted as a sizeable portion of future revenue supports scienter. *See* ¶¶321(a), 327(l), 357. *See In re Hi-Crush Partners L.P. Sec. Litig.*, 2013 WL 6233561, at *26 (S.D.N.Y. Dec. 2, 2013) ("core" where issue was 18% of projected revenues).

matters 'critical to the long-term viability' of the company").[17]

*Seventh*, the FE accounts create a strong inference of Defendants' knowledge of facts that contradicted their public statements. *Heller v. Goldin Restructuring Fund, L.P.*, 590 F. Supp. 2d 603, 622 (S.D.N.Y. 2008). Multiple credible and well-placed FEs confirm that throughout the Class Period, Defendants knew or were reckless in not knowing that Savanna failed to achieve the requisite 95% sensitivity percentage necessary for FDA approval. ¶¶199-205, 371. Yet, Defendants Bryant, Iskra and Bujarski told investors as late as February 13, 2024 and March 9, 2024 that Savanna's 510(k) application was "on track" and that the Company expected Savanna instrument placements of approximately 1,000 in 2024 to "pave the way for 2025 Savanna revenue growth." ¶¶303-04, 373. Only a few weeks later, QO withdrew its RVP4 FDA submission on the basis that "the final dataset, ***submitted in February 2024***, did not meet our expectations." ¶303. From February 2024 to April 2024, Defendants continued to tout that Savanna's 510(k) application was "on track" and affirmed instrument placements for 2024.[18] ¶¶285, 289-90; *see also Vivendi*, 381 F. Supp. 2d at 181 (plaintiffs may "rel[y] on post-class period [statements] to confirm what a defendant should have known during the class period," as holding otherwise would "reward [Defendants] for their successful concealment").[19]

---

[17] Defendants argue that the Complaint does not plead motive. DB 25, 34 n.31. Not so. Multiple FEs confirm that there was a "top-down mandate" and significant pressure to launch Savanna before it was ready for market. ¶359. Further, bonuses were tied to achieving "certain Savanna launch targets" which motivated this unrealistic sales pressure. ¶136, 381. Regardless, motive is not required to establish scienter. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007); *Tellabs*, 551 U.S. at 325. These facts bolster the circumstantial evidence of conscious misbehavior or recklessness alleged here. *See ATSI*, 493 F.3d at 99.

[18] Defendants' fraud-by-hindsight argument is "often" rejected when plaintiffs allege that "'the company failed to take into account information that was available to it' at the time the company issued incorrect statements or omissions.'" *Salix*, 2016 WL 1629341, at *17.

[19] Defendants argue the Complaint doesn't show they knew RVP4 could "never" satisfy FDA criteria. That is not what is required. As Defendants' authority confirms (DB 29), if "management

### B.      Defendants Knew Or Recklessly Made Endemic COVID-19 Misstatements

Defendants intentionally or recklessly misled investors about QO's assessment of endemic COVID revenues, *see* ¶¶375-81 and summarized below.

The circumstances surrounding Defendants' scheme doubling QO's endemic COVID revenue at the end of 2022 bolsters scienter. To staunch a rapidly falling stock price, Defendants doubled QO's estimate for endemic COVID revenue despite negative sales figures, inventory levels, and trends made known to Defendants. ¶¶112-13, 230-80. Less than one month after reaffirming this endemic revenue in January 2024, Defendants scaled back to QO's 2022 endemic revenue figure, causing a dramatic share price drop. This supports scienter. *See Bettis v. Aixtron SE*, 2016 WL 7468194, at \*16 (S.D.N.Y. Dec. 20, 2016) (temporal proximity between a false statement and a later inconsistent statement can be relevant to scienter). There is scienter, particularly where Defendants fail to allege "any intervening events" that "would justify such a sudden and extreme change of fortune." *In re Apple Inc. Sec. Litig.*, 2020 WL 6482014, at \*11 (N.D. Cal. Nov. 4, 2020); *see also In re St. Jude Med., Inc. Sec. Litig.*, 836 F. Supp. 2d 878, 899 (D. Minn. 2011) (allegations that Defendants knew company would not meet guidance where internal data indicated sales were trending downward "plainly support a 'strong inference of scienter'"). Defendants' failure to address the timing of the COVID misstatements is revealing, particularly where Defendants Busky and Bryant were directly responsible for COVID estimates and knew the Company would not reasonably meet this exponential estimate. *In re Gen. Elec. Sec. Litig.*, 857 F. Supp. 2d 367, 395 (S.D.N.Y. 2012) (drawing inference of knowledge where CFO made misleading statements about the portion of the business he was responsible for).

