

**Lauren A. Ormsbee**
**Partner**
**Labaton Keller Sucharow LLP**
140 Broadway
New York, New York 10005
212.907.0864
LOrmsbee@labaton.com

October 3, 2025

**VIA ECF**

The Honorable Jeannette A. Vargas
United States District Court
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street, Room 703
New York, NY 10007

Re:     *In re QuidelOrtho Corporation Securities Litigation*, No. 24-cv-02804 (S.D.N.Y.)

Dear Judge Vargas:

Lead Plaintiff respectfully submits the recent decisions in *Gimpel v. The Hain Celestial Grp., Inc.*, No. 23-7612, -- F.4th --, 2025 WL 2749562 (2d Cir. Sept. 29, 2025) and *Alghazwi v. Beauty Health Co.*, No. 2:23-CV-09733-SPG-MAA, 2025 WL 2751076 (C.D. Cal. Sept. 23, 2025) ("*BHC*"), as supplemental authority in opposition to Defendants' motion to dismiss (ECF No. 47-48), which Lead Plaintiff opposed on June 4, 2025 (ECF No. 50, "Opposition Brief"), and submitted additional supplemental authority in support thereof on July 8, 2025 (ECF No. 56, as modified by ECF No. 66) and on August 22, 2025 (ECF No. 69). A copy of the *Hain Celestial* and *BHC* opinions are submitted herewith as Exs. A and B, respectively.

*Hain Celestial*: In *Hain Celestial*, a unanimous panel of the Second Circuit reaffirmed the fundamental principle that once "a company speaks on an issue or topic," it must "tell the whole truth" and assumes "a duty to be both accurate and complete" such that adequate disclosure is required to make other statements, "in light of the circumstances under which they were made, not misleading." 2025 WL 2749562 at *10 (citation modified). Moreover, the Second Circuit confirmed that the court's inquiry into whether a statement is misleading should be "objective, from the perspective of a reasonable investor, considering not only a statement's literal truth but also its context and manner of presentation." *Id.* (citation modified). Accordingly, the Second Circuit reversed the lower court and held that the *Hain Celestial* defendants' failure to disclose their reliance on channel stuffing to meet investor benchmarks triggered this "half-truth" doctrine because defendants repeatedly "put the reasons for the company's success at issue" but "fail[ed] to disclose a material source of its success." *Id.* at *11-12 (citation modified).

*Hain Celestial* directly supports the falsity of Defendants' Misstatements. For example, Defendants chose to speak about Savanna RVP4's "***very positive customer feedback***" from the EU launch, QuidelOrtho's readiness for a US launch, and its manufacturing capabilities, while



New York | Delaware | London | Washington, D.C.



October 3, 2025
Page 2

failing to disclose that nearly all of the feedback that QuidelOrtho obtained from its EU customers was negative and the RVP4 panel was riddled with issues that prevented the test from ever satisfying the known FDA criteria or being manufactured to scale. *See* Opposition Brief at 6-20. Moreover, Defendants chose to speak about demand for QuidelOrtho's COVID-19 testing products, but failed to disclose that market share was materially decreasing as the Company lost customers to competitors with cheaper or newer tests. *See id.* at 20-24.

Similarly, the Second Circuit in *Hain Celestial* holistically evaluated plaintiff's scienter allegations and found that the complaint's confidential witnesses allegations supported an inference of scienter where they supported allegations that defendants "knew facts or had access to information suggesting that their public statements were not accurate." 2025 WL 2749562 at *15. Further, the Second Circuit found that a strong inference of scienter was supported by the departure of "the Individual Defendants and other key personnel under suspicious circumstances." *Id.* at *17. *Hain Celestial* also confirmed that "core-operations" and "magnitude of the fraud" doctrines, which demonstrate that "the size of the alleged fraud, coupled with its importance to [a company's] operations, provides supplemental support" for scienter. *Id.* at *16, n.19. Finally, the Second Circuit recognized that allegations of compensation motive "move the needle [inferring scienter] because the significant bonuses and stock awards" that defendants received "were tied to the metrics that Hain overstated." *Id.* at *14.

