# EXHIBIT A

2025 WL 2749562
Only the Westlaw citation is currently available.
United States Court of Appeals, Second Circuit.

Salamon GIMPEL, Rosewood Funeral Home, Lead Plaintiffs–Appellants,
James Spadola, Rodney Lynn, Consolidated Plaintiffs,
Bradley D. Flora, Individually and on behalf of all others similarly situated, Plaintiff,
v.
THE HAIN CELESTIAL GROUP, INC., Irwin D. Simon, Pasquale
Conte, John Carroll, Stephen J. Smith, Defendants–Appellees.

Docket No. 23-7612
|
August Term, 2024
|
Argued: December 5, 2024
|
Decided: September 29, 2025

**Synopsis**
**Background:** Stockholders filed second amended complaint on behalf of putative class of investors in corporation against corporation and four of its officers for securities fraud and control-person liability under the Securities Exchange Act, alleging defendants made false statements about corporation's financial results and accounting and internal controls practices, and failed to disclose corporation's "channel stuffing" practices. The United States District Court for the Eastern District of New York, Arthur D. Spatt, J., 2020 WL 1676762, granted defendants' motion to dismiss for failure to state a claim. On appeal, the Court of Appeals, 20 F.4th 131, vacated and remanded. On remand, the District Court, Joanna Seybert, Senior District Judge, 2023 WL 6360345, largely adopted report and recommendation of the District Court, Lee G. Dunst, United States Magistrate Judge, 2022 WL 18859055, recommending that defendants' motion to dismiss for failure to state a claim be granted, and granted defendants' motion, finding stockholders failed to plead actionable misstatement or omission and scienter. Stockholders appealed.

**Holdings:** The Court of Appeals, Sack, Senior Circuit Judge, held that:

[1] stockholders plausibly alleged that defendants' statements regarding its accounting practices were material misstatements, as required to state claim for securities fraud;

[2] stockholders plausibly alleged that corporation relied on various "channel-stuffing" practices to boost its revenues;

[3] stockholders plausibly alleged that defendants' statements regarding corporation's financial results were misleading statements, as required to state claim for securities fraud;

[4] stockholders plausibly alleged that defendants' statements about distributors' inventory levels were misleading, as required to state claim for securities fraud;

[5] stockholders' allegations of motive to defraud based on stock sales and compensation incentives for corporation's executives weighed in favor of scienter;

[6] stockholders' allegations of officers' conscious misbehavior or recklessness supported strong inference of scienter; and

[7] stockholders adequately pleaded loss causation, as required to state claim for securities fraud.

Vacated and remanded.

**Procedural Posture(s):** On Appeal; Motion to Dismiss for Failure to State a Claim.

West Headnotes (31)

**[1]    Federal Civil Procedure** 🔑

Courts generally consider and take as true allegations by confidential witnesses at the pleadings stage so long as the confidential witnesses are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.

**[2]    Federal Courts** 🔑

The Court of Appeals reviews the district court's dismissal of a complaint for failure to state a claim de novo. Fed. R. Civ. P. 12(b)(6).

**[3]    Federal Civil Procedure** 🔑

To survive a motion to dismiss for failure to state a claim, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. Fed. R. Civ. P. 12(b)(6).

**[4]    Securities Regulation** 🔑

Any complaint alleging securities fraud must satisfy the heightened pleading requirements of the Private Securities Litigation Reform Act (PSLRA) and the rule for pleading fraud claims by stating with particularity the circumstances constituting fraud. Securities Exchange Act of 1934 § 21D, 15 U.S.C.A. § 78u-4(b); Fed. R. Civ. P. 9(b).

**[5]    Securities Regulation** 🔑

To succeed on a § 10(b) claim, a plaintiff must prove (1) a material misrepresentation or omission by the defendant, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance upon the misrepresentation or omission, (5) economic loss, and (6) loss causation. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

**[6]    Securities Regulation** 🔑

In the context of a securities fraud claim, "channel stuffing" is not necessarily fraudulent; offering distributors concessions is a common practice, and there may be legitimate reason for a company pressing for sales to be made earlier than in the normal course, such as to incite its distributors to more vigorous efforts to sell the stuff lest it pile up in inventory. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

**[7]    Securities Regulation** 🔑

In the context of a securities fraud claim, "channel stuffing" may become fraudulent when it is done to mislead investors. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

**[8]    Securities Regulation** 🔑

Theories of actionable misstatements under § 10(b) and Rule 10b-5 include: (1) a "false statement," i.e., an actual statement that is untrue outright, and (2) a "half-truth," i.e., a representation that states the truth only so far as it goes, while omitting critical qualifying information. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

**[9]    Securities Regulation** 🔑

For purposes of a securities fraud claim under § 10(b) and Rule 10b-5, a false statement must be false at the time it was made, and the plaintiff must demonstrate with specificity why the statement is false. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

**[10]    Securities Regulation** 🔑

For securities fraud claims, although § 10(b) and Rule 10b-5 do not create an affirmative duty to disclose any and all material information, once a company speaks on an issue or topic, it must tell the whole truth; that is, when a company does speak, it assumes a duty to be both accurate and complete, and adequate disclosure is required to make other statements, in light of the circumstances under which they were made, not misleading. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

**[11]    Securities Regulation** 🔑

The plaintiff in a securities fraud action must adequately allege that the misstatement or half-truth is "material," meaning that a reasonable investor would have considered it significant in making investment decisions; in other words, there must be a substantial likelihood that the statement or omission would have been viewed by the reasonable investor as having significantly altered the total mix of information made available. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

**[12]    Securities Regulation** 🔑

Sarbanes-Oxley (SOX) certifications are statements of opinion, which may be actionable under § 10(b) and Rule 10b-5 if, among other things, that statement does not rest on the issuer's meaningful inquiry or fairly align with the information in the issuer's possession at the time. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

**[13]    Securities Regulation** 🔑

A subsequent restatement of financial results or disclosure of material weaknesses in internal controls, standing alone, does not mean that the original opinions in Sarbanes-Oxley (SOX) certifications were disingenuous, nor is a genuinely held opinion that turned out to be wrong necessarily actionable under § 10(b) and Rule 10b-5. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

**[14]** **Securities Regulation**

Stockholders plausibly alleged that statements by corporation and its officers regarding its accounting practices were material misstatements, as required to state a claim for securities fraud; complaint alleged that defendants made positive statements regarding its financial results, its compliance with generally-accepted accounting principals, the existence of effective internal controls, its description of its revenue-recognition policies, and its filings with the Securities and Exchange Commission (SEC), but subsequently issued a restatement of its financial results and disclosed material weaknesses in its internal controls and financial-reporting and accounting practices, suggesting that the statements were false at the time they were made. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

**[15]** **Securities Regulation**

Stockholders plausibly alleged that corporation relied on various "channel-stuffing" practices to boost its revenues, supporting stockholders' securities fraud claim, alleging corporation and its officers made "half-truths" in failing to disclose the practices; complaint alleged that a first confidential witness, who served as corporation's senior manager of customer support, reported that they alone processed a $700,000 product return from a customer in just one quarter, that a second confidential witness, who served as corporation's senior director of supply chain finance, reported that corporation's CEO negotiated a right of return that customer, and that an order from the Securities and Exchange Commission (SEC) revealed corporation relied on a host of similar tactics. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

**[16]** **Securities Regulation**

Stockholders plausibly alleged that statements by corporation and its officers regarding corporation's financial results were misleading statements, as required to state a claim for securities fraud, in action alleging that the statements were "half-truths" that failed to disclose the use of various "channel-stuffing" practices to boost corporation's revenues; complaint alleged that defendants repeatedly attributed its financial results to factors such as expanded distribution and brand contribution, strong demand for corporation's organic and natural brands, momentum for organic and natural products, and its diverse portfolio of products, but did not disclose that it achieved its results by granting distributors credits, incentives, spoils coverage, or a right to return product. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

**[17]** **Securities Regulation**

Stockholders plausibly alleged that statements by corporation and its officers about distributors' inventory levels were misleading, as required to state a claim for securities fraud, in action alleging that the statements were "half-truths" that failed to disclose the use of "channel-stuffing" practices to boost corporation's revenues; complaint alleged that after corporation cut its quarterly and annual guidance for anticipated sales and earnings, corporation's vice president acknowledged to investors that the guidance cut was "in the area of inventory" but stated that the problems were "one-offs," which was misleading, since inventory saturation would persist because demand for corporation's products had waned, and its distributors had already reached their inventory capacity. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

**[18]** **Securities Regulation**

In the context of a securities fraud action under § 10(b) and Rule 10b-5, the "truth-on-the-market" defense provides that a misrepresentation is immaterial if the information is already known to the market because the misrepresentation cannot then defraud the market. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

**[19]    Securities Regulation** 🔑

"Scienter," for purposes of a securities fraud claim, is a mental state embracing intent to deceive, manipulate, or defraud. Securities Exchange Act of 1934 §§ 10, 21D, 15 U.S.C.A. §§ 78j(b), 78u-4(b)(2)(A); 17 C.F.R. § 240.10b-5(b).

**[20]    Securities Regulation** 🔑

Under the Private Securities Litigation Reform Act (PSLRA), a plaintiff in a securities fraud action must allege facts giving rise to a strong inference that the defendant acted with scienter, where a "strong inference" means that the inference must be more than merely plausible or reasonable; it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent. Securities Exchange Act of 1934 §§ 10, 21D, 15 U.S.C.A. §§ 78j(b), 78u-4(b)(2)(A); 17 C.F.R. § 240.10b-5(b).

**[21]    Securities Regulation** 🔑

The inference that the defendant acted with scienter, for purposes of a securities fraud claim, need not be irrefutable or even the most plausible of competing inferences; instead, the court must consider whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard, and it must take into account inferences favoring both the plaintiff and the defendant. Securities Exchange Act of 1934 §§ 10, 21D, 15 U.S.C.A. §§ 78j(b), 78u-4(b)(2)(A); 17 C.F.R. § 240.10b-5(b).

**[22]    Securities Regulation** 🔑

A securities fraud plaintiff may establish scienter by alleging facts showing that (1) the defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness; a plaintiff can also meet his scienter burden with both motive-and-opportunity and circumstantial allegations, considered collectively. Securities Exchange Act of 1934 §§ 10, 21D, 15 U.S.C.A. §§ 78j(b), 78u-4(b)(2)(A); 17 C.F.R. § 240.10b-5(b).

**[23]    Securities Regulation** 🔑

Courts generally presume that high-level corporate insiders, such as C-suite executives, have the opportunity to commit fraud, for purposes of the scienter element of a securities fraud claim. Securities Exchange Act of 1934 §§ 10, 21D, 15 U.S.C.A. §§ 78j(b), 78u-4(b)(2)(A); 17 C.F.R. § 240.10b-5(b).

**[24]    Securities Regulation** 🔑

To establish motive to engage in securities fraud, for purposes of the scienter element of a securities fraud claim, plaintiffs must assert a concrete and personal benefit to the individuals who allegedly carried out the fraud. Securities Exchange Act of 1934 §§ 10, 21D, 15 U.S.C.A. §§ 78j(b), 78u-4(b)(2)(A); 17 C.F.R. § 240.10b-5(b).

