# EXHIBIT C

2026 WL 100576
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

STADIUM CAPITAL LLC et al., Plaintiffs,

v.

CO-DIAGNOSTICS, INC. et al., Defendants.

22-cv-6978 (AS), 22-cv-7988 (AS)

|

Signed January 14, 2026

**Attorneys and Law Firms**

Frederic Scott Fox, Sr., Jason Aron Uris, Kaplan Fox & Kilsheimer LLP, New York, NY, Chang Hahn, Ainsworth Gorkin PLLC, New York, NY, for Plaintiff Stadium Capital LLC in No. 22-cv-6978.

James Michael LoPiano, Jeremy Alan Lieberman, Joseph Alexander Hood, II, Pomerantz LLP, New York, NY, for Plaintiff Drew Lee in Nos. 22-cv-6978, 22-cv-7988.

Douglas W. Greene, Genevieve Graeme York-Erwin, Baker & Hostetler LLP, Seattle, WA, Erica Adina Barrow, Zachary Rowen Taylor, Baker & Hostetler LLP, New York, NY, Marissa Peirsol, Baker & Hostetler LLP, Columbus, OH, for Defendants in No. 22-cv-6978.

OPINION AND ORDER

ARUN SUBRAMANIAN, United States District Judge:

**\*1** Stadium Capital ("Stadium"), the lead plaintiff in this class action lawsuit,[1] has sued Co-Diagnostics ("CoDx"), its CEO Dwight Egan, and its CFO Brian Brown, for allegedly making false or misleading statements in violation of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 and SEC Rule 10b-5(b). Both sides have moved for summary judgment. Defendants have also moved to exclude the testimony of Stadium's expert witness, Chad Coffman, under Federal Rule of Evidence 702 and *Daubert*

*v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). And Stadium has moved to exclude portions of the testimony of defendants' expert witnesses, Thomas Tsai and Vinita Juneja. For the following reasons, Stadium's motion for partial summary judgment is GRANTED in part and DENIED in part, its *Daubert* motion is DENIED without prejudice, and defendants' summary judgment and *Daubert* motions are DENIED.

**BACKGROUND**

CoDx develops, manufactures, and sells tests to diagnose diseases. Dkt. 120 ¶¶ 1–2. When the COVID-19 pandemic began, CoDx quickly developed its Logix Test to detect the virus. *Id.* ¶ 3. Soon after it began selling Logix Tests in late February and March 2020, the product became CoDx's "sole material source of revenue." Dkt. 121 ¶ 1. During this period, CoDx's business skyrocketed. Dkt. 120 ¶¶ 18–26. CoDx's quarterly revenues closely tracked its quarterly Logix Test sales, a metric that a CoDx executive said the company had the ability to track in real-time. *Id.* ¶ 118; Dkt. 121 ¶¶ 7–10. Shortly after the start of the pandemic, defendants began to offer revenue guidance for the upcoming quarter when they announced CoDx's financial results for the previous quarter. Dkt. 120 ¶ 169; Dkt. 121 ¶¶ 3, 26. After reporting $1.5 million in revenue for the first quarter of 2020, CoDx earned $24 million in revenue for the second quarter—and at least $20 million in revenue for each of the seven quarters after. Dkt. 120 ¶¶ 18–26; Dkt. 121 ¶ 2.

Then sales plummeted in the middle of 2022. Dkt. 121 ¶ 16. By mid-May, CoDx received orders of just $2.5 million for the quarter-to-date—far less than what was typical for mid-quarter sales, which had been over $5.1 million at that point since CoDx started selling the Logix Test. Dkt. 121 ¶¶ 11, 14. Around the same time, CoDx and its executives made the decision not to offer mid-quarter revenue guidance. Dkt. 120 ¶¶ 230, 233; Dkt. 121 ¶¶ 56–57. Egan and Brown justified this decision in a press release and on an earnings call on May 12, 2022 with three statements that Stadium now challenges:

| Setting | Statement |
| --- | --- |
| CoDx Press Release | **Egan**: "While we remain very confident about the long-term potential of our business, our ability to accurately forecast Logix Smart™ COVID-19 Test sales through the balance of the year has diminished due to |

| | |
|---|---|
| | decreased mask mandates in the United States, continued emergence and spread of new variants, and persistently low vaccination rates in many parts of the world. As a result, it has become difficult to predict with any level of precision the cumulative impact of these and other factors on our future financial results. For these reasons, we are not providing quarterly guidance at this time and will reassess this position in the future[.]" Dkt. 120 ¶ 230; Dkt. 121 ¶ 56. |
| Earnings Call | **Brown**: "The dedication from our team to deliver solid performance remains on full display. Our record performance during the first quarter would not have been possible without their many contributions. As we look to the balance of fiscal 2022, we remain encouraged by the demand for our products and the operational and scientific teams we have established to support our future growth.<br><br>Turning now to our visibility around the outlook for the balance of the year. While we experienced strong demand for our products during the first quarter of 2022, changes in our operating environment and markets have restricted our near-term visibility. We will continue to navigate the near-term environment with caution, but as a result, we'll not be providing quarterly guidance at this time.<br><br>To be clear, we remain very confident about the long-term potential of our business and the demand for our products. Our ability to accurately forecast Logix Smart COVID-19 test sales through the balance of the year has diminished due to decreased mask mandates in the United States, continued emergence and spread of new variants and persistently low vaccination rates in many parts of the world.<br><br>Furthermore, we are experiencing sizable fluctuations in order patterns from our customers that are not cleanly captured in a particular quarter as testing requirements continue to vary across the many geographic regions we serve. As a result, it has become difficult to predict with an expected level of precision the cumulative impact of these and other factors on our future financial results." Dkt. 121 ¶ 57. |
| Earnings Call | **Analyst**: "So with the Logix Smart detection test, are you already seeing a decline in customer orders? Or are you refraining from providing a guidance mainly because it's |