---

knows that certain facts will necessarily prevent the regulatory approval … and conceals these facts from the investing public, then there is scienter." *Sanofi*, 87 F. Supp. 3d at 529.

FEs confirm the deception involved in this sudden upward revision. Defendants knew of declining COVID sales, loss of market share to competitors and mounting test inventory. *See* ¶¶230-80. Scienter is found where Defendants "had access to certain information or failed to check that information, which they had a duty to monitor." *See In re Virtu Fin., Inc. Sec. Litig.*, 2025 WL 847824, at \*23 (E.D.N.Y. Mar. 17, 2025). ***First***, the Company's slowing respiratory sales were discussed on monthly calls with the C-Suite (¶243), and this decline in sales led to "enormous" inventory issues, prompted E&O meetings during which the increasing excess and expiring products were discussed and memorialized in FE-10's "McKellar Report"—which was provided to and discussed with Defendant Busky. ¶276. ***Second***, QO's sales teams had no chance of making their "unattainable" sales quotas in 2023, and sales quota data that "easily and obviously" showed a huge decline in sales was accessible to the C-Suite. ¶¶251, 257. This information was communicated to senior management, including Defendant Busky. ¶264.

The "timing and circumstances" of Defendants Bryant, Bujarski and Iskra's terminations strongly support an inference of scienter. *Yannes*, 2021 WL 2555437, at \*6. Bryant was abruptly fired with no succession plan in place ***one day*** after the Company's February 13, 2024 revelations. ¶¶300-02; *see In re Sadia, S.A. Sec. Litig.*, 643 F. Supp. 2d 521, 534 (S.D.N.Y. 2009). This termination is "highly unusual," particularly because Bryant was personally "responsible for" the Company's endemic COVID revenues. ¶376; *see Salix*, 2016 WL 1629341, at \*15 (resignation of Defendant who was "manning the wheel . . . when it was engaging in allegedly fraudulent conduct" was "highly unusual or suspicious").[20] Defendants Bujarski and Iskra were similarly

---

[20] Further supporting this inference are allegations that Defendant Bryant recorded a video in which he took responsibility for the Company's 2023 unrealistic sales targets. ¶302; *see Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 672 F. Supp. 2d 596, 607 (S.D.N.Y. 2009) (resignation email bolstered scienter inference and allowed Court to infer that internal problems "were much more serious than the picture conveyed by [the Company's] filings and press releases").

terminated shortly after the Company again lowered its COVID-19 guidance and Savanna revenue was delayed until 2026. ¶309. *See Dentsply*, 665 F. Supp. 3d at 290.

### C.    Defendants' Scienter Arguments Fail To Raise An Innocent Inference

The Complaint's allegations, when viewed holistically, raise a strong inference of scienter that is at least as (if not more) compelling as any opposing inference. Defendants' primary challenge to the Complaint's scienter allegations rests in the FE allegations, but *six* of the Complaint's *seventeen* enumerated bases for scienter do not rely on FEs at all. *See, e.g.*, ¶¶357-58, 361, 373-76, 379-80. And although Defendants' motion lodges scattershot arguments related to the *twenty-one* FEs, not once do Defendants challenge the veracity of the statements attributed to these FEs or their credibility. That fact alone undermines a compelling non-fraud inference.