In each regard, *Hain Celestial* is in direct alignment with the allegations here. **First**, the Complaint contains the accounts of 21 former employees with direct knowledge sufficient to demonstrate Defendants' knowledge of, or access to, information that contradicted their public statements regarding Savanna RVP4 and demand and revenue from its COVID-19 tests. *See* Opposition Brief at 25-34. **Second**, the Complaint alleges that the "timing and circumstances" of Defendants Bryant, Bujarski, and Iskra's terminations strongly support an inference of scienter. *Id.* at 31-32. **Third**, the Complaint alleges that the Individual Defendants' scienter is bolstered by the core operations doctrine as they repeatedly touted Savanna as "the most important product" in the history of the Company (*e.g.* ¶82), and a "major growth driver" for the Company. *See* Opposition Brief at 28-29. **Finally**, the Complaint alleges that bonuses were tied to achieving "certain Savanna launch targets," which motivated the unrealistic sales pressure and "top-down mandate" regarding Savanna's premature launch. *See id.* at 29, n. 17.

**BHC**: In *BHC*, the court found that defendants made material misstatements regarding BHC's next generation HydraFacial system known as Syndeo—a product that the company designed specifically to increase margins for is consumable sales. 2025 WL 2751076 at *1. As alleged, defendants rushed the launch of Syndeo after conducting limited product testing because of pressures caused by declining consumable sales, while being aware that Syndeo was "plagued with flaws from the time of its launch." *Id.* at *2. Specifically, plaintiffs' complaint alleged that defendants touted the "really good feedback" that the company received from its customers regarding the Syndeo launch while omitting, *inter alia*, that 74% of Syndeo customers reported experiencing issues with their machines. *Id.* at *12. Accordingly, the *BHC* court held that "at a minimum, Defendants' alleged statements about customer feedback were misleading because they



October 3, 2025
Page 3

highlighted only positive feedback while omitting any reference to the numerous issues and complaints with the Syndeo machines." *Id.* at \*17. The *BHC* decision is directly applicable here, where Defendants stated that QuidelOrtho had "***received very positive customer feedback to date***," but omitted, *inter alia*, that (i) 60%-80% of all Savanna RVP4 customer feedback was negative; and (ii) 25% of the RVP4 tests and instruments that made it to Europe (and weren't scrapped on the production line) were invalid (¶¶173-76, 179). *See* Opposition Brief at Argument, §1.A; Misstatements 1-19; Complaint §§IV.D, IV.F, V.A-C.

Similarly, the *BHC* court found that plaintiffs adequately pled scienter through FE allegations that detailed meetings in which Syndeo issues were discussed, databases in which product issues were logged, and reports that were generated and received by defendants that detailed these issues. *See BHC*, 2025 WL 2751076, at \*12-13. Moreover, the *BHC* court found that "[b]y making repeated statements about customer feedback, Defendants held themselves out to investors as having personal knowledge about customer satisfaction." *Id.* at \*12 ("Once Defendants chose to tout positive information about customer feedback, they were bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against positive information."). Once again, this case is in direct alignment.

Here, the Complaint contains particularized allegations regarding Defendants' scienter: (a) monthly calls regarding RVP4 and its "significant failures" (¶185); (b) key executives provided product updates on Savanna to senior management, including Defendants (¶¶219, 363); (c) a formal complaint system for logging complaints from the EU launch sent directly to Defendant Ranalli and quarterly reports sent to US headquarters (¶183); (d) a formal investigation into RVP4 error codes that confirmed issues with Savanna shared in monthly or quarterly internal business unit reports to upper management (¶178); (e) monthly discussions with Defendant Busky reporting increased R&D costs to address Savanna's continued failures (¶229); and (f) routine reports from engineers and scientists to senior management (¶217). *See* Opposition Brief at Argument, §III.A. Further, the Complaint alleges that Defendants made repeated statements about the "very positive customer feedback to date," RVP4 performance, and market demand for QuidelOrtho's products. Moreover, Defendants spoke about Savanna on every earnings call and often responded to analyst questions regarding Savanna. This, paired with Defendants' statements that they were "intimately involved" and "privy to important details" regarding Savanna, supports the same conclusion as the *BHC* court—that the most compelling inference is that Defendants' statements were made with intent to mislead. *See id.* at §III.A.

Very truly yours,

Lauren A. Ormsbee