**[25]    Securities Regulation** 🔑

Stockholders' allegations of motive to defraud based on stock sales and compensation incentives for corporation's officers weighed in favor of scienter required to support stockholders' securities fraud claims, in action alleging officers made false statements about corporation's financial results and made statements that were "half-truths" that failed to disclose the use of "channel-stuffing" practices to boost corporation's revenues; complaint alleged that vice president disposed of approximately 74% of his total shares for more than $24.3 million, and CEO sold 66% of his total for more than $80 million, and that they, respectively, received stock award bonuses of $5,565,725 and $8,787,355 that were tied to the very financial metrics that corporation admittedly overstated. Securities Exchange Act of 1934 §§ 10, 21D, 15 U.S.C.A. §§ 78j(b), 78u-4(b)(2)(A); 17 C.F.R. § 240.10b-5(b).

**[26]    Securities Regulation** 🔑

"Recklessness" for purposes of the scienter element of a securities fraud claim, is highly unreasonable conduct representing an extreme departure from the standards of ordinary care and approximating actual intent, rather than merely a heightened form of negligence. Securities Exchange Act of 1934 §§ 10, 21D, 15 U.S.C.A. §§ 78j(b), 78u-4(b)(2)(A); 17 C.F.R. § 240.10b-5(b).

**[27]    Securities Regulation** 🔑

Stockholders' allegations of conscious misbehavior or recklessness by corporations' officers based on corporations' "channel-stuffing" practices supported a strong inference of scienter, as required to state a claim for securities fraud; complaint alleged that confidential witnesses reported that corporation's vice president requested mid-quarter sales numbers to calculate sales shortfalls and negotiated concessions to make up for sales shortfalls, that corporation's CEO told a customer that corporation needed "to make [the forecasted sales numbers] this quarter," that corporation pushed out inventory, and used credits and accruals to offset sales deficits on its balance sheet, and that officers prepared financial reports for the public and signed off on their accuracy. Securities Exchange Act of 1934 §§ 10, 21D, 15 U.S.C.A. §§ 78j(b), 78u-4(b)(2)(A); 17 C.F.R. § 240.10b-5(b).

**[28]    Securities Regulation** 🔑

In the context of a securities fraud claim, the "core-operations" doctrine posits that scienter may be imputed to key officers who should have known facts relating to the "core operations" of their company, while the "magnitude of the fraud" doctrine suggests recklessness if the alleged falsity impacted a large portion of the company's sales or operations. Securities Exchange Act of 1934 §§ 10, 21D, 15 U.S.C.A. §§ 78j(b), 78u-4(b)(2)(A); 17 C.F.R. § 240.10b-5(b).

**[29]    Securities Regulation** 🔑

Stockholders' allegations of conscious misbehavior or recklessness by corporations' officers based on changes to corporation's executives offered supplemental, circumstantial support for a strong inference of scienter required to support stockholders' claim for securities fraud, in action alleging corporation and its officers made false statements regarding corporation's financial results, and failed to disclose corporation's "channel-stuffing" practices; complaint alleged that over a period of approximately four years, seven executives were terminated and two more were demoted, and alleged that a confidential witness reported that corporation's chief financial officer was replaced and several other executives left because they took issue with corporation's practices. Securities Exchange Act of 1934 §§ 10, 21D, 15 U.S.C.A. §§ 78j(b), 78u-4(b)(2)(A); 17 C.F.R. § 240.10b-5(b).

**[30]    Securities Regulation** 🔑

Order of the Securities and Exchange Commission (SEC), which found that corporation engaged in "end of quarter sales" that could have had financial reporting implications, but which declined to impose a civil penalty, did not weigh against scienter required to support stockholders' securities fraud claims, in action alleging corporation and its officers made false statements regarding corporation's financial results and accounting and internal controls practices, and failed to disclose corporation's "channel-stuffing" practices; SEC's decision not to pursue charges was irrelevant as to whether stockholders plausibly alleged claims, as it was not the result of an actual adjudication of any of the issues, and the order was consistent with stockholders' theory. Securities Exchange Act of 1934 §§ 10, 21D, 15 U.S.C.A. §§ 78j(b), 78u-4(b)(2)(A); 17 C.F.R. § 240.10b-5(b).

**[31]    Securities Regulation** 🔑

Stockholders adequately pleaded loss causation, as required to state a claim for securities fraud against corporation and its officers, in action alleging defendants made false statements regarding corporation's financial results and accounting and internal controls practices, and failed to disclose corporation's "channel-stuffing" practices; complaint alleged that corporation's stock price declined after corporation disclosed that it was reevaluating whether it should have recognized revenue associated with concessions to distributors when its products sold through the distributors to end customers, rather than at the time of shipment to distributors, as it had been doing, and that the Securities and Exchange Commission (SEC) had launched a formal investigation of corporation. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

Appeal from the United States District Court for the Eastern District of New York (Joanna Seybert, *Judge*)

**Attorneys and Law Firms**

Christine M. Fox (Carol C. Villegas, James M. Fee, Matthew J. Grier, Labaton Keller Sucharow LLP, New York, NY, on the brief); (Robert V. Prongay, Leanne Heine Solish, Jonathan M. Rotter, Glancy Prongay & Murray LLP, Los Angeles, CA, on the brief); (Brian Schall, The Schall Law Firm, Los Angeles, CA, on the brief), for Lead Plaintiffs-Appellants Rosewood Funeral Home and Salamon Gimpel;

John M. Hillebrecht (Marc A. Silverman, on the brief), DLA Piper LLP (US), New York, NY, for Defendants-Appellees.

Before: Sack, Nardini, and Lee, Circuit Judges.

**Opinion**

Sack, Circuit Judge:

**\*1**  Lead Plaintiffs-Appellants Salamon Gimpel and Rosewood Funeral Home [1] (collectively, the "Plaintiffs") appeal from the dismissal of their securities-fraud class action brought against Defendants-Appellees The Hain Celestial Group, Inc. ("Hain") and four of its present or former officers, Irwin Simon, Pasquale Conte, John Carroll, and Stephen Smith (the "Individual Defendants," and together with Hain, the "Defendants"). [2]  On behalf of a putative class of investors who purchased or otherwise acquired Hain's publicly traded common stock from November 5, 2013, through February 10, 2017 (the "Class Period"), the Plaintiffs asserted claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b–5, in their operative, Second Amended Complaint (the "Complaint").

The gravamen of the Complaint is that Hain, a leading marketer, manufacturer, and seller of organic and natural food and personal care products, engaged in a so-called "channel-stuffing" scheme: Faced with flagging demand for its products and pressure to meet Wall Street analysts' financial forecasts for the company, Hain offered its distributors significant concessions to accept more product than they needed at the end of each fiscal quarter. However, by stuffing its distributors to the gills, Hain allegedly robbed Peter to pay Paul, cannibalizing future revenues to make present sales look more impressive. After distributors would no longer accept inventory and Hain's practices precipitated internal strife and an independent audit, the Securities and Exchange Commission (the "SEC") launched an investigation. Eventually, Hain restated its financial numbers, conceded that it lacked adequate internal controls to account for its practices and improperly recognized revenue, and settled with the SEC, which declined to bring charges. Hain's reported sales figures plummeted. The Plaintiffs brought suit in the Eastern District of New York.

 **\*2**  Channel stuffing is not necessarily illegal, but it may give rise to liability under the Exchange Act when a company engages in the practice to deceive investors. Here, the Plaintiffs allege that the Defendants made false statements to investors about, among other things, their financial results, the existence of adequate internal controls, and their compliance with Generally Accepted Accounting Principles ("GAAP"); they allege further that the Defendants made misleading statements by attributing Hain's financial success to consumer demand and by downplaying concerns about inventory levels without disclosing their reliance on channel stuffing. And, according to the Plaintiffs, the Defendants made these false and misleading statements with a wrongful state of mind, i.e., scienter, defined here as the "defendant's intention to deceive, manipulate, or defraud."[3] *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007); *see* 15 U.S.C. § 78u–4(b)(1), (2).

After the district court first dismissed the Plaintiffs' Complaint, *In re Hain Celestial Grp. Inc. Sec. Litig. (Hain II)*, No. 16-CV-4581, 2020 WL 1676762, at \*17 (E.D.N.Y. Apr. 6, 2020), and we reversed, *In re Hain Celestial Grp., Inc. Sec. Litig.*, 20 F.4th 131, 137-38 (2d Cir. 2021), the Defendants again moved to dismiss.[4]  Largely adopting the conclusions of Magistrate Judge Lee G. Dunst's Report and Recommendation ("R&R"), *In re Hain Celestial Grp. Inc. Sec. Litig. (Hain III)*, No. 16-CV-4581, 2022 WL 18859055 (E.D.N.Y. Nov. 4, 2022), the district court (Joanna Seybert, *Judge*) granted the Defendants' motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), concluding that the Plaintiffs had failed to adequately allege that the Defendants acted with scienter, *In re Hain Celestial Grp. Inc. Sec. Litig. (Hain IV)*, No. 16-CV-4581, 2023 WL 6360345, at \*14-18 (E.D.N.Y. Sep. 29, 2023).

On appeal, we conclude that the Plaintiffs have adequately alleged that the Defendants made actionable misstatements in connection with Hain's channel-stuffing practices and did so with scienter under Rule 10b-5(b); they also sufficiently alleged loss causation. We further determine that the Plaintiffs' claims for control-person liability against the Individual Defendants under Section 20(a) of the Exchange Act may proceed. For the reasons set forth in further detail below, we **VACATE** the district court's order dismissing the Plaintiffs' Complaint and **REMAND** the matter for further proceedings consistent with this opinion.

## BACKGROUND

### I. Factual History

 **[1]**   The following facts are drawn primarily from the factual allegations of the Plaintiffs' Complaint, which we treat as true for present purposes, "drawing all reasonable inferences in favor of [the] Plaintiffs to the extent that the inferences are plausibly supported by allegations of fact." *Hain*, 20 F.4th at 133. The Complaint relies on allegations from eight unnamed confidential witnesses ("CWs"), seven of whom are former Hain employees, and one of whom worked for a company that provided warehousing services for Hain. We generally consider and take as true allegations by CWs at the pleadings stage so long as the CWs "are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015). The Complaint also incorporates by reference various publicly available documents, such as SEC

filings, an SEC order, and earning calls transcripts, of which we take judicial notice. *See San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 808–09 (2d Cir. 1996).

### A. Hain's Alleged Channel-Stuffing Scheme

**\*3**  Hain is a leading marketer, manufacturer, and seller of organic, natural, and personal care products, which it sells primarily to specialty and natural food distributors, supermarkets, and select e-commerce retailers. In the early 2010s, Hain faced stiffening competition from other brands and retailers offering a similar selection of natural and organic foods, which weakened demand for Hain's products. Hain feared that it could meet neither its own financial projections nor the predictions made by Wall Street financial analysts about Hain's financial performance—shortcomings that could send Hain's stock prices tumbling. Hain resorted to "channel stuffing," offering its distributors significant concessions to purchase substantial quantities of product in advance of the distributors' typical purchasing patterns. *See Greebel v. FTP Software, Inc.*, 194 F.3d 185, 202 (1st Cir. 1999); *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1298 (9th Cir. 1998). But channel stuffing may exact a heavy toll: By pulling sales forward, the company artificially inflates its present sales at the expense of its future performance—it robs Peter to pay Paul. *See Steckman*, 143 F.3d at 1298. Among the concessions Hain allegedly offered its distributors to front-load their purchases were (1) cash incentives as high as $500,000 for a single distributor in a single quarter; (2) product discounts of up to 20%; (3) extended payment terms; (4) spoils coverage, or reimbursements for excess product that spoiled or expired; and (5) an absolute right to return unsold product.