| | tough to like predict the environment moving forward?" |
| --- | --- |
| | **Brown**: "It's more about the timing and being able to forecast the timing of orders is the bigger issue. It's not necessarily a demand issue that we're seeing. It's more of just timing of being able to accurately forecast what's coming in. And the last thing we want to do is provide guidance that we're not confident in. And so that's one thing you'll know going forward is if we're not confident in providing guidance, then we won't provide guidance." Dkt. 120 ¶ 234; Dkt. 121 ¶ 58. |

Three months later, on August 11, CoDx disclosed a steep decline in revenue. Dkt. 120 ¶¶ 266, 270. For the second quarter of 2022, CoDx reported revenue of just $5 million—an almost 82% decline compared to the prior year period. Dkt. 120 ¶ 270; Dkt. 121 ¶ 59. The next day, CoDx's common stock price fell by 30.65% to $4.48 per share. Dkt 120 ¶ 281; Dkt. 121 ¶ 61.

**\*2** Stadium sued defendants shortly after those reduced earnings were reported, focusing its securities-fraud claims on the three allegedly false or misleading statements above. Stadium alleges that defendants misled investors by reassuring them that demand for the Logix Test remained strong and by suspending their quarterly revenue guidance, citing an inability to accurately forecast sales when in reality defendants tracked demand daily and were already aware sales had plummeted. Dkt. 31 For their part, defendants argue that because the COVID-19 testing market was so volatile, "there was *not* a cognizable downward trend in demand for the Logix test," meaning defendants did not make any false or misleading statements or omissions. Dkt. 107 at 1. Both Stadium and defendants now move for summary judgment.

### LEGAL STANDARDS

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if a reasonable jury could find for the non-moving party, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and a fact is "material" if it could "affect the outcome." *Id.* The Court views the record "in the light most favorable to the non-movant." *Williams v. MTA Bus Co.*, 44 F.4th 115, 126 (2d Cir. 2022) (cleaned up). If the movant

bears the burden of proof, as Stadium does here on its motion, then the movant's evidence "must be substantial" and "must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Donoghue v. Oaktree Specialty Lending Corp.*, 2024 WL 3455292, at *8 (S.D.N.Y. June 20, 2024) (quoting *Leone v. Owsley*, 810 F.3d 1149, 1153 (10th Cir. 2015)). When deciding cross-motions, the Court "evaluate[s] each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Williams*, 44 F.4th at 125 (alteration in original) (quoting *Byrne v. Rutledge*, 623 F.3d 46, 53 (2d Cir. 2010)).

Under Federal Rule of Evidence 702 and *Daubert*, the proponent of expert testimony must show that the "witness ... is qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. The proponent must also demonstrate that it is more likely than not that the expert's testimony "will help the trier of fact to understand the evidence or to determine a fact in issue," "is based on sufficient facts or data," "is the product of reliable principles and methods," and "reflects a reliable application of the principles and methods to the facts of the case." *Id.*; *see also In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 539 (S.D.N.Y. 2004) ("[Rule 702] incorporates principles established in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, in which the Supreme Court charged trial courts with a gatekeeping role to 'ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.' " (footnote omitted) (quoting *Daubert*, 509 U.S. at 589, 113 S.Ct. 2786)).

### DISCUSSION

### I. The Court grants summary judgment to Stadium on falsity and materiality but otherwise denies both sides' motions.

SEC Rule 10b-5(b) prohibits the "mak[ing of] any untrue statement of a material fact" in connection with the purchase or sale of a security. 17 C.F.R. § 240.10b-5(b). To prevail on a Rule 10b-5(b) private action, "a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157, 128 S.Ct. 761, 169 L.Ed.2d 627 (2008). Here, Stadium moves for summary judgment on falsity, materiality, and scienter. Meanwhile, defendants move for summary judgment on those same elements, together with reliance and loss causation.

### A. The Court grants summary judgment to Stadium on falsity.

**\*3** Under § 10(b) and Rule 10b-5(b), "it is unlawful to (1) make any untrue statement of a material fact, or (2) omit to state a material fact necessary in order to make the statements made not misleading." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239 (2d Cir. 2016) (cleaned up); 15 U.S.C. § 78j(b). In gauging whether a statement is untrue, the central issue is not whether "particular statements, taken separately, were literally true, but whether defendants' representations, taken together and in context, would have mislead a reasonable investor." *McMahan & Co. v. Wherehouse Ent., Inc.*, 900 F.2d 576, 579 (2d Cir. 1990).