The Complaint's FE allegations are sufficiently particular and corroborative of the kind that are routinely credited in this Circuit. In fact, to satisfy the PSLRA, "the pleader needs only describe the confidential sources with sufficient particularity to support the probability that someone in such a person's position would be privy to the information alleged." *In re EVCI Colls. Holding Corp. Sec. Litig.*, 469 F. Supp. 2d 88, 96–97 (S.D.N.Y. 2006). The Complaint readily meets that standard for each FE. Moreover, any challenge to the Complaint's FE descriptions necessarily fails. DB 25. For each of the twenty-one FEs, the Complaint alleges their role or position at the Company, their responsibilities, and the time period for which they occupied that role. *See* ¶¶46-66; *NIO*, 2021 WL 3566300, at *7 ("[D]istrict [C]ourts in the Second Circuit . . . credit confidential sources whose 'positions and/or job responsibilities are described sufficiently to indicate a high likelihood that they actually knew facts underlying their allegations.'").[21]

---

[21] Defendants' citation to *In re DraftKings Inc. Sec. Litig.*, 650 F. Supp. 3d 120, 154 (S.D.N.Y. 2023) is inapposite. DB 25. There, the court evaluated unverified allegations contained in a short report, rather than FE accounts independently verified by counsel, like the allegations here.

Additionally, the Complaint cites allegations from FEs "from several geographic areas" and who "span different levels of the Company hierarchy," thus providing "[c]orroboration from multiple sources" to support an inference of scienter. *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 197 (S.D.N.Y. 2010). Defendants challenge only FE-15 and FE-16 in this regard, but both fail—each FE speaks to the COVID sales in the regions for which they are responsible, or first-hand experiences with QO customers, exactly the type of facts necessary to support their allegations. ¶¶60-61, 240-41 (FE-15), ¶¶244-45 (FE-16).[22] Notably, Defendants mischaracterize FE-15 as "low-level" (DB 26), FE-15 participated in monthly sales calls with the C-suite where the Company's slowing respiratory sales were discussed in late 2022 and early 2023. ¶243.[23]

Notably, Defendants admit, as they must, that several of the FEs had direct contact with the Individual Defendants. DB 26; *see e.g.*, ¶¶134, 185, 229, 276-80. And many others reported up to the Individual Defendants in their reporting lines. *See, e.g.*, ¶¶185, 212, 218, 260. Despite the close contact alleged here, there is "no baseline requirement" of contact with individual defendants to allege FE accounts with the requisite particularity. *Plumbers & Pipefitters Nat. Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 615 (S.D.N.Y. 2015). The sheer number of former employees and their corroborative nature further supports their credibility.[24]

---

[22] Defendants' claim that FE allegations of Defendants' knowledge of "declining sales" and missed COVID sales quotas while doubling endemic COVID revenue guidance does not support an inference of scienter (DB 26, 28) is perplexing. These trends could reasonably only support lowered not raised COVID revenues.

[23] Reliance on *In re Lehman Bros. Sec. & ERISA Litig.*, 2013 WL 3989066, at *4 (S.D.N.Y. July 31, 2013) does not help Defendants' cause, as there, the complaint failed to allege the time period in which the witnesses at issue worked at the defendant company. The Complaint alleges FE-15 and FE-16's tenure with sufficient specificity. *See* ¶60 (FE-15 was employed from September 2015 until June 2023); ¶61 (FE-16 was employed from late 2022 through September 2023).

[24] *Weston v. DocuSign, Inc.*, 669 F. Supp. 3d 849, 882 (N.D. Cal. 2023). *Sun v. TAL Educ. Grp.*, 2023 WL 6394413, *31 (S.D.N.Y. Sept. 29, 2023) does not compel a different conclusion where the Court rejected reliance on a ***single*** CW absent a description of their duties and responsibilities and how the CW knew that Defendants had access to information.

Moreover, as discussed *supra* (5, 14), Defendants' assertion that FE allegations are "unmoored in time" (DB 26) is incorrect. *See*, *e.g.*, ¶¶173, 185 (FE-4 confirming monthly calls ***throughout his tenure*** to discuss negative feedback on RVP4 and describing how he started to learn of EU RVP4 challenges between June 2022 and November 2022); ¶206 (Summer 2023 discussion that RVP4 doesn't work and "isn't even a product"); ¶177 (FE-8 describing uptick in complaints from EU customers in August 2023); ¶179 (problems with RVP4 still being addressed when FE-9 left the Company in 2024). Further, where, as here, the fraud occurred persistently throughout the Class Period, the argument that allegations are tied to "too indefinite a time period to support a strong inference of scienter" must be rejected. *See AppHarvest*, 684 F. Supp. 3d at 248 (rejecting argument where meetings happened "throughout" a certain period); *see also New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 13 (2d Cir. 2011) (meetings throughout class period supported strong inference of scienter); *Galestan*, 348 F. Supp. 3d at 301. Moreover, Defendants suggest that FE-2 and FE-14's purportedly "secondhand" testimony about Werner Kroll cannot be relied upon (DB 28-29), yet FE-2 and FE-14 both reported ***directly*** to Werner Kroll at the time these allegations occurred. ¶¶47, 59, 363, 370.