Hain's channel stuffing worked roughly as follows. Each quarter, Hain publicly reported its financial results and provided investors with guidance on its projected net sales and earnings per share. Independent Wall Street financial analysts then established consensus prospective quarterly estimates, i.e., financial benchmarks for the company, that were generally consistent with Hain's guidance and predicted continued sales growth for the company. Investors used these forecasts to gauge a company's financial performance and health, but a company's failure to meet these "Street expectations" could trigger a decline in the company's stock price.

That all is standard practice—but here's the rub: As sales weakened during the Class Period, Hain faced a "sales shortfall" between its actual, mid-quarter results and its projected figures. Joint App'x 208 ¶ 63. To bridge that gap, Carroll, the CEO of Hain North America, obtained the mid-quarter numbers, estimated the sales shortfall, and, along with Hain President and CEO Simon, enticed Hain's distributors to take on additional inventory by offering the various concessions. Carroll and Simon then directed Hain brand managers to ship the excess inventory to distributors. By pulling forward these sales, Hain could report to investors that it had met its performance benchmarks without disclosing its declining financial prospects.

For one key Hain distributor, United Natural Foods, Inc. ("UNFI"), end-of-quarter sales were especially prominent. Hain and UNFI agreed to quarterly inventory purchasing targets of around $90 million per quarter; however, UNFI communicated to Hain that it might miss these targets by as little as $10 million and as much as $30 million. To ensure that UNFI would meet its targets, Hain negotiated "off-contract" incentives and concessions. UNFI bought between 52-64% of its inventory based on these off-contract incentives, constituting more than 15% of Hain's entire U.S. quarterly sales.[5] Hain relied on similar tactics with another key distributor, Walmart Stores, Inc., which accounted for around 8% of Hain's net U.S. sales.

But these channel stuffing practices raised serious accounting issues. For one, as Hain later disclosed, although Hain negotiated these concessions "off-contract" or in "side agreements"—rather than in, for instance, its annual sales contracts—it did not have effective internal controls to "identify, accumulate[,] and assess the accounting impact" of these arrangements. Joint App'x 231–32 ¶ 147. Indeed, Hain's agreements with UNFI were, according to a subsequent SEC investigation, "typically memorialized only in email correspondence with the distributor," and some incentives agreed to only "orally." *Id.* at 361 ¶ 9. Moreover, Hain allegedly resorted to using millions of dollars' worth of credits and accruals[6] to offset sales deficits on its balance sheet. But Hain accounted for the "credits and off-invoice concessions as revenue as soon as the shipments left the warehouse." *Id.* at 209 ¶ 64; *see id.* at 215 ¶ 82. And because of the size of the credits and accruals and the ensuing "drop off" in sales following

Hain's end-of-quarter product push, *id.* at 212 ¶ 76, Hain's Chief Operating Officer ("COO") and non-defendant James Meiers "smoothed out" and "chang[ed]" the credits, concessions, and sales and revenue numbers to make the numbers "look pretty," *id.* at 209, ¶ 64, 220–21 ¶ 104.

**\*4** Booking Hain's shipments as revenue as soon as they went out the door also proved especially troublesome because, according to the CWs, Hain offered its distributors an "absolute right to return" product with no obligation to pay. Joint App'x 207 ¶ 59. One CW reported having routinely processed hundreds of thousands of dollars in quarterly product returns, including $700,000 in one quarter of 2015 alone. Nonetheless, Meiers sent the sales and revenue numbers for inclusion in Hain's SEC filings to Hain's CFO (either Smith or Conte), who signed off on Hain's accounting statements and certified their accuracy.

In addition to presenting accounting problems, the channel-stuffing practices were also unsustainable. The following fiscal quarter, distributors often returned the excess inventory from the previous quarter, "and the process would begin again, although with an increasingly larger deficit due to the prior quarter's credits [for returns] and off-invoice concessions." *Id.* at 209 ¶ 65. Faced with declining end-customer demand for Hain's products, distributors also began to hit an inventory wall, reaching their capacity. All the while, the Defendants made repeated public statements attributing Hain's strong growth in sales numbers to "strong consistent consumer demand" and other "organic" factors, while failing to disclose how the channel-stuffing practices artificially inflated sales figures. *See, e.g.*, *id.* at 259 ¶ 257, *id.* at 260 ¶ 260, *id.* at 262 ¶ 266.

### *B. The Channel-Stuffing Scheme Unravels*

Around late 2015, things fell apart. As sales ebbed, accruals and credits flowed. Filled to the brim with inventory, Hain's distributors informed Hain that they would no longer accept more inventory than necessary. Hain's newly arrived Treasurer James Langrock, brought onboard in late 2015 and "surprised" by what he found in Hain's books, questioned "how [Hain was] accounting for" its various practices. *Id.* at 224–25 ¶¶ 115, 117. He subsequently brought in external auditors, including Ernst & Young ("EY").

On January 11, 2016, as EY began to dig into Hain's books, Hain cut its quarterly and annual guidance, announcing that it anticipated its full-year sales to be $70 million less than expected and its earnings per share in the range of $1.95-$2.10, below its previous issued guidance of $2.11-$2.26. On January 21, 2016, Hain revealed in an SEC filing that Ross Weiner resigned from his positions as Vice President of Finance and Chief Accounting Officer, allegedly because "he did not like what he was seeing regarding the off-invoice concessions offered to distributors." *Id.* at 226 ¶ 122. Despite Simon's assurances to investors on January 22, 2016, that there is "nothing wrong with Hain's accounting at all," Hain's share price declined 7% between January 21 and January 25, 2016, from $36.10 a share to $33.46. *Id.* at 226 ¶¶ 123–24.

On August 15, 2016, Hain also announced that it would delay its release of its 2016 financial results because "the Company identified concessions that were granted to certain distributors in the United States [and] ... is currently evaluating whether revenue associated with those concessions was accounted for in the correct period and is also currently evaluating its internal control over financial reporting." *Id.* at 226–27 ¶ 125. Hain disclosed that it was reevaluating whether it should have recognized revenue associated with concessions when its products sold through the distributors to *end customers*, rather than at the time of shipment to *distributors*, as it had been doing. From August 15 to 16, 2016, Hain's share price fell by 26%, from $53.40 to $39.35 per share, shaving $1.6 billion off of Hain's market capitalization. On August 30, 2016, Hain informed the SEC that it would not be able to file its annual Form 10-K report for Fiscal Year 2016 by the filing deadline because of its reevaluation of its revenue-recognition policies.

**\*5** Although Hain announced in a November 16, 2016, press release that it had completed its internal audit without finding any "evidence of intentional wrongdoing," it disclosed that it had "begun to implement a remediation plan to strengthen its internal controls and organization" and was still unable to release financial results. *Id.* at 228 ¶ 132. Despite the purported conclusion of its internal investigation, on the final day of the Class Period, February 10, 2017, Hain announced it had expanded the scope

of its internal investigation to encompass its historical financial results and that the SEC had launched a formal investigation of Hain and issued subpoenas seeking relevant documents. Hain's stock price fell a further 8%, from $38.53 to $35.10 per share. Over the next months, Hain removed Carroll from his role as CEO for North America, received notice that its stock was subject to delisting from the National Association of Securities Dealers Automated Quotations ("NASDAQ"), and obtained several additional extensions for the deadline to file its financial results.

### C. Hain Restates its Financial Results

On June 22, 2017, having failed to publicly file any financial reports for almost a year, Hain issued its belated Report on Form 10-K for Fiscal Year ("FY") 2016, as well as its Reports on Form 10-Q for the first, second, and third quarters of FY 2017. Hain admitted that it identified "deficiencies that constituted individually, or in the aggregate, material weaknesses in [its] internal control over financial reporting as of June 30, 2016," including an ineffective control environment and inadequate revenue-recognition mechanisms. *Id.* at 231–32 ¶ 147. Specifically, it acknowledged, "both [its] fiscal 2016 and fiscal 2015 net sales benefited from certain concessions provided to [its] largest distributors, including payment terms beyond the customer's standard terms, rights of return of product[,] and post-sale concessions, most of which were associated with sales that occurred at the end of each respective quarter." *Id.* at 231 ¶ 146.

In conjunction with these disclosures, Hain restated its historic financials, disclosing that it overstated its net sales by $167 million—2.1%, 2.9% and 1.9% in FY 2014, FY 2015 and for the nine months ending March 31, 2016, respectively—and its GAAP earnings per share by $0.13 for Fiscal Years 2014, 2015 and the first three quarters of FY 2016. Despite having previously reported financial results that met Wall Street's consensus estimates for three of the six quarters from FY 2015 through the second quarter of FY 2016, Hain's restatement revealed that it would have missed those estimates in *every quarter* had it engaged in proper accounting practices. Hain also announced that CFO Conte was being replaced by James Langrock, effective immediately; according to a CW, Hain also terminated several senior members of its financial team, including its Controller Marla Hyndman.

Hain's business subsequently nosedived. In the first nine months of FY 2017, U.S. net sales fell 14% year-over-year, and net income and earnings per share each plummeted 51.1%. These numbers, the CEO of Hain North America acknowledged, were "obviously a significant hit for [Hain] to take." *Id.* at 235 ¶ 154.

### D. SEC Investigation and Settlement

On December 11, 2018, the SEC concluded its almost two-year-long investigation and announced it had entered a consent decree with Hain (the "SEC Order"). *See id.* at 358–65. Hain admitted that it violated Section 13(b)(2)(A) of the Exchange Act, which requires Hain to make and keep records that accurately and fairly reflect Hain's transactions, and Section 13(b)(2)(B), which requires Hain to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurance that transactions are executed in accordance with management's authorization and in conformity with GAAP.

The SEC Order recounted its findings. It stated that Hain had engaged in "end of quarter sales" in which Hain asked its two leading distributors—which together accounted for 30% of Hain's U.S. net sales—to purchase specific dollar values of inventory by quarter-end, in exchange for the following incentives:

**\*6** (1) cash incentives (up to $500,000), (2) extended payment terms (up to 90 days), (3) discounts off list price (up to 20% off), and (4) spoils coverage, whereby Hain agreed to reimburse the distributor for products that spoiled or expired before the distributor could sell through to retailers.

*Id.* at 360. While the SEC Order stated that the "vast majority of the products purchased in connection with [end-of-quarter] sales ... ultimately sold through to retailers," and "[n]one of these types of incentives are improper," it noted that these incentives "could have financial reporting implications." *Id.* at 360–61. Moreover, it concluded that "Hain lacked sufficient policies and procedures to provide reasonable assurances that [end-of-quarter] sales were accounted for properly." *Id.* at 361. Ultimately, in part because Hain engaged in remedial acts, self-reported to the SEC, and assisted with its investigation, the SEC declined to impose a civil penalty. It did, however, order Hain to cease and desist from committing violations of Section 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act.

### II. Procedural History

The case before us already has a lengthy procedural history. On August 17, 2016, three plaintiffs filed separate securities fraud actions against Hain, which the district court consolidated, appointing Lead Plaintiffs. On September 7, 2017, Plaintiffs filed a second complaint, adding additional individual defendants.

### *A. Prior Proceedings*

On March 29, 2019, the district court [7] dismissed the Plaintiffs' allegations under Sections 10(b) and 20(a) of the Exchange Act and Rule 10(b)-5 without prejudice and granted the Plaintiffs leave to amend. *See Hain I*, 2019 WL 1429560, at \*22. The Plaintiffs filed their operative Complaint on May 6, 2019, and, responding to the district court, added additional allegations, including those based on additional CWs.