Stadium argues that "[t]he undisputed evidence shows that the alleged misrepresentations were false and misleading when made." Dkt. 113 at 15. It argues that CoDx and its executives "gave investors a pretextual excuse for their decision to stop providing [quarterly projected revenue] guidance, when in reality, they were simply trying to delay delivering the bad news." *Id.* Stadium cites to quarterly sales data to claim CoDx and its executives knew that second-quarter-of-2022 demand for the Logix Test was "meagre." *Id.*; *see also* Dkt. 121 ¶¶ 11–12, 14–16. It then points to an email between CoDx executives and their investor relations consultant, in which the consultant advised that "keep[ing] quarterly guidance but lower[ing] your estimates" would "have a negative impact on the share price." Dkt. 114-12 at 2. He predicted that "pull[ing]

guidance completely, citing uncertainty in the market causing the company to not accurately predict results ... could be viewed as more positive than guiding to a figure and coming up very short." *Id.* Defendants eventually gave this rationale to investors for suspending quarterly projections. Dkt. 114-21 at 7. Stadium also points to testimony from CoDx executives that the "theme" they were emphasizing was that "COVID was not going away." Dkt. 121 ¶ 51. Stadium argues that saying all this "but omitting the negative elephant in the room"—the steep quarter-to-date decline in Logix Test sales—rendered the three challenged statements false or misleading. Dkt. 133 at 16 (quoting Dkt. 42 at 6).

Defendants disagree for two reasons. First, they argue that "the undisputed, material facts establish the statements were true" because of the volatility of the COVID-19 testing market and the difficulty in providing precise revenue projections. Dkt. 107 at 9–10. Defendants rely on the expert testimony of Dr. Thomas Tsai, who reported significant uncertainty at the time regarding near-term demand for COVID-19 testing. Dkt. 106-1 ¶ 14. Defendants then refer to testimony and emails from CoDx executives stating that these uncertain market conditions made it impossible to accurately predict sales at the time and led them to suspend quarterly revenue projections. Dkt. 108 ¶¶ 155–56, 194, 221, 236–40. Defendants further point to testimony from CoDx executives stating that, despite this uncertainty, they remained confident about long-term demand and earning potential. Dkt. 108 ¶¶ 30, 192, 252. Second, defendants argue that omitting quarter-to-date sales data did not render any statements misleading and that they had no regular practice of disclosing it. Dkt. 107 at 13–15. They rely on the testimony of company executives that intra-quarter sales numbers were often volatile (especially during this period) as well as some of the underlying sales numbers to help prove it. Dkt. 108 ¶¶ 123–28, 130–32, 136, 138–39. They also rely on the testimony of their executives that no one saw the early 2022 decline in Logix Test sales as concerning, and that it didn't factor into the press-release and earnings-call preparation. *Id.* ¶¶ 144–45, 177, 179, 182, 185, 188.

**\*4** The Court is unconvinced by defendants' arguments, because they sidestep the key point: CoDx experienced a steep decline in demand for its flagship product but withheld that information from investors. When asked on the earnings call about whether CoDx was "already seeing a decline in customer orders," Brown responded "[i]t's not necessarily a demand issue that we're seeing." Dkt. 108 ¶ 234; Dkt. 115 ¶ 58. But of course, CoDx *was* already seeing a decline in

customer orders relative to historical trends. Dkt. 115 ¶¶ 11, 14. This omission of negative information about declining Logix Test demand renders CoDx, Egan, and Brown's statements about uncertain demand misleading. *See In re BankAtlantic Bancorp, Inc. Sec. Litig.*, 2010 WL 6397500, at *6, 29 (S.D. Fla. Aug. 18, 2010) (defendant's positive statements to investors misleading when there were internal emails stating that "the music has stopped" and expressing "significant concern" about the investments). Egan and Brown painted a rosy picture of long-term fiscal health, while attributing the decision to halt future quarter guidance to anything *but* CoDx's undisputed decline in quarter-to-date sales. These are textbook misleading statements. *See Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014) ("once a company speaks on an issue or topic, there is a duty to tell the whole truth"). Any rational juror would find that "taken together and in context, [the challenged statements] would have misled a reasonable investor[.]" *McMahan*, 900 F.2d at 579.

### B. The Court grants summary judgment to Stadium on materiality.

"For an undisclosed fact to be material, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 170 (2d Cir. 2021) (citations omitted). "[M]aterial facts include ... facts which affect the probable future of the company and those which may affect the desire of investors to buy, sell, or hold the company's securities." *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 849 (2d Cir. 1968). "Only if the established omissions are so obviously important to an investor, that reasonable minds cannot differ on the question of materiality[,] is the ultimate issue of materiality appropriately resolved as a matter of law by summary judgment." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976) (internal quotations omitted).