Defendants fail to provide the Court with "any cogent non-fraudulent inference that is ***more*** compelling than the inferences of fraud alleged by Plaintiff[]." *See Salix*, 2016 WL 1629341, at \*16 (emph. in original). At best, Defendants' proposed inference "merely raises a factual dispute that the Court must resolve in plaintiff's favor at this stage." *See Okla. Firefighters Pension & Ret. System v. Musk*, 2025 WL 951231, at \*16 (S.D.N.Y. Mar. 28, 2025); *see also EVCI Colls.*, 469 F. Supp. 2d at 97 (whether defendants' engaged in questionable practices is "manifestly unsuited for resolution on a motion to dismiss").

## IV.    The Complaint Adequately Pleads Scheme Liability

A complaint "state[s] a scheme liability claim" if it adequately alleges: "(1) that the

defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance." *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 105 (2d Cir. 2021). The Supreme Court recognizes that the scope of Rules 10b-5(a) and (c) is "expansive" and its "provisions capture a wide range of conduct" that can (but does not need to) include false and misleading misrepresentations. *Lorenzo v. Sec. & Exch. Comm'n*, 587 U.S. 71, 79 (2019). Defendants argue that the Complaint fails to allege "distinct, inherently deceptive acts required to allege scheme liability." DB 34-35. Not so. The Complaint alleges at least seven distinct deceptive business acts, in addition to the 104 Misstatements, that constituted Defendants' scheme to defraud QO investors. ¶¶429(a)-(g), ***none of which are addressed by Defendants***. Defendants' insistence that the deceptive acts need to involve collusion, manipulative stock trades or creation of a sham entity (DB 34) is simply not borne out in the case law. Moreover, Defendants ignore the U.S. Supreme Court's decision in *Lorenzo* and the Second Circuit's more recent decision in *S.E.C. v. Rio Tinto plc*, 41 F.4th 47, 49 (2d Cir. 2022) (in fact, their cited authority predates these cases), which confirmed that the dissemination of misleading statements can be considered a deceptive act for scheme liability.

## V.     The Complaint's Section 20(a) Claim Is Adequately Alleged

As Defendants concede (DB 35), if Plaintiff has adequately pled a § 10(b) claim, the Court should sustain the § 20(a) claim. *See AppHarvest*, 684 F. Supp. 3d at 274.

## CONCLUSION

Defendants' Motion should be denied in full. If granted, however, Plaintiff respectfully requests leave to amend to address any insufficiencies identified by the Court.

35

DATED: June 4, 2025

Respectfully submitted,

*/s/ Lauren A. Ormsbee*
**LABATON KELLER SUCHAROW LLP**
Lauren A. Ormsbee
Lisa M. Strejlau
Charles J. Stiene
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
lormsbee@labaton.com
lstrejlau@labaton.com
cstiene@labaton.com

*Counsel for Lead Plaintiff and Lead*
*Counsel for the Proposed Class*

36

## CERTIFICATE OF COMPLIANCE

I, Lauren A. Ormsbee, hereby certify that this memorandum of law complies with the length restrictions in Local Civil Rule 7.1(c), as modified by § 5(A) of this Court's Individual Practices in Civil Cases and the Court's Order granting Defendants' Letter Motion for Leave to File Excess Pages. *See* Local Rule 7.1(c) (allowing that a court may "permit[] a party to submit briefs longer than [Local Rule 7.1(c)'s] limits"); ECF No. 46.

I further certify that this memorandum of law contains 7,644 words, including any footnotes or endnotes and excluding only those sections of the brief that are exempted under Local Rule 7.1(c) and Your Honor's Individual Practices. In preparing this certificate of compliance, I have relied on the word count of the word-processing system used to prepare this memorandum of law.

/s/ *Lauren A. Ormsbee*
Lauren A. Ormsbee