On April 6, 2020, the district court again dismissed the Plaintiffs' Complaint, this time with prejudice. *See Hain II*, 2020 WL 1676762, at \*17. The court dismissed the Plaintiffs' claims under Rule 10b-5(a) and (c), [8] which prohibits the "employ[ment of] any device, scheme, or artifice to defraud," 17 C.F.R. § 240.10b–5(a), and "engage[ment] in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person," *id.* § 240.10b–5(c). *Hain II*, 2020 WL 1676762 at \*9–12. The court determined that the Plaintiffs had not sufficiently alleged an "absolute right to return" purchased product, *Hain II*, 2020 WL 1676762, at \*11; this absolute right to return was dispositive to these "scheme liability" claims, the court held, because "[c]hannel stuffing becomes a form of fraud only when it is used to book revenues on the basis of goods shipped but not really sold because the buyer can return them," *id.* at \*10–11 (quoting *Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 709 (7th Cir. 2008)). The court then dismissed the Plaintiffs' Section 10(b) and Rule 10b-5(b) claims because the court had already determined that the channel-stuffing scheme was legitimate. *Id.* at \*12 ("This theory fails because its predicate is the illegitimacy of the channel stuffing practices the Court already found to be legitimate."). The court also reached the issue of scienter, concluding that although the Plaintiffs' allegations were "quite close" to meeting their burden, they nonetheless failed to do so. *Id.* at \*14–17. The Plaintiffs timely appealed from the district court's dismissal of their allegations of a violation of Rule 10b-5(b), but not clauses (a) and (c).

**\*7** On appeal, we vacated the district court's judgment and remanded the case for the district court to reconsider the Defendants' motion to dismiss. *See Hain*, 20 F.4th at 138. We concluded that the district court had erred in dismissing the Plaintiffs' Rule 10b-5(b) claim because whether the channel-stuffing scheme is itself fraudulent under 10b-5(a) or (c) is not dispositive to a Rule 10b-5(b) claim, which focuses "not on schemes, devices, or practices, but on statements made." *Id.* at 136–37. Rule

10b-5(b), we elaborated, "does not require that conduct underlying a purportedly misleading statement or omission amount to a fraudulent scheme or practice." *Id.* at 137. We clarified that the success of the Plaintiffs' theory—"that [the] Defendants made statements attributing Hain's high sales volume to strong consumer demand, while omitting to state that increased competition had weakened consumer demand and that Hain's high sales volume was achieved in significant part by the offer of unsustainable channel stuffing incentives," *id.* at 137—depends on whether "something said was materially misleading, either because it included a false statement of a material fact or because it omitted to state a material fact which omission rendered the things said misleading," *id.* at 136. We therefore vacated the district court's decision that the Complaint failed to satisfy Rule 10b-5(b)'s requirements. *Id.* at 137.

As to scienter, we concluded that the district court erred twice. First, the district court's mistaken understanding of the Plaintiffs' theory "inevitably affected" its scienter analysis, requiring reconsideration. *Id.* Second, we determined that the court erred in failing to "assess the total weight of the circumstantial allegations together with the allegations of motive and opportunity." *Id.* at 137–38. We directed the district court to consider anew whether the Complaint sufficiently stated a Rule 10b-5(b) claim. *Id.* at 138.

### B. The District Court's Opinion on Remand

On remand, the Defendants' motion to dismiss was referred to Magistrate Judge Lee G. Dunst. Judge Dunst issued a report and recommendation ("R&R") recommending that the district court grant the Defendants' motion to dismiss with prejudice, concluding that the Plaintiffs had failed to adequately plead (1) any actionable misstatement or omission under Rule 10b-5(b) and (2) scienter. *See Hain III*, 2022 WL 18859055, at *34.

On September 29, 2023, Judge Seybert issued a memorandum and order adopting much of the R&R. *See Hain IV*, 2023 WL 6360345, at *18. While the court "concur[red]" with "Magistrate Judge Dunst's threshold recommendation finding that [the] Plaintiffs have failed to plead an actionable misstatement or omission," *id.* at *14, it explicitly adopted only the R&R's "scienter-related recommendations," *id.* at *18. Because the court concluded that the Plaintiffs had failed to make the requisite scienter allegations, it dismissed the Plaintiffs' Rule 10(b) and Rule 20(a) claims and denied the Plaintiffs leave to amend their Complaint. *Id.* at *18. The Plaintiffs appeal for a second time.

### DISCUSSION

## I. Applicable Law

### A. Standard of Review

**[2]** **[3]** We review the district court's dismissal of a complaint for failure to state a claim *de novo*. *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 138 (2d Cir. 2011). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

**[4]** "Any complaint alleging securities fraud must satisfy the heightened pleading requirements of the [Private Securities Litigation Reform Act of 1995 (the "PSLRA")] and Fed. R. Civ. P. 9(b) by stating with particularity the circumstances constituting fraud." *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009). Under the PSLRA's heightened pleading requirement, the plaintiff must "(1) 'specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading,' and (2) 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind,' " i.e., scienter. *Tellabs*, 551 U.S. at 321, 127 S.Ct. 2499 (quoting 15 U.S.C. §§ 78u–4(b)(1), 78u–4(b)(2)). While we "normally" draw all reasonable inferences in favor of the

plaintiff, "the PSLRA establishes a more stringent rule for inferences involving scienter because the PSLRA requires particular allegations giving rise to a strong inference of scienter." *ECA*, 553 F.3d at 196.

## B. Securities Law

**\*8**  The Plaintiffs' primary claims are brought pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and the relevant provision of its implementing regulation, Rule 10b-5(b), 17 C.F.R. § 240.10b–5(b). Section 10(b) makes it unlawful for "any person, directly, or indirectly ... [t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of" rules and regulations promulgated by the SEC for the protection of investors. 15 U.S.C. § 78j(b). Rule 10b-5(b), in turn, makes it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." [9] 17 C.F.R. § 240.10b–5(b). As we explained when this case was last on appeal, violations of Rule 10b-5(b) "do[ ] not require that the defendant have used a fraudulent or otherwise illegal device, scheme, artifice, act, practice, or course of business" but rather turn on "whether something said was materially misleading, either because it included a false statement of a material fact or because it omitted to state a material fact which omission rendered the things said misleading." *Hain*, 20 F.4th at 136.

 **[5]**   To succeed on a Section 10(b) claim, "a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta,* 552 U.S. 148, 157, 128 S.Ct. 761, 169 L.Ed.2d 627 (2008). The Plaintiffs also bring Section 20(a) control-person liability claims against the Individual Defendants, which require an adequately pleaded Rule 10b-5(b) claim as a predicate. *ECA*, 553 F.3d at 207.

## C. Channel Stuffing

 **[6]**     **[7]**   Channel stuffing is not necessarily fraudulent: Offering distributors concessions is a common practice, *see Tellabs,* 551 U.S. at 325, 127 S.Ct. 2499, and there may be legitimate reason for a company "pressing for sales to be made earlier than in the normal course," *Greebel*, 194 F.3d at 202, such as to "incite [its] distributors to more vigorous efforts to sell the stuff lest it pile up in inventory," *Makor*, 513 F.3d at 709. However, channel stuffing may become fraudulent when it is "done to mislead investors." *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1262 (11th Cir. 2006). Parsing between "[a] certain amount of channel stuffing [that] could be innocent," *Makor*, 513 F.3d at 709, and illegitimate channel stuffing done to mislead investors has been no easy task for courts. In *Tellabs*, the Supreme Court suggested that a company "writing orders for products customers had not requested" is the "illegitimate kind" of channel stuffing, 551 U.S. at 325, 127 S.Ct. 2499; on remand, the Seventh Circuit opined that channel stuffing becomes fraudulent "only when it is used ... to book revenues on the basis of goods shipped but not really sold because the buyer can return them" because the conditions of revenue recognition—the transfer of "ownership and its attendant risks"—have not actually occurred. *Makor*, 513 F.3d at 709.

As we previously explained in this case, a plaintiff proceeding under Rule 10b-5(b) [10] may successfully plead securities fraud even when the alleged channel-stuffing practices are not themselves "fraudulent or otherwise illegal" because Rule 10b-5(b) focuses "on whether something said was materially misleading, either because it included a false statement of a material fact or because it omitted to state a material fact which omission rendered the things said misleading," rather than on whether "that conduct underlying a purportedly misleading statement or omission amount to a fraudulent scheme or practice." *Id.* at 136–37. In our Circuit, courts have recognized two relevant scenarios in which a company may incur liability under Rule 10b-5(b) in connection with channel-stuffing practices.

**\*9** First, district courts have recognized that channel stuffing may give rise to liability if it results in improper revenue recognition and, therefore, false financial statements and violations of GAAP. *See, e.g., Plumbers & Pipefitters Nat. Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 608–09, 616 (S.D.N.Y. 2015) (concluding, where the plaintiff alleged that the defendant engaged in "large bulk sales to distributors designed to inflate revenue before the end of a quarter" and the defendant restated its financial results and admitted violations of GAAP, that the plaintiff adequately alleged a securities-fraud claim). Improper revenue recognition could occur, for example, if the company offers its distributors the "right to return" product and fails to account for those returns, or if it does not properly recognize the costs associated with the incentives used to induce channel stuffing. Of course, even if channel stuffing requires financial corrections or results in false affirmations of GAAP compliance, those misstatements must be material, and a plaintiff must adequately plead scienter for a cognizable securities-fraud claim to obtain. *See Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) ("Only where such allegations [of GAAP violations or accounting irregularities] are coupled with evidence of corresponding fraudulent intent might they be sufficient.").

A second possibility—regardless of whether the company restated its financial results—is that the company made misleading statements about, for example, the company's financial success or channel inventory levels without disclosing its reliance on channel stuffing. *See Hain*, 20 F.4th at 136–37 (holding that a company may incur liability based "on whether something said was materially misleading" in connection with channel stuffing on Rule 10b-5(b) claim); *see, e.g., Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 31–34 (S.D.N.Y. 2019) (concluding that the defendants' statements about inventory levels, revenue growth, and price harmonization were actionable in light of channel-stuffing allegations); *San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, 732 F. Supp. 3d 300, 316 (S.D.N.Y. 2024) (statements about "the strength and sustainability of the company's earnings in general and demand for [the] products in particular" are misleading if "much of [the company's] sales were due to channel stuffing"); *In re SolarEdge Techs., Inc. Sec. Litig.*, No. 23-CV-9748, 2024 WL 4979296, at \*7 (S.D.N.Y. Dec. 4, 2024) ("Plaintiffs have adequately pleaded that it was misleading for [the defendant] to attribute increased revenues in late 2022 to a variety of factors meanwhile omitting that part of the increase in revenues was caused by a practice of channel stuffing."). Failing to disclose the existence of channel stuffing, under this theory, is misleading because investors would want to know that revenue is not being driven by increased demand but by sales tactics that will likely prove unsustainable once distributors reach maximum inventory and the company can no longer flood them with product.

Mindful of these principles, we turn to the Plaintiffs' allegations.

### II. Actionable Misstatements

We first examine whether the Plaintiffs have plausibly alleged actionable misstatements. The district court noted only that it concurred with the portions of the R&R that concluded that the Plaintiffs had failed to allege such actionable misstatements and omissions, *Hain IV*, 2023 WL 6360345, at \*14, but did not specifically adopt those portions of the R&R into its findings, *see id.* at \*18 ("The Court adopts Magistrate Judge Dunst's scienter-related recommendations."). So, although the district court did not reach the misstatement issue, we first consider the alleged actionable misstatements because our conclusions as to which statements are actionable are, of course, relevant in determining whether the Defendants acted with scienter in making them.