Stadium claims the omission of CoDx's quarter-to-date decline in sales was material to investors. Dkt. 113 at 17–18. Stadium points out that before, during, and after the class period, the Logix Test was CoDx's sole material source of revenue. Dkt. 121 ¶ 1. Relying on CoDx's financials, it then points to the 82% decline in CoDx's revenues in the second quarter of 2022, which Egan attributed to lower demand

for the Logix Test, among other factors. *Id.* ¶ 59. It also highlights the over 30% single-day decline in CoDx's stock price following the disclosure of the decline in sales. *Id.* ¶¶ 59, 61–62. Thus, Stadium argues that "[g]iven the extent to which sales of the Logix Test had declined, there is no genuine dispute as to materiality." Dkt. 113 at 17.

Defendants claim that any omission was immaterial because "the market was already aware of the volatile, cyclical nature of COVID-test sales" and "the market understood from these statements, in context, the same thing that disclosing lower quarter-to-date sales would have communicated." Dkt. 107 at 15–16. To support these claims, defendants rely on Tsai's expert report on volatility in the COVID-19 testing market. Dkt. 108 ¶¶ 43–103. Also, they argue that analyst and news commentary described defendants' statements (and suspension of revenue guidance) as an "indication of a likely decline in future revenue and earnings related to COVID-19 products." *Id.* ¶¶ 256–57, 263–64. Thus, defendants claim that even if they disclosed quarter-to-date sales on May 12, that would not have changed an investor's total mix of information. Dkt. 107 at 16.

The court again is unconvinced. First, the magnitude of CoDx's decline in quarter-to-date sales makes clear that the information was plainly material to any reasonable investor. Of course, "bright-line numerical tests for materiality are inappropriate," *ECA, Loc. 134 v. JP Morgan Chase Co.*, 553 F.3d 187, 204 (2d Cir. 2009), but as a general matter a deviation of greater than 5% of a financial figure is "a good starting place" for assessing materiality. *Id.* (citing SAB No. 99, 64 Fed. Reg. at 45,151). Here, sales to date were about 50% lower than the *lowest* number defendants had previously reported as guidance. Dkt. 121 ¶¶ 11, 14. As defendants note, these numbers could be noisy—but that is far more signal than noise. After all, defendants previously relied on these numbers to give forward-looking guidance. And to that end, this lower number signaled what was to come: an 82% decrease in sales for the company's marquee product by the end of the quarter. *Id.* ¶ 59. Qualitative inquiry backs that up. "Among useful qualitative factors [are] ... whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability, and whether management expects that the misstatement will result in a significant market reaction." *Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 485 (2d Cir. 2011) (citations and quotation marks omitted). The Logix Test was the sole material source of revenue for CoDx—it's hard to play a more

significant role than that. Dkt. 121 ¶ 1. And management certainly was in on discussions indicating the importance of the guidance: the consultant they had hired sent Brown (the CFO of CoDx) an email in early May as he "prepare[d] to discuss guidance with the Board," sharing the view that "keep[ing] quarterly guidance but lower[ing] your estimates" would "have a negative impact on the share price." Dkt. 114-2 at 2.

**\*5** Relatedly, the Court views investor reactions to defendants' eventual disclosure of the declining sales as clear indicia of the information's materiality. *See, e.g., Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 550 (S.D.N.Y. 2017) ("comScore's significant stock drop further supports an inference of materiality"); *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 380 (S.D.N.Y. 2015) (holding that the dramatic decline in Petrobras' share price following the disclosure of a corruption scheme was indicia the information was material). On August 12, 2022, the first day of trading after CoDx reported its steep decline in Logix Test sales and overall revenue, CoDx's stock price declined by over 30%, which indicates the information was "obviously important," and thus material. *TSC*, 426 U.S. at 450, 96 S.Ct. 2126. Any rational juror would view the steep decline in demand for the product that was CoDx's sole material source of revenue as a fact that would have "significantly altered the total mix of information made available" to an investor. *In re Synchrony*, 988 F.3d at 170.

### C. The Court denies Stadium summary judgment on scienter.

Scienter is defined as "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 318, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)). Plaintiffs have two options to prove scienter. *In re Mylan N.V. Sec. Litig.*, 666 F. Supp. 3d 266, 294 (S.D.N.Y. 2023) (citing *Kalnit v. Eichler*, 264 F.3d 131, 137–38 (2d Cir. 2001)). "First, the plaintiff may choose to adduce specific facts demonstrating that the 'defendants had both a motive and opportunity to commit fraud.' Alternatively, the plaintiff can produce 'facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.' " *Id.* (quoting *Kalnit*, 264 F.3d at 138).

Recklessness in the securities fraud context is "conscious recklessness—*i.e.*, a state of mind approximating actual intent, and not merely a heightened form of negligence." *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (emphasis omitted). Recklessness can be shown based on "defendants' knowledge of facts or access to information contradicting their public statements." *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000). And the scienter of a company's officers and directors may be imputed to the company. *In re Axsome Therapeutics, Inc. Sec. Litig.*, 2025 WL 965265, at \*9 (S.D.N.Y. Mar. 31, 2025) (holding that scienter of CEO and COO are "imputed to the Company" (citing *Jackson v. Abernathy*, 960 F.3d 94, 98–99 (2d Cir. 2020))). Given the complex inquiry on intent required for scienter determinations, "the Second Circuit has left no doubt that scienter issues are seldom appropriate for resolution at the summary judgment stage." *SEC v. Cole*, 2015 WL 5737275, at \*5 (S.D.N.Y. Sept. 19, 2015).