### A. Legal Principles

**[8]** Under Rule 10b–5(b), it is unlawful to (1) "make any untrue statement of a material fact," or (2) "omit to state a material fact necessary in order to make the statements made ... not misleading." 17 C.F.R. § 240.10b–5(b). These prongs correspond to two actionable theories under Section 10(b) and Rule 10b–5: (1) a false statement, i.e., "an actual statement ... that is ... 'untrue' outright," and (2) a half-truth, i.e., a "representation[ ] that state[s] the truth only so far as it goes, while omitting critical qualifying information."[11] *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239–40 (2d Cir. 2016).

**\*10** **[9]** A false statement is the most intuitive: it must, of course, be false at the time it was made, and the plaintiff must demonstrate with specificity why the statement is false. *Rombach v. Chang*, 355 F.3d 164, 172 (2d Cir. 2004).

Case 1:24-cv-02804-JAV    Document 71-1    Filed 10/03/25    Page 17 of 28

**[10]**  A half-truth theory involves more nuance. A classic contract-law example of a half-truth is "the seller who reveals that there may be two new roads near a property he is selling, but fails to disclose that a third potential road might bisect the property." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 188–89, 136 S.Ct. 1989, 195 L.Ed.2d 348 (2016). For securities-fraud claims, although "§ 10(b) and Rule 10b–5 do not create an affirmative duty to disclose any and all material information," *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44, 131 S.Ct. 1309, 179 L.Ed.2d 398 (2011), once "a company speaks on an issue or topic," it must "tell the whole truth," *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014). That is, when a company does speak, it assumes "a duty to be both accurate and complete," *Caiola v. Citibank, N.A., N.Y.*, 295 F.3d 312, 331 (2d Cir. 2002), and adequate disclosure is required to make other statements, "in light of the circumstances under which they were made, not misleading," *Meyer*, 761 F.3d at 250. To determine whether a statement is misleading, our inquiry is objective, from the perspective of a "reasonable investor," considering not only a statement's "literal truth" but also its "context and manner of presentation." *Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019).

**[11]**  The plaintiff must also adequately allege that the misstatement or half-truth is "material," meaning that "a reasonable investor would have considered [it] significant in making investment decisions." *Caiola*, 295 F.3d at 329. In other words, there must be a "substantial likelihood" that the statement or omission "would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Matrixx*, 563 U.S. at 38, 131 S.Ct. 1309.

Here, the Plaintiffs allege that Defendants made both actionable false statements to investors related to Hain's financial results and accounting practices and misleading "half-truths" in failing to disclose their reliance on channel stuffing when attributing their financial success and discussing inventory levels.

### B. Misstatements under Accounting Fraud Theory

**[12]    [13]    [14]**  We first conclude that the Plaintiffs have plausibly alleged that the Defendants made a series of material misstatements about, among other things, Hain's financial results, its compliance with GAAP, the existence of effective internal controls, its description of its revenue-recognition policies, and its certifications in its SEC filings that, among other things, those filings did not contain any untrue or misleading statements of material fact and rested on adequate internal controls (the "SOX certifications").[12]  *See, e.g.*, Joint App'x 238–57 ¶¶ 163–250 (detailing false statements in Hain's financial results); *id.* at 271–72 ¶¶ 294–96 (Hain's compliance with GAAP); *id.* at 272–73 ¶¶ 297–99 (Hain's revenue-recognition policies); *id.* at 273 ¶¶ 300–02 (Hain's statement that "incentives are deducted from our gross sales to determine reported net sales"); *id.* at 273–74 ¶¶ 303–05 (Hain's statement that "[a]ccruals for trade promotions are recorded primarily at the time a product is sold to the customer based on expected levels of performance"); *id.* at 274–77 ¶¶ 306–12 (SOX certifications); *id.* at 277–81 ¶¶ 313–19 (Hain's statements about the existence of adequate internal controls). Hain's subsequent restatement of its financial results and disclosure of material weaknesses in its internal controls and financial-reporting and accounting practices, *see id.* at 231–33 ¶¶ 147–49, suffice to establish that these statements were in fact false at the time they were made,[13] *see, e.g., Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 544 (S.D.N.Y. 2017) ("In light of [the defendant's] admission that it must restate its financial statements, there can be no dispute that the [complaint] pleads numerous false and misleading misstatements with respect to revenue, revenue related metrics, and [the defendant's] compliance with GAAP."); *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 486 (S.D.N.Y. 2004) ("Although a restatement is not an admission of wrongdoing, the mere fact that financial results were restated is sufficient basis for pleading that those statements were false when made.").

### C. Actionable "Half-Truths" in Failing to Disclose Channel-Stuffing Practices

**\*11**  We also conclude that the Defendants made a series of actionable misleading, "half-true" statements by failing to disclose to investors their reliance on the channel-stuffing practices when discussing Hain's financial success and inventory levels at its distributors.

 **[15]**   As an initial matter, the Plaintiffs have adequately alleged that Hain relied on various channel-stuffing practices to boost its revenues. According to the CW allegations, Hain offered distributors an absolute right to return purchased product. The Defendants counter that the CW allegations are too vague and conclusory to support this conclusion, but this argument founders. We may credit the allegations of the CWs so long as they "are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak*, 216 F.3d at 314. The Plaintiffs' Complaint does just that: CW 6, who served as Senior Manager of Customer Support at Hain, alleged that they alone processed a $700,000 product return from UNFI in just one quarter of 2015, while CW 7, who served as Senior Director of Supply Chain Finance, also reported that Simon negotiated a right of return with UNFI. Hain's disclosure in its FY 2016 SEC filing that its net sales benefited from "rights of return of product" fortifies these allegations. Joint App'x 231 ¶ 146. That disclosure and the subsequent SEC Order together reveal that Hain relied on a host of other practices that may have been of interest to investors, such as quarterly cash incentives of up to $500,000 to distributors, extended payment terms, price discounts of up to 20% off, and spoils coverage, including up to $1.6 million for one distributor in one quarter alone. The Plaintiffs have therefore plausibly alleged that Hain used undisclosed, material sales tactics to meet benchmarks that may have made a difference in the mind of a "reasonable investor." *Caiola*, 295 F.3d at 329.

 **[16]**   Having determined that the Complaint sufficiently alleges that Hain employed various channel-stuffing tactics, we further conclude that the Defendants made a series of actionable misleading statements by failing to disclose their reliance on channel stuffing to meet investor benchmarks. In making these statements, Hain triggered the "half-truth" doctrine—that "once a company speaks on an issue or topic, there is a duty to tell the whole truth," *Meyer*, 761 F.3d at 250—by repeatedly attributing its financial results during the Class Period to factors such as "expanded distribution and brand contribution," Joint App'x 241 ¶ 174, "strong demand for [its] organic and natural brands as demonstrated by the increasing consumption of [its] products," *id.* at 242 ¶ 181, "momentum for organic and natural products," *id.* at 244 ¶ 190, its "diverse portfolio of brands and products," *id.* at 246 ¶ 198, and "strong worldwide demand for [its products]," *id.* at 250 ¶ 219. But it did not disclose that it allegedly achieved its financial results in no small part by granting distributors credits, incentives, spoils coverage, or a right to return product. By "put[ting] the reasons for the company's success at issue, but fail[ing] to disclose a material source of its success, specifically the practice of channel stuffing, the[se] statement[s] [were] materially misleading." *SolarEdge*, 2024 WL 4979296, at \*8; *see also San Antonio Fire,* 732 F. Supp. 3d at 316 (concluding that statements discussing strength and sustainability of the company's earnings and demand for its products "would be misleading if (as alleged) the company was having trouble getting the materials to make the products, many of the products it did make didn't work, and much of its sales were due to channel stuffing"); *Okla. Firefighters,* 367 F. Supp. 3d at 33 ("[A] reasonable investor would likely have found it significant that ... revenues were driven by inflated channel inventory and not increased end-user demand because those forces fundamentally differ in sustainability.").

 **\*12**  **[17]**   We similarly conclude that several of the Defendants' statements about distributors' inventory levels were also misleading. For example, on January 12, 2016, the day after Hain cut its quarterly and annual guidance for anticipated sales and earnings, Carroll acknowledged to investors that the guidance cut was "in the area of inventory" but stated that these problems were "one-offs." Joint App'x 267 ¶ 281. If, as the Complaint alleges, demand for Hain's products had waned, and Hain's distributors had already reached their inventory capacity, the characterization of these problems as "one-offs" would be misleading since inventory saturation would persist. *See Novak*, 216 F.3d at 311–12 (holding that the defendants' "reassurances that inventory was under control or giving false explanations for its growth" constituted "conscious misstatements"); *Okla. Firefighters,* 367 F. Supp. 3d at 31 (concluding that statements that channel inventory levels were "flat," "neutral," or had increased only a "bit" were misleading because they failed to mention "the true nature of [the defendant's] channel inventory levels"). For the same reason—that a buildup of inventory based on channel stuffing "would inevitably require a drawdown in future quarters," *Okla. Firefighters,* 367 F. Supp. 3d at 35—several of the Individual Defendants' other statements about inventory levels and declining sales are similarly actionable, *see, e.g.*, Joint App'x 258–59 ¶¶ 253–56 (Carroll downplaying inventory concerns on a February 4, 2014, earnings conference call); *id.* at 266 ¶ 278, 269 ¶ 288, 270 ¶ 291 (Carroll and Conte

attributing declining sales to distributor and account shifts, rather than inventory saturation from channel stuffing); *id.* at 269–70 ¶¶ 290–91 (Carroll telling investors that "[w]e're resolving some of the issues we had with retailers, for example, with ... distributors as we had accounts shift" in response to question about declining sales growth in U.S. segment on a May 4, 2016, earnings call).

**[18]** The Defendants contend that Hain adequately disclosed these practices to investors, but we are unpersuaded. The "truth-on-the-market" defense invoked by the Defendants provides that "a misrepresentation is immaterial if the information is already known to the market because the misrepresentation cannot then defraud the market." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir. 2000). Here, Hain urges that it disclosed its channel-stuffing practices to investors by stating in SEC filings that it undertook "[s]ales incentives and promotions" such as "price discounts, slotting fees and coupons" in an effort to "support sales of the Company's products." *See, e.g.*, Hain Celestial Group, Inc., Annual Report at 42 (Form 10-K) (Aug. 21, 2015).

The Defendants' argument fails at the pleading stage. We have emphasized that the "corrective information must be conveyed to the public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements" and cautioned that "[t]he truth-on-the-market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint for failure to plead materiality." *Ganino*, 228 F.3d at 167. For one, Hain's statement that it used various incentives and promotions did not disclose that it offered distributors a right to return product. And because the "truth-on-the-market defense" is a fact-intensive inquiry, whether Hain's generic language about offering sales incentives and promotions sufficiently counterbalanced the statements that attributed sales growth to growing demand should not be resolved at the pleadings stage. *See, e.g.*, *In re Fannie Mae 2008 Sec. Litig.*, 891 F. Supp. 2d 458, 476 & n.12 (S.D.N.Y. 2012), *aff'd*, 525 F. App'x 16 (2d Cir. 2013) (rejecting the defendants' contention that it disclosed sufficient information to "correct, clarify, or render immaterial the purported misstatements" on motion to dismiss). We cannot conclude, for example, that Hain's boilerplate statement that "[s]ales are reported net of sales and promotion incentives" in its revenue-recognition policies, [14] Joint App'x 272 ¶ 297, would inform a reasonable investor that Hain's increasing reliance on credits, discounts, and incentives propelled those sales numbers, *see, e.g.*, *Solomon v. Sprint Corp.*, No. 19-CV-5272, 2022 WL 889897, at *6 (S.D.N.Y. Mar. 25, 2022) (company's general disclosures of its use of promotions "do not defeat the clear impression generated by the company's other statements about the strength of the business overall"). Indeed, the Defendants can hardly be said to have disclosed their channel stuffing when, despite their alleged increasing reliance on the practice, they failed to update these statements year over year, "render[ing] [the statements] meaningless in light of the changing circumstances and risks." *In re Salix Pharms., Ltd.*, No. 14-cv-8925, 2016 WL 1629341, at *12 (S.D.N.Y. Apr. 22, 2016) (concluding that the defendant's cautionary language was inadequate to invoke the PSLRA's safe-harbor provision for forward-looking statements [15] ). *Compare* Hain, Annual Report at 42, 61 (Form 10-K) (Aug. 21, 2015) *with* Hain, Annual Report at 37, 54 (Form 10-K) (Aug. 27, 2014).