Stadium says defendants were reckless. It points to evidence that Egan and Brown had access to real-time daily Logix Test sales data, Dkt. 115 ¶¶ 7–8, 21, 24, and that Brown used this data to calculate quarterly revenue guidance, which he would generally discuss with Egan, *id.* ¶¶ 24–30. Stadium says these facts indicate that Egan and Brown knew—or at the very least were reckless in failing to know—about the steep decline in Logix Test demand by May 12. Stadium then argues that defendants' rationale for suspending revenue guidance was a pretext to avoid disclosing this rapid decline. It points to correspondence between Brown, Egan, and their investor-relations consultant workshopping their press release and earnings script and the decision to suspend revenue guidance. *Id.* ¶¶ 39–46.

Defendants disagree. They deny that Egan regularly looked at the real-time numbers, Dkt. 121 ¶ 21, deny that Brown often looked at this measure either, *id.* ¶ 24, and argue that Egan and Brown acted in good faith and did not intend to mislead investors. Dkt. 107 at 17. They point to the testimony of Egan and Brown expressing their good-faith belief in long-term demand for the Logix Test and the difficulty they had parsing volatile sales data. Dkt. 108 ¶¶ 139–40, 165, 189–92, 215, 221, 234, 252, 278. They then point to corroborating testimony from CoDx executive Andrew Benson. Dkt. 108 ¶¶ 141, 194–96, 220, 239–42. On defendants' view, the decision not to share mid-quarter guidance had nothing to do with an intent to mislead investors and instead has a simpler explanation: They didn't feel confident making a prediction in a volatile situation.

**\*6** A rational jury may very well agree with Stadium that given Egan and Brown's actual knowledge of—or, at the very least, access to the data showing—the decline in Logix Test sales, they intended to deceive investors by omitting that information. But while it's a close call, the facts don't compel a ruling in Stadium's favor at this juncture. *See S. Cherry St., LLC,* 573 F.3d at 109 (defining scienter proved by recklessness as "not merely a heightened form of negligence" (emphasis omitted)); *In re Mylan,* 666 F. Supp. 3d at 295 (holding that scienter requires "[n]ot just any failure to see the obvious ... [but rather] an egregious refusal to see the obvious" (quotations omitted)).

In many of the cases Stadium references where scienter was established on summary judgment, the facts showed that the defendants admitted to or were clearly aware of their reckless behavior. *SEC v. Honig,* 2023 WL 6386918, at \*30 (S.D.N.Y. Sept. 29, 2023) (defendant admitted statement was inaccurate); *SEC v. Gallison,* 588 F. Supp. 3d 509, 524 (S.D.N.Y. 2022) (defendant's actions directly contradicted statement at issue); *SEC v. Frohling,* 851 F.3d 132, 137 (2d Cir. 2016) (defendant admitted he knew facts that made his statements false). Those kinds of admissions are absent here, and defendants offer *some* explanation for Egan and Brown not mentioning the decline in quarter-to-date sales—that they thought the decline they were seeing wasn't indicative of anything other than volatility in the market, which they did mention. While that explanation doesn't hold water for either falsity or materiality, if the jury finds that CoDx, Egan, and Brown genuinely *thought* it was true, it could find they lacked scienter.

For these reasons, neither side is entitled to summary judgment on this element.

### D. The Court denies summary judgment to defendants on reliance.

An essential element of a plaintiff's § 10(b) and Rule 10b-5(b) claim is "reliance upon the misrepresentation or omission" made by the defendant. *Stoneridge,* 552 U.S. at 157, 128 S.Ct. 761. However, proving direct reliance "place[s] an unnecessarily unrealistic evidentiary burden on [a] plaintiff who has traded on an impersonal market." *Basic Inc. v. Levinson,* 485 U.S. 224, 245, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). Thus, the Supreme Court has endorsed the "fraud-on-the-market" theory, which "recogniz[es] a

rebuttable presumption of classwide reliance on public, material misrepresentations when shares are traded in an efficient market." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds,* 568 U.S. 455, 463, 133 S.Ct. 1184, 185 L.Ed.2d 308 (2013). "Any showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance." *Basic,* 485 U.S. at 248, 108 S.Ct. 978. "The district court's task is simply to assess all the evidence of price impact—direct and indirect—and determine whether it is more likely than not that the alleged misrepresentations had a price impact." *Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys. (ATRS),* 594 U.S. 113, 126–27, 141 S.Ct. 1951, 210 L.Ed.2d 347 (2021).