**\*13** Nor do the cases cited by the Defendants salvage their argument. For instance, in *Dalberth v. Xerox Corp.*, 766 F.3d 172 (2d Cir. 2014), we concluded on summary judgment that one of the individual defendants adequately disclosed that the company's reorganization of U.S. operations had negative effects on the company's revenue growth where, for example, the individual defendant stated that cash generation was "clearly unsatisfactory" and attributed this problem in part to the company's "reorganization and restructuring," *id.* at 186. This specific disclosure about a discrete problem is miles apart from Hain's generic statement that it generally employed promotions and incentives—just as a child telling his parents that he ate dessert is misleading if he ate the entire cake. *See Macquarie Infrastructure Corp. v. Moab Partners, L. P.*, 601 U.S. 257, 264, 144 S.Ct. 885, 218 L.Ed.2d 214 (2024).

In sum, we conclude that Hain made actionable misstatements when it stated, among other things, its financial results, the existence of adequate internal controls, and its compliance with GAAP. That Hain restated its financials and admitted deficiencies in its practices suffices to establish that they were false at the time they were made. We further conclude that Hain made a series of misleading "half-truths" in discussing the causes of its financial success without disclosing its reliance on channel stuffing.

### III. Scienter

[19]  [20]  [21]  We next turn to whether the Plaintiffs have adequately alleged scienter, "a mental state embracing intent to deceive, manipulate, or defraud." [16] *Tellabs*, 551 U.S. at 319, 127 S.Ct. 2499. Under the PSLRA, a plaintiff must allege facts giving rise to a "strong inference that the defendant acted with [scienter]," 15 U.S.C. § 78u-4(b)(2)(A), where a "strong inference" means that the inference "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent," *Tellabs*, 551 U.S. at 314, 127 S.Ct. 2499. That inference, however, need not be "irrefutable," of the "smoking-gun genre," or even the "most plausible of competing inferences." *Id.* at 324, 127 S.Ct. 2499. Instead, we must consider "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard," *id.* at 323, 127 S.Ct. 2499, and we must take into account inferences favoring both the plaintiff and the defendant, *Blanford*, 794 F.3d at 305.

[22]  A plaintiff may establish scienter by alleging facts showing that (1) the defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness. *ECA*, 553 F.3d at 198. A plaintiff can also meet his scienter burden with both motive-and-opportunity and circumstantial allegations, considered collectively. *See Hain*, 20 F.4th at 137–38. The Plaintiffs here advance both motive-and-opportunity and recklessness arguments; because a plaintiff who fails to show motive must provide correspondingly stronger circumstantial allegations, *Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 355 (2d Cir. 2022), we consider the strength of the Plaintiffs' motive allegations first.

#### A. *Motive and Opportunity*

[23]  [24]  The Plaintiffs first argue that the Individual Defendants had the motive and opportunity to make the false and misleading statements. We generally presume that high-level corporate insiders, such as C-suite executives, have the opportunity to commit fraud. *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74 (2d Cir. 2001). To establish a motive to engage in fraud, "plaintiffs must assert a concrete and personal benefit" to the individuals who allegedly carried out the fraud. *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001). We have cautioned against inferring motive from a "generalized" desire of individual defendants to see strong corporate performance or higher stock prices, "common to all corporate executives and, thus, too generalized to demonstrate scienter," *id.*—otherwise, "virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions." *ECA*, 553 F.3d at 201. The Plaintiffs allege that we may infer motive from the Individual Defendants' suspicious stock sales and compensation incentives that were tied to erroneous financial statements. We agree.

*14  [25]  First, the Plaintiffs have adequately alleged that two of the Individual Defendants, Carroll and Simon, engaged in suspicious stock sales during the Class Period; as a point of comparison to the Class Period sales, the Plaintiffs provide a Control Period from July 30, 2010, to November 4, 2013, a period equal in length to and before the Class Period. During the Class Period, Carroll disposed of approximately 74% of his total shares for more than $24.3 million, and Simon sold 66% of his total for more than $80 million, both of which represent significantly higher volumes and totals than during the Control Period.

We find the timing and volume of stock sales unusual, even if the allegations lack several attributes that might make the inferences drawn in the Plaintiffs' favor even stronger. Although the Plaintiffs did not plead net profits that Carroll and Simon received from the sales, our caselaw instructs that the amount of profits is merely one of several "[f]actors considered in determining whether insider trading activity is unusual," including "the portion of stockholdings sold, the change in volume of insider sales, and the number of insiders selling," *Scholastic*, 252 F.3d at 74–75, and therefore imposes no net-profit pleading requirement. We decline to impose one here. That the Plaintiffs do not allege that the sales occurred in the final 100 days of the nearly four-year-long class period or that two of the other Individual Defendants, Smith and Conte, engaged in suspicious sales might weaken the strength of the inferences we draw in the Plaintiffs' favor. *Cf. San Leandro*, 75 F.3d at 814 (concluding that the failure of some individual defendants to sell stock during class period undermined the plaintiffs' allegations that any defendant intended to inflate stock for personal profit); *Chapman v. Mueller Water Prods., Inc.*, 466 F. Supp. 3d 382, 412 (S.D.N.Y. 2020) (stating that district courts in our Circuit are "frequently skeptical that stock sales are indicative of scienter where no trades occur in the months immediately prior to a negative disclosure"). But that does not mean we discount the Plaintiffs' allegations

altogether. Rather, consistent with the teachings of *Tellabs*, we simply consider at the pleading stage whether "*all of the facts* alleged, taken collectively," support an inference of scienter, even if that inference is "not [ ] irrefutable." 551 U.S. at 323–24, 127 S.Ct. 2499. We therefore abstain from imposing a brightline rule that securities-fraud plaintiffs *must* allege that sales took place in the final 100 days of a class period or that all Individual Defendants engaged in such sales. *See Scholastic*, 252 F.3d at 75 (explaining that *San Leandro* and similar cases did not "establish[ ] a per se rule that the sale by one officer of corporate stock for a relatively small sum can never amount to unusual trading[;] [r]ather, each case was decided on its own facts"). The Plaintiffs' allegations of motive, taken collectively, tip the scale in their favor.

Second, we give weight to the Plaintiffs' allegations that Simon and Carroll had the motive to commit fraud because bonuses they received were tied to the very metrics that Hain admittedly overstated. To be sure, "[m]otives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this inquiry." *ECA*, 553 F.3d at 198. But we may infer the defendants' "motive to sweep problems under the rug" if the allegations support a "direct link between the compensation package and the fraudulent statements." *Id.* at 201. Here, the Plaintiffs' allegations move the needle because the significant bonuses and stock awards that Simon and Carroll received in FY 2015—a bonus of $5,565,725 and $8,787,355 in stock awards for Simon and a bonus of $711,711 and $1,119,854 in stock awards for Carroll—were tied to the metrics that Hain overstated, including Hain's net sales, net income, and earnings per share. [17] That Simon met his bonus target for net sales in FY 2015 by only 0.1%— and would not have hit that metric had Hain properly accounted for its channel-stuffing practices—suffices to show that the "defendants benefitted in some concrete and personal way from the purported fraud." *Novak*, 216 F.3d at 307–08; *see also San Antonio Fire*, 732 F. Supp. 3d at 318 (motive allegations weigh in favor of scienter where the alleged fraud of several million dollars was "critical" because "the company just barely hit the thresholds necessary for bonuses").

**\*15**  Because we conclude that the Plaintiffs' motive allegations weigh in favor of scienter, the circumstantial evidence need not be as great, although it must still be strong. *See Ark. Pub. Emps.*, 28 F.4th at 355.

### B. *Circumstantial Evidence of Conscious Misbehavior or Recklessness*

 **[26]**   We next consider the Plaintiffs' allegations of circumstantial evidence of conscious misbehavior or recklessness. Here, recklessness is "highly unreasonable" conduct representing "an extreme departure from the standards of ordinary care" and "approximating actual intent," rather than "merely a heightened form of negligence." *Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 214–15 (2d Cir. 2020). "[S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged [the] defendants' knowledge of facts or access to information contradicting their public statements." *Id.* at 215. "Under such circumstances, [the] defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." *Novak*, 216 F.3d at 308.

As discussed above, the Plaintiffs here advance two broad sets of actionable misstatements: (1) false statements about, among other things, Hain's financial results and accounting and internal controls practices, and (2) misleading, half-true statements about Hain's financial success and inventory. While both scienter inquiries turn on the same principle—whether the Defendants "knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation," *Novak*, 216 F.3d at 308—our precise inquiry in applying that principle varies with the type of actionable misstatement. For the false statement theory, the question is whether the Defendants knew or should have known that their revenue-treatment policies and hence their contemporaneous financial statements were incorrect. *See In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 566 (S.D.N.Y. 2004); *Plumbers & Pipefitters*, 89 F. Supp. 3d at 616–17. For the half-truth theory, we ask whether the Defendants knew or should have known that the channel-stuffing practices and its implications contradicted their statements about Hain's financial success and inventory levels. *See San Antonio Fire*, 732 F. Supp. 3d at 319–20; *Okla. Firefighters*, 367 F. Supp. 3d at 37. Because of the substantial overlap between these inquiries, we consider them together.

### i. *Confidential Witnesses' Allegations About Individual Defendants*

**[27]**   The Plaintiffs first argue that the Individual Defendants' actual knowledge of and active participation in the channel-stuffing practices support an inference of scienter. Again, we have recognized that such circumstantial evidence can support scienter where the defendants "knew facts or had access to information suggesting that their public statements were not accurate." *ECA*, 553 F.3d at 199. We conclude that the Plaintiffs' allegations support a strong inference that the Individual Defendants had actual knowledge of the channel-stuffing practices that made their statements about financial success and inventory misleading.

Start with the Plaintiffs' allegations that Individual Defendants negotiated the concessions and directed Hain employees to push product on distributors. According to the CWs, Carroll requested mid-quarter sales numbers from CW 6 to calculate sales shortfalls, negotiated the credits and off-invoice concessions to make up for sales shortfalls, and informed sales-calls attendees about the concessions. At the end of the fourth quarter of FY 2016, Simon called the general manager of a customer, BluePrint, told him that BluePrint "needs to make [the forecasted sales numbers] this quarter," and directed CW 2 [18] to "push[ ] inventory" to BluePrint's distributor. Joint App'x 213 ¶ 78. And, according to CW 7, Simon dealt directly with UNFI's owner on the concessions and revenue and could "always make [UNFI] buy more [product] if needed." *Id.* at 218 ¶ 94. These allegations, which we treat as true for present purposes, contradict Hain's public statements attributing its financial success to factors such as strong demand and downplaying inventory issues. *See Scholastic*, 252 F.3d at 73 (concluding that the company's "aggressive sales practices ... would furnish additional support for the proposition that company officials were aware of declining sales and increasing returns"). They also support scienter as to the false financial and accounting statements because the Individual Defendants knew or had access to information about sales on "loosened terms." *Plumbers & Pipefitters*, 89 F. Supp. 3d at 617.