Defendants aim to rebut the presumption of classwide reliance, making two arguments. First, they claim that the "front-end" price increase on May 13 that kept CoDx's stock high was because of the positive *first-quarter* results announced with the challenged statements, not any omissions in the challenged statements concerning *second quarter* sales. Dkt. 107 at 20. They rely on the expert report of Dr. Vinita Juneja and on the fact that financial analysts covering CoDx didn't raise their price targets after the May 13 releases concerning sales in the second quarter, but instead *lowered* them (suggesting that the market priced in that this was bad news simply from the lack of guidance). Dkt. 108 ¶¶ 256–65. Second, defendants argue that the "back-end" price drop following the disclosure of declining Logix Test sales on August 11 can't be used as indirect evidence of a "front-end" price impact, given the mismatch between the generic statements made on May 12 and the specific disclosure on August 11. Dkt. 107 at 21. Again, defendants rely on Juneja's expert report. Dkt. 108 ¶¶ 269, 289. Putting all that together, defendants argue that CoDx's stock rose after the earnings call for reasons unrelated to the lack of sales guidance for the second quarter, that the lack of guidance was priced in, and then that the final revelation of the sales numbers was just too mismatched with the alleged omission to support any inference that the alleged omissions inflated the stock's price. Dkt. 107 at 22.

**\*7** While defendants' argument might hold sway with the jury, it's not enough for summary judgment. Defendants "bear[ ] the burden of persuasion to prove a lack of price impact by a preponderance of the evidence." *Goldman,* 594 U.S. at 121, 126, 141 S.Ct. 1951. They haven't established that as a matter of law, viewing the evidence in the light most favorable to Stadium. First, it isn't relevant that CoDx's stock

price may have risen because of other positive news on the earnings call. Stadium is arguing that there was a material *omission*—in other words, the statements on the earnings call maintained the inflation that was already in the stock price. *See In re Vivendi,* 838 F.3d at 257–58. And "statements that merely maintain inflation already extant in a company's stock price, but do not add to that inflation, nonetheless affect a company's stock price." *Waggoner v. Barclays PLC,* 875 F.3d 79, 104 (2d Cir. 2017). Next, defendants fail to show as a matter of law that the market properly priced in the bad news after the earnings call. As support, they cite analyst reports that mentioned the lack of guidance and didn't raise their price targets. Dkt. 108 ¶¶ 256–57. But, again, Stadium's theory of the case (consistent with the caselaw) is that the price *would* have dropped (or at least not risen as much) if defendants had made a full disclosure.

That leaves defendants' argument that the back-end disclosure is mismatched with the omission, confounding any inference from the price drop. This argument relies on the Supreme Court's decision in *Goldman.* 594 U.S. 113, 141 S.Ct. 1951. There, the Court examined generic statements (risk factors in SEC filings) paired with a specific disclosure that came afterward and allegedly rendered those statements false or misleading. *Id.* at 116, 141 S.Ct. 1951. The Court cautioned that "when the earlier misrepresentation is generic (*e.g.,* 'we have faith in our business model') and the later corrective disclosure is specific (*e.g.,* 'our fourth quarter earnings did not meet expectations')," then "it is less likely that the specific disclosure actually corrected the generic misrepresentation, which means that there is less reason to infer front-end price inflation—that is, price impact—from the back-end price drop." *Id.* at 123, 141 S.Ct. 1951. This Court embraces that principle, but it has nothing to do with this case. Here, the statements downplaying the bad mid-quarter demand for the test were narrow (not broad); and the disclosure of the poor sales of that very same product was directly related to them. Defendants' argument to the contrary (that all that was said on the call was a generic negative signal about future earnings) is wishful thinking. On May 12 Egan said: "It's not necessarily a demand issue we're seeing." Dkt. 120 ¶ 234. Then on August 11 he said: "lower volumes for our ... test drove a year-over-year decline in revenue." Dkt. 103-17 at 4. In short, this looks nothing like the generic risk factors described in *Goldman.* 594 U.S. at 120, 141 S.Ct. 1951 (including "[o]ur clients' interests always come first," and "[i]ntegrity and honesty are at the heart of our business").

At trial, defendants may well persuade a jury that Stadium's claim of market reliance is bogus. But at this stage, they haven't met their burden of showing that as a matter of law Stadium's story of reliance is wrong. That story goes: (1) the stock price was propped up when defendants downplayed a lack of demand they were seeing for CoDx's product, then (2) the stock price later dropped when sales turned out to be low for the quarter.