 **\*16**  The CWs' allegations about Hain's accounting practices further support a strong inference of scienter. For example, according to CW 7, Hain pushed out inventory, used credits and accruals to offset sales deficits on its balance sheet, and engaged in creative accounting tactics to smooth out sales, which would plummet in the first month of a subsequent quarter after Hain had pushed its inventory on distributors. Several CWs confirmed that Hain offered its distributors a right to return product: CW 6 reported a $700,000 product return in 2015 and stated that $500,000 in quarterly returns were on the "low-end" of such returns. Joint App'x 211 ¶ 72. CW 3—who prepared budget materials as an Executive Assistant to COO Meiers—stated that at the end of 2015 and early in 2016, they witnessed a significant increase in returns and credits. CW 7 reported that accruals began to climb into the millions of dollars from a starting point of around $200,000. CW 1 eventually left Hain in June 2016 because he believed "something screwy" was going on with Hain's financial numbers after he saw sales declining but credits increasing to millions of dollars each quarter. Joint App'x 217 ¶ 89.

Burnishing the scienter allegations, the Individual Defendants' involvement continued through concession negotiations and top-down directives to accounting and reporting. After Carroll and Simon directed Hain's managers to ship off-invoice product to distributors, Smith and Conte prepared Hain's financial reports for the public, and they, with Simon, signed off on their accuracy. Notably, Smith and Carroll received weekly reports on sales, inventory, and guidance targets. Such allegations suggest actual knowledge of the alleged unsustainable practices and improper revenue-recognition practices. *See, e.g.*, *Okla. Firefighters*, 367 F. Supp. 3d at 37 (the plaintiffs sufficiently alleged knowledge where the defendants tracked inventory levels and saw data at monthly meetings); *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 198 (S.D.N.Y. 2010) (conversations and attendance at meetings show "access to and actual knowledge of facts"). That Hain never had an internal audit or compliance department and subsequently disclosed in its Form 10-K for FY 2016 that its "internal controls to identify, accumulate and assess the accounting impact of certain concessions or side agreements on whether the Company's revenue recognition criteria had been met were not adequately designed or operating effectively," Joint App'x 231–32 ¶ 147; *see also id.* at 362 ¶ 16 (SEC Order finding that Hain maintained insufficient policies), further suggests recklessness on the part of the Defendants, *see San Antonio Fire*, 732 F. Supp. 3d at 321 (collecting district court cases in this Circuit holding that "poor internal controls support an inference of scienter").

Consider next the Plaintiffs' allegations that the Defendants maintained an inappropriate "tone at the top," i.e., a company culture of secrecy and fear, and poor internal controls. *See San Antonio Fire*, 732 F. Supp. 3d at 320–21 (collecting district court cases that have "repeatedly held that improper tone at the top ... support[s] an inference of scienter"). For example, according to

CW1, after Hain's August 15, 2016, announcement that it would delay releasing its FY 2016 financial results, Carroll demanded that "employees refrain from using the term 'loading' " and rephrase it as " 'inventory reduction.' " Joint App'x 217–18 ¶ 92. CW7 alleged overhearing Carroll and Simon stating that they were "not supposed" to be discussing their arrangements with UNFI in front of others. *Id.* at 218–19 ¶ 95. And, according to CW 7, Hain executives told one employee—who was eventually fired during the class period—to stop asking questions about the end-of-quarter tactics. *Id.* at 223 ¶ 113. Such secrecy insinuates knowledge of wrongdoing.

 **[28]**   Bolstering the scienter inference is that the alleged fraud touched on large swaths of Hain's U.S. business and areas of critical import to Hain and its executives, who we may infer "are likely to know more about things central to their business." [19] *Stadium Cap. LLC v. Co-Diagnostics, Inc.*, No. 22-cv-6978, 2024 WL 456745, at *5 (S.D.N.Y. Feb. 5, 2024). Hain ultimately adjusted its net sales by 2.1%, 2.9%, and 1.9% in FY 2014, FY 2015 and for the nine months ending March 31, 2016, respectively, which, taken together, accounted for about $167 million of $7 billion (around 2.4%) in net sales over a three-year period. The total *size* of this alleged fraud is comparable to other cases in which we have credited scienter allegations, *see Scholastic*, 252 F.3d at 77 (holding that a total of $24 million in charges for book returns "undermines, at the pleading stage, the argument that the defendants were unaware" of any increase in returns), although the figures are not eye-popping as a percentage of net sales, *cf. Salix*, 2016 WL 1629341, at *3, 16 (considering a "startling" magnitude of alleged fraud, around 12.5% of sales).

 **\*17**   Further tilting the balance in the Plaintiffs' favor, moreover, is the *importance* of this alleged fraud to Hain. *See, e.g.*, *Scholastic*, 252 F.3d at 76–77 (stating that pleaded facts establishing significance of inventory levels to company's financial performance supported allegation that defendants acted recklessly when they failed to acknowledge publicly the company's decreased sales and increased returns); *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 Fed. App'x 10, 14 & n.3 (2d Cir. 2011) (summary order) (the plaintiffs properly pleaded scienter where "inventory levels" were "key to measuring [the defendant's] financial performance and [were] a subject about which investors and analysts often inquired"). As already recounted, pushing product at the end of quarters through various channel-stuffing tactics was a top-down priority, deemed critical to meet Wall Street financial benchmarks, and involving top Hain executives and the company's most important distributors. Because of the size of the restatement, the importance of the end-of-quarter practices to meet financial targets, and the distributors affected, we infer that the Individual Defendants would have "monitored [these operations] closely," *San Antonio Fire*, 732 F. Supp. 3d at 319, and knew or should have known information contradicting their public statements, *see Okla. Firefighters*, 367 F. Supp. 3d at 37–38 (inferring scienter from allegations of fraud in the defendant's "primary profit engine"). Put simply, it would strain credulity to conclude that the Individual Defendants were unaware of channel stuffing and its potentially insidious implications for investors.

####  ii. Personnel Changes During and After the Class Period
 **[29]**   District courts in our Circuit have concluded that key personnel changes—while not sufficient to establish scienter—may add to the total mix of circumstantial evidence of fraud when those changes are "highly unusual and suspicious," especially "when independent facts indicate that the resignation was somehow tied to the fraud alleged." *In re AppHarvest Sec. Litig.*, 684 F. Supp. 3d 201, 245 (S.D.N.Y. 2023). Here, the Plaintiffs provide a litany of suspicious personnel changes—the terminations of seven executives and demotions of two more—some of which the CWs' allegations link to the alleged fraud. *See* Joint App'x 288–90 ¶¶ 339–47.

Of particular note, each of the Individual Defendants and other key personnel departed under suspicious circumstances. On September 8, 2015, Hain announced that Conte would be replacing Smith as CFO after only two years in the role, allegedly because Smith clashed with Simon over the company's practices. On December 7, 2016, Hain transferred Meiers, who oversaw the accounting issues, from his position as COO to a role as CEO for the Hain Pure Protein division, in a move that one CW characterized as a demotion. On March 6, 2017—less than a month after the revelation that the SEC had launched an investigation—Hain announced that Carroll would be removed from his role as CEO for Hain North America. Then, on June 22, 2017, the same day that Hain restated its financial results and announced its remedial measures, Conte resigned as CFO. On that day, Hain also announced that it would be creating an expanded "team with new hires including a new controller for

the U.S. segment, a global revenue Controller, a Head of Internal Audit, and a Chief Compliance Officer." *Id.* at 290 ¶¶ 346–47. In 2018, Simon and Senior Vice President and Controller Marla Hyndman also departed.

Fortifying these allegations, several other Hain executives left the company, allegedly because they took issue with Hain's channel-stuffing practices and its financial reporting. *See, e.g.*, *id.* at 223 ¶ 112, 289 ¶ 341 (Hain firing Senior Vice President of Finance/Business Planning, Rose Ng, in September 2015, allegedly because she was "butting heads with Meiers" over Hain's financial-reporting practices); *id.* at 226 ¶ 122 (Hain announcing Ross Weiner's resignation from his position of Vice President – Finance, Chief Accounting Officer on January 21, 2016, and CW 6 alleging that Weiner left because "he did not like what he was seeing regarding the off-invoice concessions offered to distributors"). We view these allegations as offering supplemental, circumstantial support for the Plaintiffs' scienter pleadings.

### iii. The SEC Order

[30]   Finally, we reject the Defendants' insistence that the SEC Order exonerates them of potential liability. The Defendants assert that the SEC Order "undermines any inference of wrongful intent" because of the Order's statement that the incentives were not necessarily improper and the SEC's decision not to charge Hain or any individual with fraud. Appellee's Br. at 29 (citing *Hain IV*, 2023 WL 6360345, at \*15). As a preliminary matter, the SEC's decision not to pursue charges is "irrelevant as to whether Plaintiffs have plausibly alleged claims in *this* case," *Vanleeuwen v. Keyuan Petrochems., Inc.*, No. 13-cv-6057, 2014 WL 3891351, at \*4 n.5 (S.D.N.Y. Aug. 8, 2014), because the SEC Order was the result of negotiated, "private bargaining" between the SEC and Hain, rather than "the result of an actual adjudication of any of the issues," *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893–94 (2d Cir. 1976). Indeed, by its own terms, the SEC Order states that Hain consented to the entry of the Order "[s]olely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party." Joint App'x 358. It does not doom the Plaintiffs here.

 **\*18**  But even taking the Defendants' argument on its own terms, the SEC Order is consistent with the Plaintiffs' theory. As we pointed out above, the inquiry under Rule 10b-5(b) is not on the legality of "schemes, devices, or practices, but on statements made." *Hain*, 20 F.4th at 136. Again, that principle establishes that the Defendants' exposure to Rule 10b-5(b) liability does not turn on the propriety of the incentives described in the SEC Order,[20] but on whether the Defendants made misleading statements in connection with those practices. What is more, while noting the legality of these incentives in a vacuum, the SEC Order explicitly recognized that those incentives "could have financial reporting implications," Joint App'x 360 ¶ 5—consistent with the Plaintiffs' theory as to Hain's allegedly fraudulent accounting practices. Nor does the SEC Order's determination that the "vast majority of the products purchased [by distributors] in connection with [end-of-quarter] sales ... ultimately sold through to retailers," *id.* at 361–62, absolve the Defendants. That finding is consistent with the Plaintiffs' theory that distributors would be stuffed to the gills with inventory and eventually either return Hain's product or stop buying it, causing sales to fall off a cliff. *See id.* at 206 ¶ 57. And Hain's numbers eventually did precisely that, with year-over-year U.S. net sales falling by 14% and net income plummeting by 51.1% for the first nine months of FY 2017 after Hain imposed remedial measures. That much of the product may have eventually sold through to end customers negates neither Hain's admission that it failed to account properly for those sales in its SEC filings nor its allegedly misleading statements about its financial and operational status during the Class Period.

### C. Holistic Evaluation of the Plaintiffs' Allegations

Having analyzed the Plaintiffs' allegations, we now consider "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 323, 127 S.Ct. 2499. We conclude that they do.