### E. The Court denies summary judgment to defendants on loss causation.

"Loss causation is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Lentell v. Merrill Lynch & Co.,* 396 F.3d 161, 172 (2d Cir. 2005) (internal quotations omitted); *see also* 15 U.S.C. § 78u-4(b)(4). A plaintiff can demonstrate loss causation by producing evidence supporting a "corrective disclosure." *In re Omnicom Grp., Inc. Sec. Litig.,* 597 F.3d 501, 511, 513 (2d Cir. 2010) ("*Omnicom II*"); *In re Mylan,* 666 F. Supp. 3d. at 288. A disclosure is corrective if it reveals new information to the market that indicates the falsity of a challenged statement. *In re Omnicom Grp., Inc. Sec. Litig.,* 541 F. Supp. 2d 546, 551–52 (S.D.N.Y. 2008) ("*Omnicom I*"). Nevertheless, a plaintiff "must disaggregate at least some portion of the declines in share prices from losses resulting from other, non-fraud-related events." *In re Moody's Corp. Sec. Litig.,* 2013 WL 4516788, at *12 (S.D.N.Y. Aug. 23, 2013). "In their attempt to disaggregate competing causal events from economic loss, plaintiffs may utilize event studies conducted by experts." *Id.* (citing *In re Vivendi,* 634 F. Supp. 2d 352, 364 (S.D.N.Y. 2009) ("It is an expert that produces the almost obligatory 'event study' that begins by isolating stock declines associated with market-wide and industry-wide downturns from those specific to the company.")). "[S]ummary judgment is appropriate if [a plaintiff] cannot show that at least some of the price drop was due to the fraud." *Omnicom II,* 597 F.3d at 510 n.3 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

**\*8** Defendants claim that CoDx's August 11 second-quarter earnings release didn't "correct" any prior omissions or misstatements because it announced new developments: disappointing full-quarter results and continued uncertainties and delays. Dkt. 107 at 24–25. They then argue that even if the August 11 earnings release was a corrective disclosure, Stadium still didn't properly disaggregate losses.

*Id.* Defendants aim to exclude Coffman's expert testimony on this basis (addressed further below), but they argue that even if such testimony were admitted, it does not give rise to a genuine issue of material fact. *Id.*

The Court disagrees. First, defendants fail to show that there's no genuine dispute of material fact about whether the August 11 statements were corrective. Stadium's case centers on allegedly false or misleading statements on May 12 downplaying a decline in demand for the Logix Test. Stadium points to statements made by Egan during the August 11 earnings call attributing CoDx's steep decline in revenue to a decline in demand for the Logix Test, in his words a "falloff." Dkt. 121 ¶¶ 59–60. This was new, relevant information to investors on the same subject matter of the alleged fraud that negatively impacted CoDx's stock price. A jury could reasonably rely on that information to conclude that the alleged fraud caused the loss.

Second, there's a genuine dispute of material fact about whether part of the stock drop was caused by the correction of the misstatement. The Court disagrees that the record is clear that Stadium inadequately "disaggregate[d] at least some portion of the declines in share prices from losses resulting from other, non-fraud-related events." *In re Moody's*, 2013 WL 4516788, at *12. Stadium's expert conducted an event study that purports to isolate how much of the price decline was attributable to news about sales and demand for the Logix Test. Dkt. 103-34. The event study included controls "for market and industry effects" and reached the statistically significant result of a 32.21% decline in the value of the common stock attributable to the news about declining demand. *Id.* ¶ 75. Defendants' expert, Juneja, claims there was confounding news warranting further disaggregation of losses—for example, that demand would *continue* to stay low. Dkt. 106-3 ¶¶ 24–27. And Coffman replies that Juneja didn't conduct any of her own analysis to prove that this other information drove the drop instead and that he sees it as part and parcel with the same corrective disclosure. Dkts. 103-35 ¶ 7; 103-34 ¶ 76. The conflicting opinions of these experts illustrates the presence of a genuine dispute as to a material fact. It is "up to the jury to determine how much, if any, of the artificial inflation identified by [plaintiff's expert] was caused by [defendants'] alleged fraud[.]" *In re Vivendi*, 838 F.3d at 255–56.

## II. The Court denies defendants' motion to exclude Coffman's expert testimony.

Defendants move to exclude Coffman's testimony because he allegedly fails to analyze and account for confounding factors essential to determining loss causation. Dkt. 110 at 1. Generally, a court must determine if a proponent for an expert witness shows: (1) that the "witness ... is qualified as an expert by knowledge, skill, experience, training, or education," (2) that the expert's "testimony is based on sufficient facts or data," (3) that the expert's "testimony is the product of reliable principles and methods," and (4) that "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702; *see also In re Rezulin*, 309 F. Supp. 2d at 539. In this case, defendants challenge the reliability of Coffman's opinion as it relates to loss causation, inflation, and damages.

**\*9** For experts on loss causation "[t]o establish a causal link between stock price movement and misrepresentations or corrective disclosures, an economist must control for confounding factors, i.e., other industry- or company-specific information released to the market unrelated to the alleged fraud." *Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse First Bos.*, 853 F. Supp. 2d 181, 190 (D. Mass. 2012), *aff'd sub nom.* 752 F.3d 82 (1st Cir. 2014) (citing *Omnicom I*, 541 F. Supp. 2d at 554). "Before a conclusion on causation can be reliably drawn, the expert must make some reasonable attempt to eliminate some of the most obvious causes." *U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Loc. Union No. 3, AFL-CIO*, 313 F. Supp. 2d 213, 238 (S.D.N.Y. 2004). "It is not required, however, that an expert categorically exclude each and every possible alternative cause in order to render the proffered testimony admissible." *Astra Aktiebolag v. Andrx Pharms., Inc.*, 222 F. Supp. 2d 423, 488 (S.D.N.Y. 2002), *aff'd sub nom. In re Omeprazole Pat. Litig.*, 84 F. App'x 76 (Fed. Cir. 2003).