To summarize, based on the unusual stock sales and executive compensation tied to Hain's overstated financial results, the Plaintiffs have adequately alleged that the Individual Defendants had the motive and opportunity to mislead investors about the channel-stuffing practices. Holistically, the CWs' allegations also limn a portrait of the Individual Defendants acting recklessly —at the very least—in orchestrating those practices and failing to ensure a proper accounting thereof. In light of the allegations

of the Individual Defendants' personal involvement, we would be hard-pressed to conclude at this stage that the Defendants did not know, or should not have known, that those practices would endanger the propriety of their financial results, or that it would be inaccurate to attribute Hain's financial success solely to organic demand. And providing the final gloss for the Plaintiffs are the size and significance of the alleged fraud to Hain's operations, the improper "tone at the top" and admittedly inadequate internal controls, and a sustained pattern of suspicious executive personnel changes. Notwithstanding their heightened pleading burden, the Plaintiffs have adequately alleged scienter.

## IV. Loss Causation

 **[31]**  We also conclude that the Plaintiffs have adequately pleaded loss causation, for which there is no heightened pleading standard. *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346–47, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005); *see also Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 174 (2d Cir. 2005) (stating that loss causation is generally a fact-specific question appropriate for trial). As the Plaintiffs have alleged declines in Hain's stock price following Hain's negative disclosures, the Plaintiffs have met the pleading standard. *See, e.g.*, *AppHarvest*, 684 F. Supp. 3d at 273.

## V. Section 20(a) Control Liability Claims

Finally, we reinstate the Plaintiffs' claims under Section 20(a), under which a plaintiff may "allege a primary § 10(b) violation by a person controlled by the defendant, and culpable participation by the defendant in the perpetration of the fraud." *Scholastic*, 252 F.3d at 77; *see 15 U.S.C. § 78t(a)*. Because the district court dismissed the Plaintiffs' Section 20(a) claims for failure to plead a primary Section 10(b) violation, *see Hain IV*, 2023 WL 6360345, at *14, and "on appeal [the] defendants offer no basis for dismissing the secondary liability claim if we reverse the dismissal of the securities fraud causes of action, we hereby reinstate it," *Scholastic*, 252 F.3d at 78.

## CONCLUSION

 **\*19**  We have considered the Defendants' other arguments and conclude that they are without merit. Based on the foregoing, we conclude that the Plaintiffs have adequately alleged that the Defendants made actionable misstatements and omissions in connection with the channel-stuffing scheme and acted with scienter.[21] Accordingly, this long-pending case should proceed to discovery. The judgment of the district court is therefore **VACATED**, and this case is **REMANDED** to the district court for further proceedings consistent with this opinion.

## All Citations

--- F.4th ----, 2025 WL 2749562

## Footnotes

1      Co-Lead Plaintiff Rosewood Funeral Home is a funeral home in the Houston, Texas area that purchased Hain Celestial Group, Inc. ("Hain") call options during the Class Period and suffered approximately $1,548,333 in losses. Co-Lead Plaintiff Salamon Gimpel purchased Hain common stock and suffered approximately $822,519 in losses during the Class Period.

2      Defendant Simon founded Hain and served as its President, Chief Executive Officer ("CEO"), and Chairman of the Board until June 2018. Defendant Conte served as Treasurer and Vice President from July 2009 to October 2014, Senior Vice President of Finance from October 2014 to September 2015, and Chief Financial Officer ("CFO") and Executive

Vice President of Finance from September 2015 to June 2017 (as successor to Smith). Defendant Carroll was Hain's Executive Vice President and CEO for Hain Celestial North America from February 2015 to March 6, 2017, and has been the Executive Vice President for Global Brands, Categories, and New Business Ventures since March 6, 2017. Defendant Smith preceded Conte as Hain's CFO and Executive Vice President from September 3, 2013, to September 30, 2015.

3    Unless otherwise indicated, when quoting cases, all internal quotation marks, alteration marks, emphases, footnotes, and citations are omitted.

4    To date, this case has seen four substantive district-court opinions and one opinion from this Court. *See In re The Hain Celestial Grp. Inc. Sec. Litig. (Hain I)*, No. 16-CV-4581, 2019 WL 1429560, at \*22 (E.D.N.Y. Mar. 29, 2019) (dismissing then-operative complaint without prejudice); *In re Hain Celestial Grp. Inc. Sec. Litig. (Hain II)*, No. 16-CV-4581, 2020 WL 1676762, at \*17 (E.D.N.Y. Apr. 6, 2020) (dismissing Complaint with prejudice), *vacated and remanded* 20 F.4th 131 (2d Cir. 2021); *In re Hain Celestial Grp. Inc. Sec. Litig. (Hain III)*, No. 16-CV-4581, 2022 WL 18859055 (E.D.N.Y. Nov. 4, 2022), *report and recommendation adopted (Hain IV)*, No. 16-CV-4581, 2023 WL 6360345, at \*17–\*18 (E.D.N.Y. Sep. 29, 2023) (dismissing Complaint with prejudice again).

5    The U.S. business segment, in turn, represented around half of Hain's global net sales during the Class Period.

6    In "accrual basis" accounting, an accrual is revenue that is actually earned but not yet paid, whereas in "cash basis" accounting, "revenues are recognized when cash is received (as opposed to earned)." *Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 209 n.8 (2d Cir. 2020). One CW reported becoming wary about the size and legitimacy of the accruals used to offset sales deficits. Joint App'x 215–16 ¶ 85.

7    At this time, Judge Arthur B. Spatt presided over the case; the case was transferred to Judge Seybert after Judge Spatt's passing.

8    As discussed below, these claims are not before us on this appeal.

9    The Supreme Court has found an implied private right of action in Section 10(b) and Rule 10b–5. *See Macquarie Infrastructure Corp. v. Moab Partners, L. P.*, 601 U.S. 257, 260, 144 S.Ct. 885, 218 L.Ed.2d 214 (2024).

10    Two other provisions of Rule 10b-5, clauses (a) and (c), impose liability on public companies for "use of a fraudulent or deceptive device, scheme, artifice, act, or practice." *Hain*, 20 F.4th at 136. Because these provisions are not before us, we do not consider the circumstances in which channel stuffing might become a fraudulent scheme in and of itself.

11    We use the term "half-truth," rather than "omission," to avoid confusion with non-actionable, "pure omissions." *See Vivendi*, 838 F.3d at 240 n.9. "[T]he difference between a pure omission and a half-truth is the difference between a child not telling his parents he ate a whole cake and telling them he had dessert." *Macquarie*, 601 U.S. at 264, 144 S.Ct. 885. Although we had previously held that liability may arise under a "pure omission" theory—omissions when the "corporation is subject to a duty to disclose the omitted facts," such as where a different statutory or regulatory provision obligates the company to speak affirmatively, *Vivendi*, 838 F.3d at 239–40 & n.8—the Supreme Court has since clarified that they are not actionable under Rule 10b–5(b), *see Macquarie*, 601 U.S. at 264, 144 S.Ct. 885; *Maso Cap. Invs. Ltd. v. E-House (China) Holdings Ltd.*, No. 22-355, 2024 WL 2890968, at \*4 (2d Cir. June 10, 2024) (summary order) ("Rule 10b–5(b) does not proscribe pure omissions, but instead covers half-truths by requiring disclosure of information necessary to ensure that statements already made are clear and complete.").

12    The Defendants' principal argument on this score is that the Plaintiffs abandoned these claims, a conclusion with which the R&R agreed. *See Hain III*, 2022 WL 18859055, at \*16–17. However, our review of the record reveals that the Plaintiffs maintained that these statements were false and material before both the magistrate judge and the district court. *See, e.g.*, Joint App'x 947 (the Plaintiffs' opposition to Defendants' motion to dismiss before the magistrate judge stating that "Hain's quarterly and annual reported financial results during the Class Period, including net sales, net income, and

EPS, were materially overstated in violation of GAAP because the Company failed to account for the off-invoice sales concessions and incentives granted to distributors, including with respect to revenue recognition").

The SOX certifications are statements of opinion, which may be actionable if, among other things, that statement does not rest on the issuer's "meaningful inquiry" or "fairly align with the information in the issuer's possession at the time." *New Eng. Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*, 122 F.4th 28, 46–47 (2d Cir. 2023). As the Defendants press, a subsequent restatement of financial results or disclosure of material weaknesses in internal controls, "standing alone, does not mean that the original certified opinions were disingenuous[,] [n]or is a genuinely held opinion that turned out to be wrong necessarily actionable." *Id.* at 47. However, as we explain further below, the Plaintiffs allege that the Defendants never had an internal audit or compliance department and documented the concessions they personally negotiated in potentially deceptive ways. Such allegations, coupled with the later disclosure, suggest that "the speaker kn[ew] or reasonably should [have] know[n] of different material facts" about Hain's internal controls and accounting practices. *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 175 (2d Cir. 2020).

In any event, it appears that this statement was false in light of Hain's subsequent disclosures.

Because the PSLRA's safe-harbor provision applies to forward-looking statements, it is not applicable to the Defendants' representations of present fact. *See Okla. Firefighters*, 367 F. Supp. 3d at 33. However, the doctrine's treatment of unchanging, boilerplate language is illustrative here. *See Slayton v. Am. Exp. Co.*, 604 F.3d 758, 772–73 (2d Cir. 2010) (holding that the doctrine requires the defendants to "demonstrate that their cautionary language was not boilerplate and conveyed substantive information" and concluding that cautionary language was mere boilerplate in part because "the defendants' cautionary language remained the same even while the problem changed").

The Individual Defendants' scienter can be imputed to Hain. *See Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 195 (2d Cir. 2008) ("When the defendant is a corporate entity, ... the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter.").

Executive compensation packages may, of course, depend on a host of metrics, but we may infer motive where there is a "direct link" between at least some of the metrics and the alleged fraudulent statements. *ECA*, 553 F.3d at 201.

CW 2 served as a Senior Sales Analyst, "responsible for forecasting, trade planning, and profit and loss analysis at the BluePrint brand business at Hain." Joint App'x 199 ¶ 33.

In making this argument, the Plaintiffs invoke two related doctrines, the "core-operations" and "magnitude of the fraud" doctrines. The core-operations doctrine posits that "scienter may be imputed to key officers who should have known facts relating to the 'core operations' of their company," *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 352 (S.D.N.Y. 2011), while the magnitude of the fraud doctrine suggests recklessness if the alleged falsity impacted a large portion of the company's sales or operations, *see Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000). We have not, however, "clearly affirmed the validity of [the core-operations] doctrine following the passage of the PSLRA," *In Re Renewable Energy Grp. Sec. Litig.*, No. 22-335, 2022 WL 14206678, at *3 n.4 (2d Cir. Oct. 25, 2022) (summary order), although we have suggested that the doctrine "can provide supplemental support for allegations of scienter, even if they cannot establish scienter independently," *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 14 n.3 (2d Cir. 2011) (summary order). Here, we assume that the size of the alleged fraud, coupled with its importance to Hain's operations, provides supplemental support for the Plaintiffs' other sufficiently pleaded allegations of scienter.

Note, too, that the SEC Order did not speak about a right to return, but we have credited the Plaintiffs' allegations on this point.

Because we reverse the district court's judgment, we do not decide whether the court abused its discretion in denying the Plaintiffs leave to amend the Complaint. *See* Joint App'x 1064 (the Plaintiffs requesting leave to amend if the district court granted the Defendants' motion to dismiss).

Case 1:24-cv-02804-JAV    Document 71-1    Filed 10/03/25    Page 28 of 28

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.