Defendants argue that Coffman's expert opinion is inadmissible because it fails to account for the "axiomatic" requirement of "adequately accounting for obvious alternative explanations." Fed R. Evid. 702 advisory committee's note to 2000 amendments; Dkt. 110 at 1. They then argue that expert testimony on loss causation requires an accounting of confounding factors that Coffman did not provide. Dkt. 110 at 7–16. They point to three confounding issues that Coffman allegedly failed to disaggregate in his testimony on loss causation: (1) the financial results for the second half of the second quarter of 2022, (2) forward-looking statements about uncertain future sales and demand, and (3) the announcement of delays for the initial clinical trial of an at-home, point-of-care PCR test. Dkt. 110 at 7–16.

Stadium responds that none of that information is "confounding" because, as Coffman said at his deposition, it isn't "negative value relevant information that would have substantially contributed to the stock price decline." Dkt. 111-3 at 73:23–25; Dkt. 119 at 1. First, Stadium says the financial results for the second half of the second quarter of 2022 are "part of the corrective information," so they aren't "confounding." Dkt. 119 at 1. In other words, those continued poor results are what the market would've priced in, had defendants not misled investors in the May 12 statements. Next, Stadium says the statements about demand uncertainty "could not possibly cause a stock price reaction" because they "so closely mirror the alleged misrepresentations," *id.* at 2, and so the market had "already digested that information and incorporated it into the price," *In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 659 (2d Cir. 2016). And it asserts that an analyst's response shows that the market didn't view the announcement regarding the continued delay of the PCR test clinical trial as material negative news. Dkt. 119 at 2.

Zooming out, Coffman's testimony is reliable and thus admissible. First, he used the common and accepted method of an event study, which determined that the corrective disclosure caused a "statistically significant negative price movement in [CoDx's] Common Stock beyond the 95% confidence level (as well as beyond the 99% confidence level)." Dkt. 103-34 ¶ 56. That was after "controlling for market and industry factors," as required. *Id.* Second, Coffman stated in his report that he "also considered and analyzed the degree to which information arguably unrelated to the corrective information (*i.e.*, confounding information) potentially impacted the stock price over the two-day trading period." Dkt. 103-34 ¶ 76. He noted that he "did not identify any confounding information." *Id.* Indeed, the most obvious cause of the over-30% price drop was the news about substantially decreased Logix Test sales and what that fact implied about future sales, not information about those low sales remaining stable for the second half of the quarter, another announcement about continued uncertainty surrounding future demand, or another announcement that the at-home PCR test wasn't quite ready yet. Coffman testified

at his deposition that the "confounding" information was either already baked into the market (or would have been if defendants had told the truth on their May call), or it was immaterial. So there wouldn't be any material "confounding" information to consider. Coffman's theory and methods are plainly reliable enough to reach a jury. *See Ambrosini v. Labarraque*, 101 F.3d 129, 141 (D.C. Cir. 1996) (possibility of some un-eliminated causes presents question of weight, so long as most obvious causes have been considered and reasonably ruled out by expert).

**\*10** To be sure, defendants can try to rebut Coffman's testimony or otherwise mitigate potential damages by showing that their "confounding" information contributed materially to the price drop. But the Court determines that Coffman's testimony "can be helpful to the jury" as it evaluates those arguments. *In re Pfizer Inc. Sec. Litig.*, 819 F.3d at 660–61. Because Coffman's opinion was "the product of reliable principles and methods" and "reliably applied the principles and methods to the facts of the case," it is admissible. Fed. R. Evid. 702; *see also In re Rezulin*, 309 F. Supp. 2d at 539.

## CONCLUSION

For the reasons stated above, Stadium's motion for partial summary judgment, Dkt. 112, is GRANTED in part and DENIED in part, its motion to exclude portions of Tsai and Juneja's testimony, Dkt. 104, is DENIED without prejudice,[2] and defendants' motions for summary judgment, Dkt. 101, and to preclude Coffman's testimony, Dkt. 109, are DENIED.

The Clerk is directed to terminate the motions at Dkts. 101, 104, 109, and 112.

SO ORDERED.

**All Citations**

--- F.Supp.3d ----, 2026 WL 100576

---

**Footnotes**

1    The certified class includes "[a]ll persons and entities who purchased the publicly traded securities of CoDx during the period May 12, 2022, through the close of the market on August 11, 2022 (4:00 p.m. ET), inclusive (the "Class Period"), and were damaged thereby." Dkt. 59 ¶ 2 (footnote omitted). It excludes defendants, their immediate family members, and certain affiliates. *Id.*

2    The Court has ruled in Stadium's favor on every issue here besides scienter, and the Court does not rely on Tsai or Juneja's testimony on that element. So Tsai and Juneja's testimony doesn't adversely impact Stadium in any way on the cross-motions for summary judgment. In its motions *in limine*, Stadium may reassert any portion of its *Daubert* motion that it thinks remains live.

---

**End of Document**    © 2026 Thomson Reuters. No claim to original U.S. Government Works.